EXHIBIT  3

fls. 142

**Execution Version**

Dated 2 September, 2017

entered by and among

J&F INVESTIMENTOS S.A.,

ZMF PARTICIPAÇÕES LTDA.,

FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES OLÍMPIA,

CA INVESTMENT (BRAZIL) S.A.,

and, as intervening-consenting parties,

PAPER EXCELLENCE B.V.

and

FB PARTICIPAÇÕES S.A.

SHARE PURCHASE AGREEMENT



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

1

fls. 143

Execution Version

## Table of Contents

1   Definitions and Interpretation ................................................................................................ 4

2   Due Diligence ..................................................................................................................... 22

3   Sale and Purchase of Purchased Shares .......................................................................... 22

4   Initial Sale and Purchase of Shares ................................................................................... 23

5   Second Sale and Purchase of Shares ............................................................................... 36

6   Signing Acts and Post-Signing Acts .................................................................................. 44

7   Conduct of Business .......................................................................................................... 45

8   Representations and Warranties of the Sellers .................................................................. 47

9   Representations and Warranties regarding the Company .................................................. 52

10  Representations and Warranties of the Purchaser and of the Purchaser Parent Company 67

11  Other Covenants ................................................................................................................ 68

12  Indemnification ................................................................................................................... 71

13  Fiduciary Assignment of Shares ........................................................................................ 78

14  Antitrust Approvals ............................................................................................................. 78

15  Seller Guarantees Release ................................................................................................ 79

16  Non-Compete/Non-Solicitation/Non-Hire .......................................................................... 80

17  Confidentiality .................................................................................................................... 81

18  Specific Performance ......................................................................................................... 82

19  Termination ........................................................................................................................ 82

20  Second Shareholders' Agreement and FIC FIP Quotaholders' Agreement ...................... 84

21  Governing Law and Dispute Resolution ............................................................................. 84

22  Miscellaneous .................................................................................................................... 85

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justica do Estado de Sao Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

## SHARE PURCHASE AGREEMENT

This Share Purchase Agreement ("**Agreement**") is entered into on 2 September, 2017 by and among the following parties:

(1) **J&F INVESTIMENTOS S.A.**, a corporation with head offices in the City of São Paulo, State of São Paulo, at Avenida Marginal Direita do Tietê, No. 500, Vila Jaguara, CEP 05118-100, enrolled with CNPJ/MF under No. 00.350.763/0001-62, herein duly represented according to its by-laws ("**J&F**");

(2) **ZMF PARTICIPAÇÕES LTDA.**, a limited liability company, with head offices in the City of São Paulo, State of São Paulo, at Avenida Marginal Direita do Tietê, No. 500, Vila Jaguara, CEP 05118-100, enrolled with CNPJ/MF under No. 08.706.916/0001-73, herein duly represented according to its by-laws ("**ZMF**" and, jointly with J&F, "**J&F Sellers**");

(3) **FUNDO DE INVESTIMENTO EM PARTICIPAÇÕES OLÍMPIA**, a private equity investment fund, enrolled with the CNPJ/MF under No. 14.586.233/0001-22, managed by BRL Trust Investimentos Ltda., with head offices at Rua Iguatemi, No. 151, in the City of São Paulo, State of São Paulo, enrolled with the CNPJ/MF under No. 23.025.053/0001-62, herein duly represented under the terms of its corporate documents ("**FIP Olimpia**" and, jointly with J&F Sellers, "**Sellers**"); and

on the other side,

(4) **CA INVESTMENT (BRAZIL) S.A.**, a corporation with head offices at Alameda Santos, 1.293, 6th floor, Cj. 63, CEP 01419-904, enrolled with CNPJ/MF under No. 28.132.263/0001-73, herein duly represented according to its by-laws ("**Purchaser**"),

(Sellers and Purchaser are referred to herein, collectively, as the "**Parties**" and, individually, as a "**Party**"),

and as intervening and consenting parties,

(5) **PAPER EXCELLENCE B.V.**, a corporation organized and validly existing under the laws of Netherlands, with head offices at De Cuserstraat 91, 1081CN, Amsterdam, registered with CNPJ/MF under No. 28.232.959/0001-71, herein duly represented according to its by-laws (the "**Purchaser Parent Company**");

and as intervening and consenting party exclusively with respect to Sections 5.2.2(v) and 13 herein,

(6) **FB PARTICIPAÇÕES S.A.**, a privately-held corporation (*sociedade por ações de capital fechado*) duly organized and validly existing under the laws of Brazil, with head offices in the City of São Paulo, State of São Paulo, at Avenida Marginal Direita do Tietê, No. 500, Bloco I – 1º andar - A, sala No. 8, Vila Jaguara, CEP 05118-100, enrolled with CNPJ/MF under No. 11.309.502/0001-15, herein duly represented according to its by-laws ("**FB**"),

**WHEREAS:**

(A) The Company and the Company Group Entities, as defined below, operate in pulp and energy industries in Brazil;

(B) On the date hereof, the Sellers collectively own, directly and indirectly, eighty-two point ninety-five percent (82.95%) of the Company's total and voting share capital, as follows: (1) J&F directly owns sixty-three point fifty nine percent (63.59%) of the Company's share capital; (2) FIP Olimpia directly owns one point ninety-six percent (1.96%) of the Company's total and voting share capital; and (3) FIC FIP, as defined below, directly owns fifty point fifty



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 145

percent (50.50%) of the quotas issued by FIP Florestal (as defined below), which, in its turn, owns thirty-four point forty-five percent (34.45%) of the Company's total and voting share capital;

(C)     (1) the Company holds directly one hundred percent (100.00%) of the share capital of Rishis Empreendimentos e Participações S.A. ("**Rishis**") and one hundred percent (100.00%) of the share capital of Cellulose Eldorado Austria GmbH ("**Eldorado Austria**"); and (2) the Company holds, indirectly through Eldorado Austria, (i) one hundred percent (100.00%) of the share capital of Eldorado USA, Inc. ("**Eldorado USA**"); (ii) one hundred percent (100.00%) of the share capital of Cellulose Eldorado Asia (WFOE) ("**Eldorado Asia**"); and (iii) one hundred percent (100.00%) of the share capital of Eldorado Intl. Finance GmbH ("**Eldorado Finance**", and jointly with Rishis, Eldorado Austria, Eldorado USA and Eldorado Asia, "**Company Group Entities**"); and

(D)     The Purchaser has agreed to acquire the Purchased Shares (as defined below) from the Sellers, and the Sellers have agreed to sell the Purchased Shares (as defined below) to Purchaser, under certain terms and conditions agreed upon among them as set forth in this Agreement ("**Transaction**").

**NOW, THEREFORE**, the Parties and the intervening consenting parties resolve to enter into this Agreement, which shall be governed by and construed according to the following terms and conditions:

## 1     Definitions and Interpretation

1.1     **Definitions.** Capitalized words, both in the singular and plural form, as the case may be, as used in this Agreement shall have the following meanings:

| | |
|---|---|
| "**Accounting Firm**" | means one of the following accounting firms: Deloitte Touche Tohmatsu or PriceWaterhouseCoopers, to be engaged in that order of priority, or in the event both are conflicted, as appointed by the International Chamber of Commerce Centre for Expertise in accordance with the provision of appointment of experts under the "Rules for Expertise" of the International Chamber of Commerce. |
| "**Affiliate**" | means, with respect to a Person: (i) the Person that Controls it directly or indirectly; (ii) the companies that are Controlled directly or indirectly by such Person; (iii) the companies that are Controlled directly or indirectly by a Person that Controls such Person; or (iv) any other Person under direct or indirect, common or shared Control of such company or its Controller. |
| "**Agreement**" | has the meaning defined in the preamble. |
| "**Agricultural Partnerships**" | has the meaning defined in Section 9.19.3. |

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

4

fls. 146

**Execution Version**

| | |
|---|---|
| "Agricultural Partnerships Agreement" | has the meaning defined in Section 9.19.3. |
| "ANTAQ" | means the *Agência Nacional de Transportes Aquaviários.* |
| "ANTAQ Approval" | has the meaning defined in Section 11.8.1. |
| "Anti-Corruption Indemnifiable Matters" | means any Losses arising out of or under (i) the Leniency Documents; (ii) any Anti-Corruption Laws that are applicable to the activities of the Company, of the Company Group Entities and/or Sellers, or (iii) that may include other anti-corruption or anti-bribery Laws, and other anti-corruption, fraud, kickback or anti-money laundering Laws, related regulations, such as the Organisation for Economic Co-operation and Development Convention on Combating Bribery of Foreign Public Officials in International Business Transactions and all legislation implementing such Convention; the United States' Foreign Corrupt Practices Act of 1977, and any rules and regulations promulgated thereunder; the United Kingdom Bribery Act of 2010, as amended, and any rules and regulations promulgated thereunder. |
| "Anti-Corruption Laws" | means (i) the Decree-Law No. 2,848, dated December 7, 1940, Law No. 8,429, dated June 2, 1992, Law No. 9,613, dated March 3, 1998 (as amended), Law No. 12,846, dated August 1, 2013 of the Federative Republic of Brazil; (ii) the United Nations Convention against Corruption of 2003, internalized within the Brazilian legal system by Federal Decree 5.687, of January 31, 2006, and any other anti-corruption or anti-bribery Law of the Federative Republic of Brazil, and other anti-corruption, fraud, kickback or anti-money laundering Laws. |
| "Antitrust Authority" | means any Governmental Authority for antitrust matters with jurisdiction in respect of the Transaction. |
| "Antitrust Authority's Approval" | means any necessary prior approval from the Antitrust Authority |
| "Assets" | has the meaning defined in Section 9.22. |
| "Assigned Purchaser" | has the meaning defined in Section 3.2. |
| "Assignment" | has the meaning defined in Section 4.1.3. |

5

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 147

**Execution Version**

| | |
|---|---|
| **"Assigned Shares"** | has the meaning defined in Section 13.1. |
| **"Books and Records"** | means all files, documents, instruments and books and records, including financial statements and related work papers and letters from accountants or auditors, ledgers, deeds and business correspondence. |
| "Brazil" | means the Federative Republic of Brazil. |
| "Brazilian Civil Code" | means Law No. 10,406/2001, as currently in effect. |
| "Brazilian Code of Civil Procedure" | means Law No. 13,105/2015, as currently in effect. |
| "BRL" or "Brazilian Reais" | means the official Brazilian currency. |
| "Business Day" | means any day in which commercial banks are open for business in the City of São Paulo, State of São Paulo, Brazil. |
| "B3" | means B3 S.A. – Brasil, Bolsa Balcão. |
| "Claim" | means any judicial or administrative lawsuit, litigation, dispute, claim, action, defense, appeal, suit, condemnation or arbitration brought or conducted by any Person before any court or other Governmental Authority. |
| "Collateral Value" | means two hundred million Brazilian Reais (BRL200,000,000.00), adjusted by SELIC as from the First Purchase Date. |
| "Company" | means ELDORADO BRASIL CELULOSE S.A., a corporation with head offices in the City of São Paulo, State of São Paulo, at Avenida Marginal Direita do Tietê, No. 500, Bloco II, Subsolo, Sala No. 18, Vila Jaguara, CEP 05118-100, enrolled with CNPJ/MF under No. 07.401.436/0002-12. |
| "Company Disclosure Package" | means (i) the Financial Statements, (ii) all of the Sections of the *Formulário de Referência* of the Company filed with the CVM as of August 22, 2017, except for Section 4 (*Fatores de Risco*), and (iii) the documents disclosed in the Data Room. |
| "Company Group Entities" | has the meaning defined in Whereas (C). |
| "Company Net Debt" | has the meaning ascribed to it in **Exhibit 1.1(A)** |

6

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 148

**Execution Version**

|  | to this Agreement. |
|---|---|
| "**Company Working Capital**" | has the meaning ascribed to it in **Exhibit 1.1(A)** to this Agreement. |
| "**Company's Shareholders' Agreement**" | means the Shareholders' Agreement entered into by and between J&F and FIP Florestal, as shareholders of the Company, on November 30, 2011. |
| "**Conditions Precedent**" | means, jointly, the First Purchase Conditions Precedent and the Second Purchase Conditions Precedent. |
| "**Confidential Information**" | has the meaning defined in Section 17.2. |
| "**Control**" | means the ownership, whether by ownership of securities, contract, proxy or otherwise, of shareholding or contractual rights of a Person that assures, directly or indirectly: (i) the majority of the votes in the resolutions of such Person, or (ii) the power to appoint the majority of the managers or directors of such Person, or (iii) the power to direct or cause the direction of the management or policies of such Person, and the related terms "Controlled by", "Controlling" or "under common Control with" shall be read accordingly. |
| "**CVM**" | means the Brazilian Securities and Exchange Commission (*Comissão de Valores Mobiliários*). |
| "**Data Room**" | means the virtual data room maintained by Intralinks at the direction of the Sellers and the Company comprising the documents and other information relating to the Company and the Company Group Entities. The Data Room will not contain copies of the Leniency Documents. |
| "**Demanded Party**" | has the meaning defined in Section 21.2. |
| "**Demanding Party**" | has the meaning defined in Section 21.2. |
| "**Disclosed Indemnifiable Matters**" | means acts, facts and omissions disclosed by the Sellers to the Purchaser in the Company Disclosure Package; provided that, for purposes of this Agreement, the information contained in the Leniency Documents shall not be considered as a Disclosed Indemnifiable Matter. |

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

| | |
|---|---|
| "Dispute" | has the meaning defined in Section 21.2. |
| "Due Diligence Completion Date" | has the meaning defined in Section 2.1. |
| "Eldorado Asia" | has the meaning defined in Whereas (C). |
| "Eldorado Austria" | has the meaning defined in Whereas (C). |
| "Eldorado Finance" | has the meaning defined in Whereas (C). |
| "Eldorado USA" | has the meaning defined in Whereas (C). |
| "Encumbrance" | means any mortgage, pledge (including *caução* or *penhor*), deed of trust, right of others, security interest, obligation, encumbrance, set-off right, hypothecation, burden, title defect, title retention agreement, license occupancy agreement (*usufruto*), easement (*servidão*), encroachment (*esbulho possessório*), voting trust agreement, limitation in voting rights, pre-emptive right, option, right of first offer, negotiation, or refusal, lien (statutory or other), charge, priority or other security agreement, or other restrictions or limitations of any nature whatsoever over property (including regarding assignment and licensing), including liens as may arise under any contract or Law as well as any agreement, arrangement or obligation to create any of the foregoing. The Company's Shareholders' Agreement, the Quotaholders Agreement, the FIC FIP Quotaholders' Agreement and the Second Shareholders' Agreement shall not be considered as Encumbrances. |
| "Environmental Laws" | means any applicable Law (or agreement with Governmental Authorities) relating to human health and safety, the environment, indoor or ambient air, soils, subsurface strata, surface water, groundwater, sediments, or natural resources or to hazardous substances. |
| "Estimated First Purchase Price" | has the meaning defined in Section 4.4.1. |
| "Estimated Second Purchase Price" | has the meaning defined in Section 5.3.1. |
| "Existing Encumbrances" | means the encumbrances listed in **Exhibit 1.1(B)**. |
| "FB" | has the meaning defined in the preamble. |

8

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 150

| | |
|---|---|
| "FIC FIP" | means Fundo de Investimento em Cotas De Fundos de Investimento em Participações JMF, an investment fund, enrolled with the CNPJ/MF under No. 10.947.525/0001-92, managed by Santander Securities Services Brasil DTVM S.A., with head offices at Avenida Presidente Juscelino Kubitschek, No. 2041 and 2235, Bloco A, Part, in the City of São Paulo, State of São Paulo, enrolled with the CNPJ/MF under No. 62.318.407/0001-19. |
| "FIC FIP Quotaholders' Agreement" | has the meaning defined in Section 20.2. |
| "Fiduciary Assignment Agreement" | has the meaning defined in Section 13.1. |
| "Financial Statements" | means the consolidated and audited financial statements, for the twelve (12) month period ended on December 31, 2016, of (i) the Company; (ii) FIP Florestal; and (iii) FIC FIP. |
| "FIP Florestal" | means Florestal Fundo de Investimento em Participações Multiestratégia, a private equity investment fund, enrolled with the CNPJ/MF under No. 10.673.596/0001-44, managed by Planner Corretora de Valores S.A., with head offices at Avenida Brigadeiro Faria Lima, No. 3900, 10° andar, in the City of São Paulo, State of São Paulo, enrolled with the CNPJ/MF under No. 00.806.535/0001-54. |
| "FIP Olímpia" | has the meaning defined in the preamble. |
| "FIP Preemptive Right" | has the meaning defined in Section 4.1.2. |
| "FIP Redemption" | has the meaning defined in Section 4.2.1(ii)(a). |
| "First Purchase" | has the meaning defined in Section 4.7. |
| "First Purchase Conditions Precedent" | has the meaning defined in Section 4.3.3. |
| "First Purchase Date" | has the meaning defined in Section 4.7. |
| "First Purchase Date Notice" | has the meaning defined in Section 4.3.4. |
| "First Purchase Dispute Notice" | has the meaning defined in Section 4.5.1. |
| "First Purchase Disputed Item" | has the meaning defined in Section 4.5.1. |
| "First Purchase Equity Percentage" | has the meaning defined in Section 4.2.4. |
| "First Purchase Estimated Net Debt" | means the Company Net Debt estimated by Sellers for the First Purchase Date in accordance with Section 4.4.1. |

9

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 151

Execution Version

| | |
|---|---|
| **"First Purchase Estimated Working Capital"** | means the Company Working Capital estimated by Sellers for the First Purchase Date in accordance with Section 4.4.1. |
| **"First Purchase Estimated Working Capital Variance"** | means the difference between the First Purchase Estimated Working Capital and the Target Company Working Capital. |
| **"First Purchase Net Debt"** | means the Company Net Debt as of the First Purchase Date. |
| **"First Purchase Working Capital"** | means the Company Working Capital as of the First Purchase Date. |
| **"First Purchase Price Adjustment"** | has the meaning defined in Section 4.6. |
| **"First Purchased Shares"** | has the meaning defined in Section 4.2.4 |
| **"First Purchase Price Statement"** | has the meaning defined in Section 4.5. |
| **"First Purchase Purchaser's Conditions Precedent"** | has the meaning defined in Section 4.3.2. |
| **"First Purchase Sellers' Conditions Precedent"** | has the meaning defined in Section 4.3.3. |
| **"First Purchase Unresolved Item"** | has the meaning defined in Section 4.5.4. |
| **"First Purchase Working Capital Variance"** | means the difference between the First Purchase Working Capital and the First Purchase Estimated Working Capital. |
| **"Forestry Assets"** | has the meaning defined in Section 9.21. |
| "Funcef" | means Fundação dos Economiários Federais. |
| **"Funcef Remaining Shares"** | means two hundred and seventy-two million, two hundred and fifty thousand (272,250,000) quotas of FIP Florestal, or twenty-four point seventy-five percent (24.75%) of the quotas issued by FIP Florestal, free and clear from any and all Encumbrances, together with all rights, titles, interest and advantages attached to them, which represent an indirect equity interest of eight point five hundred and twenty-six percent (8.526%) of the Company's total share capital. |
| **"Funcef Tag Along Right"** | means Funcef's right to sell the totality of the Funcef Remaining Shares to any potential purchaser, pursuant to the Quotaholders' Agreement. |

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 152

Execution Version

**"Governmental Authority"**

means any federal, state or city, governmental, administrative, taxing, regulatory authority, agency, court, arbitrator, tribunal, or other Brazilian or foreign governmental, regulatory entity, the Brazilian Central Bank or any recognized Brazilian stock exchange or any other authority or agency which exercises authority over the Parties, the Company and the Company Group Entities and/or their business.

**"Grossed-Up Basis"**

means, when expressly used to describe the basis on which the payment of a specified sum is to be made, a basis such that the amount of such payment, after being reduced by the amount of all Taxes imposed on the recipient of such payment as a result of the receipt or accrual of such payment, will be increased to equal the specified sum.

**"ICC"**

has the meaning defined in Section 21.3.1.

**"ICC Rules"**

has the meaning defined in Section 21.3.1.

**"IFRS"**

means the International Financial Reporting Standards, as adopted in Brazil.

**"Indebtedness"**

means, with respect to a Person: (i) all long and short term debts, negative balances in any deposit, current or savings accounts, term loans and financings overdue and unpaid, or not yet due, with financial institutions or any other Person; (ii) all outstanding obligations corresponding to bonds, debentures or similar debt instruments; (iii) all long and short term accounts payable that are overdue and unpaid including the respective accrued interest and penalty; (iv) any outstanding deferred purchase prices, payments, premiums or earn-outs from previous equity or asset acquisitions that are expected to be paid out; (v) all amounts due to employees and service providers that have not been paid within the term originally agreed upon; (vi) all debts owed to Related Parties; (vii) all past-due amounts, in installments or not, due and unpaid to federal, state or municipal Tax collection Governmental Authorities; (viii) all accounts receivable in advance (*antecipações de recebíveis)*; (ix) any and all operating lease or financial lease; (x) any declared and unpaid dividends, interest on

11

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 153

equity, other pecuniary benefits and/or other type of profit distribution, in cash or in kind; (xi) any and all amounts related to interest charged up to the debt assessment date, as well as any penalties incurred but not yet included in the principal amount; and (xii) all present or contingent obligations relating to retention commitments, change of control related bonus and severance payments, employee bonus, performance bonus, or (with respect to any employee or Third Party) amounts payable in respect of the Transaction.

"Indemnification Event"

has the meaning defined in Section 12.5.1.

"Indemnification Notice"

has the meaning defined in Section 12.5.1.

"Indemnified Party"

has the meaning defined in Section 12.5.1.

"Indemnifying Party"

has the meaning defined in Section 12.5.1.

"Initial Payment"

has the meaning defined in Section 4.1.

"Initial Purchase"

has the meaning defined in Section 4.1.

"Initial Purchase Date"

has the meaning defined in Section 4.1.

"Initial Purchase Unwinding"

has the meaning defined in Section 4.1.2(ii)(b).

"Initial Purchase Unwinding Date"

has the meaning defined in Section 4.1.5.

"Initial Shares"

has the meaning defined in Section 4.1.

"Initial Shares Equity Percentage"

means the percentage of the totality of the equity interest in the Company acquired by Purchaser upon the acquisition of the Initial Shares, as set forth in Section 3.2.

"Indemnity Cap"

has the meaning defined in Section 12.3.1.

"Indemnity Equity Percentage"

means the percentage of the equity interest in the Company acquired by Purchaser and/or Assigned Purchaser from the relevant Sellers pursuant to this Agreement, which shall correspond to (i) the Initial Shares Equity Percentage purchased from J&F; (ii) the sum of the Initial Shares Equity Percentage and the First Purchase Equity Percentage purchased from J&F Sellers, if only the First Purchase occurs; or (iii) the sum of the Initial Shares Equity Percentage, the First Purchase Equity Percentage and the Second Purchase Equity Percentage purchased from Sellers, if the

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justica do Estado de Sao Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 108396787201882260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 154

**Execution Version**

Second Purchase occurs.

"IOF"

means *Imposto sobre Operações de Crédito, Câmbio e Seguros ou relativas a Títulos ou Valores Mobiliários.*

"IP Right"

means any and all author's rights, copyrights, trademarks, trade names, trade dress, look and feel, patents, domain names, source and object codes of computer programs, confidential and privileged information and know-how (including, without limitation, trade secrets, formulae, undisclosed processes and/or procedures, test information and market surveys) and applications for such rights (whether or not registered or capable of becoming registered) owned by, licensed to or used by a Person.

"JBS"

means JBS S.A., a corporation (*sociedade por ações de capital aberto*) with head offices in the City of São Paulo, State of São Paulo, at Avenida Marginal Direita do Tietê, No. 500, Vila Jaguara, CEP 05118-100, enrolled with CNPJ/MF under No. 02.916.265/0001-60.

"J&F Sellers"

has the meaning defined in the preamble.

"J&F Sellers' Compliance Representations"

means the representations and warranties of: (i) J&F under Section 8.1.8 (Leniency Documents) and Section 8.1.9 (Anticorruption Investigations); and (ii) the J&F Sellers in relation to the Company and the Company Group Entities under Section 9.32 (Compliance with Laws).

"J&F"

has the meaning defined in the preamble.

"J&F Mandate"

has the meaning defined in Section 4.1.5.

"J&F Sellers' Fundamental Representations"

means the representations and warranties of: (i) the Sellers under Sections 8.1.1 and 8.2.1 (Organization), Sections 8.1.2 and 8.2.2 (Power, Capacity and Authorization), Sections 8.1.3 and 8.2.3 (Enforceability); Sections 8.1.5 and 8.2.5 (No Conflicts and/or Consents); Sections 8.1.7 and 8.2.7 (Solvency); (ii) the J&F Sellers in relation to the Company and the Company Group Entities under Section 9.1 (Organization), Section 9.2 (Power, Capacity and Authorization), Section 9.3 (Enforceability), Section 9.4 (No Conflicts and/or Consents),

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 155

**Execution Version**

|  |  |
|---|---|
|  | Section 9.5 (Subsidiaries), Section 9.6 (Title to Equity Interest), Section 9.7 (Shareholders' Agreement) and Section 9.31 (Solvency). |
| **"Judicial Homologation"** | has the meaning defined in Section 4.3.2(v). |
| **"Law"** | means any federal, state, local, administrative or other laws, determination, statute, code, ordinance, rule, regulation, decree or other requirement or procedure enacted, adopted, promulgated, applied or issued by any Governmental Authority, whether in Brazil or outside of Brazil and applicable to the Company, the Company Group Entities and/or Parties. |
| **"Lease"** | has the meaning defined in Section 9.19.2. |
| **"Leased Properties"** | has the meaning defined in Section 9.19.2 |
| **"Lender Waivers"** | has the meaning defined in Section 15.2. |
| **"Leniency Condition Precedent"** | has the meaning defined in Section 4.3.2(v). |
| **"Leniency Documents"** | means the Leniency Agreement, dated June 5, 2017, between J&F and the *Ministério Público Federal do Distrito Federal*, as well as all the plea bargain agreements executed by Joesley Mendonça Batista, Wesley Mendonça Batista, as well as Messrs. Ricardo Saud, Florisvaldo Caetano de Oliveira, Demilton Antônio de Castro, Francisco de Assis e Silva, Valdir Aparecido Boni and any other individual related to J&F with references to the Company and the Company Group Entities, as amended (*acordos de colaboração premiada*). |
| **"Licenses"** | has the meaning defined in Section 9.23. |
| **"Longstop Date"** | has the meaning defined in Section 19.1. |
| **"Loss"** | means any losses, disbursements, fines, penalties, awards, direct liability, claim, damage, costs, expenses or reasonable legal, accounting and other professional fees and charges effectively paid or otherwise incurred by a Party, by the Company or by the Company Group Entities (excluding any loss of earnings, loss of business opportunity, lost profits and any incidental, moral, special, indirect, consequential or punitive damages). |

14

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839677201882601 00. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

Execution Version

"Material Adverse Change"

means, in relation to the Company and the Company Group Entities: (i) the acceleration or early repayment (howsoever described) of any financial obligation in an amount in excess of one hundred million Brazilian Reais (BRL100,000,000.00); or (ii) any act, fact or circumstance that has a material and adverse impact on the Company's ability to operate and trade as it currently operates and trades, provided that none of the following shall either alone or in combination constitute, or be taken into account in determining whether there has been, a Material Adverse Change for purposes of this definition: (a) general macroeconomic, credit, capital or financial market or political conditions (including those in the financial, banking, currency, foreign exchange and capital markets) in Brazil or abroad, including with respect to interest rates or commodity prices or currency exchange rates or as a result of public demonstrations, elections or election campaigns; (b) any general interruption in the supply of any utility (including water, gas and electricity), hurricane, tornado, flood, volcano, earthquake or other natural or man-made disaster occurring after the date of this Agreement; (c) any change in applicable Law or IFRS (or authoritative interpretation or enforcement thereof) which is proposed, approved or enacted on or after the date of this Agreement; (d) general conditions in the industries in which the Company and the Company Group Entities operate; (e) changes in the Taxes applicable to the Company's and Company Group Entities' business and operations; (f) any action taken, or failure to take action, or such other circumstance, change, event or effect, in each case, at the Purchaser's written request or with respect to which the Purchaser's has given written consent; or (g) the commencement or escalation of a war or armed hostilities (including those involving Brazil or the Netherlands), whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack (including upon Brazil or the Netherlands).

"Material Contract"

has the meaning defined in Section 9.13.



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 157

**Execution Version**

| | |
|---|---|
| "Managing Person" | means, as applicable, the board of directors, the board of officers, the general partner, the managing partner, the supervisory board, the trustee, or any other similar body or Person, if any, charged with supervisory responsibility over the establishment and implementation of policies for any Person. |
| "Minimum Claim" | has the meaning defined in Section 12.3.2. |
| "Non Compete Parties" | has the meaning defined in Section 16.1. |
| "Notice of Direct Claim" | means the notice an Indemnified Party shall deliver to an Indemnifying Party. |
| "Notice of Dispute" | has the meaning defined in Section 21.2. |
| "Notice of Third Party Claim" | means a notice of such Third Party Claim, with a copy of the complaint, that the Indemnified Party shall deliver to the Indemnifying Party in the event of any Third Party Claim brought against an Indemnified Party which is subject to indemnification under the terms of this Agreement. |
| "Order" | means any order, writ, *mandado de segurança*, judgment, decision, decree, ruling, assessment, instruction, award, injunction or similar order of any Governmental Authority (in each such case whether preliminary or final). |
| "Ordinary Course of Business" | means the business of the Company as a going concern in the ordinary and usual course of business and in any case in compliance with the applicable Law: (i) in accordance with its past practice; or (ii) where there is no past practice, similar in nature, scope and magnitude to actions reasonably taken in the ordinary course of the normal day-to-day operations of other Persons of the same economic size acting in the same geography and industry of the Company. |
| "Party" | has the meaning defined in the preamble. |
| "Parties' First Purchase Conditions Precedent" | has the meaning defined in Section 4.3.1. |
| "Parties' Second Purchase Conditions Precedent" | has the meaning defined in Section 5.2.1. |
| "Payable Loss" | has the meaning defined in Section 12.6. |

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

"Person"

means any individual or legal entity, including, without limitation, companies, associations, consortiums, joint ventures, trusts, funds, estates, entities without legal status or other corporate entities, or any Governmental Authority.

"Petros"

means Fundação Petrobras de Seguridade Social – Petros.

"Petros Remaining Shares"

means two hundred and seventy-two million, two hundred and fifty thousand (272,250,000) quotas of FIP Florestal, or twenty-four point seventy-five percent (24.75%) of the totality of the quotas issued by FIP Florestal, free and clear from any and all Encumbrances, together with all rights, titles, interest and advantages attached to them, which represent an indirect equity interest of eight point five hundred and twenty-six percent (8.526%) of the Company's total share capital.

"Petros Tag Along Right"

means Petros' right to sell the totality of the Petros Remaining Shares to any potential purchaser, pursuant to the Quotaholders' Agreement.

"Properties"

has the meaning defined in Section 9.19.1.

"Purchaser's Indemnified Parties"

has the meaning defined in Section 12.1.1.

"Purchased Shares"

means the totality of the shares issued by the Company that will be acquired by Purchaser pursuant to this Agreement, which shall correspond to (i) the Initial Shares, if the First Purchase does not occur; (ii) the sum of the Initial Shares and the First Purchased Shares, if the Second Purchase does not occur; or (ii) the sum of the Initial Shares, the First Purchased Shares and the Second Purchased Shares, if the Second Purchase occurs.

"Purchaser"

has the meaning defined in the preamble.

"Purchaser Parent Company"

has the meaning defined in the preamble.

"Purchaser Mandate"

has the meaning defined in Section 4.1.4.

"Purchaser's Fundamental Representations"

means the representations and warranties of the Purchaser under Section 10.1 (Organization), Section 10.2 (Power, Capacity and Authorization), Section 10.3

17

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 159

**Execution Version**

|  |  |
|---|---|
|  | (Enforceability) and Section 10.5 (No Conflicts and/or Consents). |
| "Quotaholders' Agreement" | means the *Instrumento Particular de Acordo de Cotistas do Florestal Fundo de Investimento em Participações*, dated November 30, 2011. |
| "Reference Purchase Price" | means fifteen billion Brazilian Reais (BRL15,000,000,000.00). |
| "Related Party" | means, with regard to any Person: (i) a Person that is an Affiliate of such Person; or (ii) a Representative of such Person or of an Affiliate of such Person; or (iii) spouse, stable union or equivalent companion, parent, children, brother and sister of such Person; or (iv) any relative of such Person until the third degree. |
| "Representative" | means, with respect to any Person, any officer, director, principal or manager of such Person. |
| "Restraint" | means any Law, whether temporary, preliminary or permanent, which is then in effect and has the effect of enjoining, restraining, prohibiting or otherwise preventing the consummation of the Transaction. |
| "Restricted Business" | has the meaning defined in Section 16.1. |
| "Restrictive Period" | has the meaning defined in Section 16.1. |
| "Reverse Payment" | has the meaning defined in Section 4.1.2(ii)(b). |
| "Reverse Transfer" | has the meaning defined in Section 4.1.2. |
| "Rishis" | has the meaning defined in Whereas (C). |
| "Scenario A" | has the meaning defined in Section 4.2.1. |
| "Scenario B" | has the meaning defined in Section 4.2.2. |
| "Scenario C" | has the meaning defined in Section 4.2.3. |
| "Second Purchase" | has the meaning defined in Section 5.6. |
| "Second Purchase Conditions Precedent" | has the meaning defined in Section 5.2.3. |
| "Second Purchase Date" | has the meaning defined in Section 5.6. |
| "Second Purchase Date Notice" | Has the meaning defined in Section 5.2.4. |
| "Second Purchase Sellers' Conditions Precedent" | has the meaning defined in Section 5.2.3. |

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 108396787201882601 00. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 160

Execution Version

| | |
|---|---|
| "Second Purchase Dispute Item" | has the meaning defined in Section 5.4.1. |
| "Second Purchase Dispute Notice" | has the meaning defined in Section 5.4.1. |
| "Second Purchase Equity Percentage" | has the meaning defined in Section 5.1.2. |
| "Second Purchase Estimated Net Debt" | means the Company Net Debt estimated by Sellers for the Second Purchase Date in accordance with Section 5.3.1. |
| "Second Purchase Estimated Working Capital" | means the Company Working Capital estimated by Sellers for the Second Purchase Date in accordance with Section 5.3.1. |
| "Second Purchase Estimated Working Capital Variance" | means the difference between the Second Purchase Estimated Working Capital and the Target Company Working Capital. |
| "Second Purchase Net Debt" | means the Company Net Debt as of the Second Purchase Date. |
| "Second Purchase Working Capital" | means the Company Working Capital as of the Second Purchase Date. |
| "Second Purchase Purchaser's Conditions Precedent" | has the meaning defined in Section 5.2.2. |
| "Second Purchase Price Adjustment" | has the meaning defined in Section 5.5. |
| "Second Purchase Price Statement" | has the meaning defined in Section 5.4. |
| "Second Purchased Shares" | has the meaning defined in Section 5.1.2. |
| "Second Purchase Unresolved Item" | has the meaning defined in Section 5.4.3. |
| "Second Purchase Working Capital Variance" | means the difference between the Second Purchase Working Capital and the Second Purchase Estimated Working Capital. |
| "Second Shareholders' Agreement" | has the meaning defined in Section 20.1. |
| "SELIC" | means the average adjusted rate of the daily financings accrued by the Special System of Liquidity and Custody (*Sistema Especial de Liquidação e de Custódia* – SELIC) for federal governmental titles. |
| "Sellers" | has the meaning defined in the preamble. |
| "Sellers' Equity Percentage" | means, for each of Scenario A, Scenario B, or Scenario C, as set forth in Sections 4.2 and 5.1, the percentage of Purchased Shares each of the Sellers shall sell and transfer on the Initial Purchase First Purchase Date and on the |

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.




19

fls. 161

Execution Version

Second Purchase Date, as the case may be.

"Sellers' Fundamental Representations"

means the representations and warranties of: (i) the Sellers under Sections 8.1.1, 8.2.1 and 8.3.1 (Organization), Sections 8.1.2, 8.2.2 and 8.3.2 (Power, Capacity and Authorization), Sections 8.1.3, 8.2.3 and 8.3.3 (Enforceability); Sections 8.1.5, 8.2.5 and 8.3.5 (No Conflicts and/or Consents); Sections 8.1.7, 8.2.7 and 8.3.7 (Solvency); (ii) the J&F Sellers in relation to the Company and the Company Group Entities under Section 9.1 (Organization), Section 9.2 (Power, Capacity and Authorization), Section 9.3 (Enforceability), Section 9.4 (No Conflicts and/or Consents), Section 9.5 (Subsidiaries), Section 9.6 (Title to Equity Interest), Section 9.7 (Shareholders' Agreement) and Section 9.31 (Solvency).

"Sellers' Guarantee"

has the meaning defined in Section 15.1.

"Sellers' Guarantee Release"

has the meaning defined in Section 15.1.

"Sellers' Indemnified Parties"

has the meaning defined in Section 12.1.3.

"Sellers' Knowledge"

means the knowledge that any prudent and reasonable member of the board of directors (*membro do Conselho de Administração*) or officers (*Diretores Estatutários*) of the Company would be expected to have.

"Set Off"

has the meaning defined in Section 5.3.6.

"Tag Along Quotaholder"

has the meaning defined in Section 4.2.2.

"Tag Along Rights"

means the Petros Tag Along Right and the Funcef Tag Along Right.

"Target Company Working Capital"

means eight hundred and forty four million seven hundred and ninety four thousand Brazilian Reais (BRL 844,794,000.00).

"Tax"

means all taxes, assessments, charges, duties, fees or levies imposed by any taxing authority, including all federal, state or municipal, and other income, profits, gross receipts, capital gains, transfer, sales, property, excise, license, payroll, social security, withholding and other taxes, assessments, charges, duties or levies and including ICMS (State Value Added Tax on Sales and Services), IPI (Excise Tax), COFINS (Contribution for Social Security Financing),

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839678720188260100 e código 4C8DFAC.

fls. 162

**Execution Version**

PIS (Contribution to the Social Integration Program), CSLL (Social Contribution on Net Income), ISS (Municipal Tax on Services), IPTU (Municipal Real Estate Tax), ITR (Rural and Land Tax), ITBI (Property Transfer Tax), ITCMD (Tax on Estate and Donation of Assets or Rights), IPVA (Vehicle Tax), IR (Income Tax), INSS (Social Security Contribution), FGTS (Severance Pay Indemnity Fund), union contributions and IOF, and including all interest, penalties, deficiency assessments and additions imposed with respect to such amounts and other taxes.

| | |
|---|---|
| "Tax Return" | means all returns, reports, elections, declarations, disclosures, schedules, information returns or other documents (including any related or supporting schedules, statements or information and any amendment to the foregoing) required to be supplied to a Governmental Authority relating to Taxes of any party or the administration of any Laws, regulations or administrative requirements relating to any Taxes. |
| "Threshold" | has the meaning defined in Section 12.3.3. |
| "Third Party" | means any Person that is neither a Party to this Agreement, the Company nor the Company Group Entities. |
| "Third Party Claims" | means any Claim made by a Third Party against the Parties or the Company. |
| "Transaction" | has the meaning defined in Whereas (D). |
| "Transaction Documents" | means this Agreement with all its Exhibits, as well as the Second Shareholders Agreement, the Quotaholders' Agreement, the Fiduciary Assignment Agreement, as well as any other document provided for herein which shall be entered into or executed by the Parties for the implementation of the Transaction. |
| "Transactional Taxes" | has the meaning defined in Section 11.7. |
| "ZMF" | has the meaning defined in the preamble. |

1.2 **Rules of interpretation.** This Agreement shall be construed in accordance with the following rules:

    1.2.1    Any reference in this Agreement to the preamble, a recital, a Section or an Exhibit shall be deemed as a reference to the preamble, a recital, a Section of or Exhibit to



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 163

**Execution Version**

this Agreement, unless expressly stated otherwise.

1.2.2 Unless the context requires otherwise, a reference in this Agreement to the singular includes a reference to the plural and vice versa, and a reference to one gender includes a reference to any other gender (including the masculine, the feminine and the neutral).

1.2.3 The terms "including", "include" or "includes" shall be deemed to be followed by the sentence "but not limited to".

1.2.4 An "amendment" includes any modification, supplement, novation, restatement or re-enactment and "amended" is to be construed accordingly.

1.2.5 Any and all terms hereunder shall be counted in calendar days, except when expressly stated to be counted in Business Days. Whenever the expiration of (i) a term falls on a day that is not a Business Day the term shall be automatically extended to the subsequent Business Day; (ii) a payment term falls on any day in which commercial banks are not open for business in the City of Amsterdam, the Netherlands, the term for such payment and for the relevant consideration for the payment shall be automatically extended to the subsequent day in which commercial banks are open for business in City of Amsterdam, The Netherlands, and in the City of São Paulo, Brazil. The provisions of Article 132 of the Brazilian Civil Code shall govern the counting of terms hereunder.

1.2.6 The words "hereof", "herein", "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement.

1.2.7 The table of contents and the headings in this Agreement are for convenience only and shall be ignored in the interpretation of this Agreement.

## 2    Due Diligence

2.1 **Due Diligence Process**. Purchaser has commenced prior to the date of execution of this Agreement, and shall until and including September 25, 2017 ("**Due Diligence Completion Date**"), conduct a due diligence of the Company and the Company Group Entities, which shall include, but not be limited to, legal, technical (including Forestry Assets), financial, tax, accounting, and regulatory reviews.

## 3    Sale and Purchase of Purchased Shares

3.1 **Sale and Purchase of the Purchased Shares**. Subject to the fulfillment of the applicable Closing Conditions Precedent and on the basis of the representations, warranties, covenants and agreements contained herein, and subject further to Section 4.1.2 below, the Parties agree that this Agreement sets forth the terms and conditions for the sale and transfer, by the Sellers, and purchase, by the Purchaser, of up to one hundred percent (100%) of the common shares issued by the Company, by means of the Initial Purchase (as the case may be) as well as the sale and purchase, of the First Purchased Shares, on the First Purchase Date, and of the Second Purchased Shares, on the Second Purchase Date.

3.2 Sellers agree that Purchaser shall be entitled to complete the transactions provided for herein, in full or in part, directly or by means of Purchasers' Parent Company or any wholly-owned subsidiary of Purchasers' Parent Company ("**Assigned Purchaser**").

3.3 Purchaser hereby irrevocably and irreversibly undertakes to acquire Petros' Remaining



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 164

**Execution Version**

Shares, Funcef Remaning Shares and FIP Florestal's shares in the Company's share capital in accordance with the provisions of the First Shareholders' Agreement and the Quotaholders' Agreement, subject to fulfillment of all conditions set forth in this Agreement.

## 4   Initial Sale and Purchase of Shares

**4.1**   **Initial Sale and Purchase**. Subject to Purchaser not having submitted the notice provided under Section 19.1(ii) of this Agreement and subject to the Parties' First Purchase Condition Precedent being fulfilled, on the later of (a) the Due Diligence Completion Date, so long as the Leniency Condition Precedent, except for the Judicial Homologation shall have been fulfilled no later than three (3) Business Days prior thereto; or (b) three (3) Business Days following the fulfillment of the Leniency Condition Precedent, except for the Judicial Homologation ("**Initial Purchase Date**"), Purchaser shall acquire from J&F, and J&F shall sell and transfer to Purchaser, one hundred and ninety-eight million, three hundred and thirty-two thousand, five hundred and ninety-four (198,332,594) common shares issued by the Company, which represent thirteen percent (13%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them ("**Initial Shares**"), against a payment by Purchaser to J&F of one billion and six million Brazilian Reais (BRL 1,006,000,000.00) ("**Initial Payment**") (such sale and purchase of the Initial Shares, and making of the Initial Payment, the "**Initial Purchase**"), *provided, however,* that if the Initial Purchase Date does not occur by the First Purchase Date, then no Initial Purchase shall occur and the Parties shall proceed as provided for in Section 4.2 below.

**4.1.1**   **Initial Purchase Acts**. On the Initial Purchase Date, subject to the terms and conditions set forth herein, the Parties shall perform and/or shall cause the Company to perform the following acts and obligations:

(i)   The Parties shall execute the terms of transfer (*termos de transferência*) of the Initial Shares in the Company's Share Transfer Book (*livro de transferências de ações*) and the Company shall update its Share Registry Book (*livro de registro de ações*) accordingly; and

(ii)   The Purchaser shall pay the Initial Payment to J&F to the bank account held in Brazil by J&F, to be indicated in writing by it to the Purchaser, at least, ten (10) days prior to the Initial Payment.

**4.1.2**   The Parties hereby agree that the sale and purchase of the Initial Shares shall be subject to a condition, as provided for in Article 127 of the Brazilian Civil Code (*condição resolutiva*), as follows: in case FIP Florestal exercises its preemptive right, in accordance with Section 7.5 of the Company's Shareholders' Agreement ("**FIP Preemptive Right**"), the sale of the Initial Shares shall be unwound, such that the Initial Shares shall be transferred back to J&F ("**Reverse Transfer**") and the Initial Payment shall be transferred back to Purchaser, as follows:

(i)   J&F shall promptly provide Purchaser with a copy of the written notice to FIP Florestal as to the exercise of the FIP Preemptive Right;

(ii)   As soon as reasonably practicable but in any event no later than the third (3rd) Business Day following delivery of the notice provided for in paragraph (i) above, the Parties shall perform and/or shall cause the Company to perform the following acts and obligations:

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.




**Execution Version**

(a) The Parties shall execute the terms of transfer (*termos de transferência*) giving effect to the Reverse Transfer of the Initial Shares in the Company's Share Transfer Book (*livro de transferências de ações*) and the Company shall update its Share Registry Book (*livro de registro de ações*) accordingly; and

(b) J&F shall pay to Purchaser to such account as the Purchaser shall have specified in writing an amount corresponding to the Initial Payment, adjusted by SELIC from the Initial Purchase Date until the date on which this payment is made ("**Reverse Payment**" and together with the Reverse Transfer, the "**Initial Purchase Unwinding**").

*Provided, however*, that the Reverse Transfer and the Reverse Payment shall in any case be simultaneous and shall be mutually conditioned. If FIP Florestal does not exercise FIP Preemptive Right, the sale of the Initial Shares shall be definitive.

4.1.3   Prior to the Initial Purchase, J&F shall notify Funcef and Petros of the assignment to Purchaser on an irrevocable and irreversible basis all of its credit rights against FIP Florestal arising out of the sale and transfer by J&F to FIP Florestal of the Initial Shares as a result of the exercise of the FIP Preemptive Right (being its right to receive an amount equal to the Initial Payment from FIP Florestal for the sale and transfer of the Initial Shares by J&F to FIP Florestal), pursuant to Article 290 of the Brazilian Civil Code, *provided, however*, that such assignment shall only become effective in case J&F fails to make the Reverse Payment pursuant to Section 4.1.2 above ("**Assignment**").

4.1.4   Purchaser hereby irrevocably and irreversibly, pursuant to Article 684 of the Brazilian Civil Code, appoints and constitutes J&F as its attorney-in-fact, granting to J&F express and special powers to take any and all actions required, necessary or desirable to carry out the Reverse Transfer including, without limitation, the ability to sign and execute on behalf of Purchaser the share transfer books (*livros de transferências de ações*) and any other similar deeds and documents ("**Purchaser Mandate**"), provided that:

(i) the Purchaser Mandate shall be effective only after the Reverse Payment is made;

(ii) the granting of the Purchaser Mandate (*mandato*) by Purchaser is a condition for this act (*condição do negócio*) and this mandate shall be valid until the earlier of (a) the First Purchase Date or (b) the termination of this Agreement; and

(iii) Purchaser shall carry out any and all acts and cooperate with J&F in order to comply with the provisions of this Section 4.1.4.

4.1.5   J&F hereby irrevocably and irreversibly, pursuant to Article 684 of the Brazilian Civil Code, appoints and constitutes Purchaser as its attorney-in-fact, granting to Purchaser express and special powers to take any and all actions required, necessary or desirable to carry out the Reverse Transfer including, without limitation, the ability to sign and execute on behalf of J&F the share transfer books (*livros de transferências de ações*) and any other similar deeds and documents; and to, in case J&F fails to take any of the following actions: (a) make the Reverse Payment on the



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 166

**Execution Version**

date of the Initial Purchase Unwinding ("**Initial Purchase Unwinding Date**"), transfer the Initial Shares to FIP Florestal or collect and receive payment therefor by FIP Florestal pursuant to the Assignment ("**J&F Mandate**"), provided that:

(i)     the J&F Mandate shall be effective only if on the Initial Purchase Unwinding Date the Reverse Payment is not made;

(ii)    the granting of the J&F Mandate (*mandato*) by J&F is a condition for this act (*condição do negócio*) and this mandate shall be valid and in force until the earlier of (a) the First Purchase Date or (b) the termination of this Agreement; and

(iii)   J&F shall carry out any and all acts and cooperate with Purchaser in order to comply with the provisions of this Section 4.1.5.

4.1.6   If J&F fails to make the Reverse Payment on the Initial Purchase Unwinding Date (except only as a result of Purchaser's refusal to make the Reverse Transfer), J&F shall pay to Purchaser the Reverse Payment adjusted by the variation of the SELIC as from the Initial Purchase Unwinding Date (included) until the date of its actual payment (excluded) plus (i) a non-compensatory fine in the amount of ten percent (10%) of the Reverse Payment and (ii) default interest at the rate of one percent (1%) per month on the due amount, to be applied *pro rata die* as from the date the Reverse Payment should have been paid until the date of its actual payment. For the avoidance of doubt, the fine and default interest set forth in items (i) and (ii) above shall apply regardless of whether Purchaser receives from FIP Florestal payment for the Initial Shares pursuant to the Assignment.

4.2    **Sale and Purchase of the First Purchased Shares**. Subject to the fulfillment of the First Purchase Conditions Precedent and on the basis of the representations, warranties, covenants and agreements contained herein, the Parties agree that, on the First Purchase Date and in accordance with the Sellers' Equity Percentage, Purchaser shall purchase from J&F and/or from FIC FIP, as the case may be, either directly or indirectly, an equity interest in the Company, as follows:

4.2.1   **Scenario A: Full Exercise of the Tag Along Rights.** In case Funcef exercises the Funcef Tag Along Right and Petros exercises the Petros Tag Along Right, then Purchaser will either buy quotas issued by FIC FIP or shares of the Company (as provided for in Section 11.1), which represent, directly or indirectly and jointly with the Initial Shares (as the case may be), thirty-four point forty-five percent (34.45%) of the Company's total and voting direct and indirect share capital ("**Scenario A**"), as follows:

(i)     If the Initial Purchase shall not have occurred, Purchaser shall acquire from J&F, and J&F shall sell and transfer to Purchaser, one hundred and ninety-eight million, three hundred and thirty-two thousand, five hundred and ninety-four (198,332,594) common shares issued by the Company, which represent thirteen percent (13%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them;

(ii)    if the Initial Purchase shall have occurred and Funcef and Petros shall have agreed with the FIP Redemption, then the Parties shall proceed as follows:



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 167

**Execution Version**

(a) J&F Sellers shall vote in FIP Florestal's quotaholders' meeting in favor of redeeming (*amortização*) and Purchaser shall perform all acts required to redeem (*amortizar*) all quotas of the FIP Florestal with payment by delivery of the shares of the Company held by the FIP Florestal ("**FIP Redemption**");

(b) Purchaser shall acquire from Funcef and Petros one hundred percent (100%) of the common shares issued by the Company received by Funcef and Petros as a result of the FIP Redemption, which represent seventeen point zero five percent (17.05%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them; and

(c) Purchaser shall acquire from FIC FIP, and J&F and ZMF shall cause FIC FIP to sell and transfer to Purchaser, sixty-seven million, eighty thousand and eight hundred and sixty three (67,080,863) common shares issued by the Company received by FIC FIP as a result of the FIP Redemption, which represent four point thirty-nine percent (4.39%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them.

(iii) If Funcef and Petros shall not have agreed with the FIP Redemption, then the Parties shall proceed as follows:

(a) Purchaser shall acquire from each of Funcef and Petros all of the two hundred and seventy-two million, two hundred and fifty thousand (272,250,000) quotas of FIP Florestal held by each of Funcef and Petros, which represent, in aggregate, forty-nine point five percent (49.5%) of the totality of the quotas issued by FIP Florestal, free and clear from any and all Encumbrances, together with all rights, titles, interest and advantages attached to them, which represent an aggregate indirect equity interest of seventeen point zero five percent (17.05%) of the Company's total share capital;

(b) J&F and Purchaser shall cause a FIP Redemption; and

(c) Purchaser shall acquire from FIC FIP, and J&F and ZMF shall cause FIC FIP to sell and transfer to Purchaser, sixty-seven million, eighty thousand and eight hundred and sixty three (67,080,863) common shares issued by the Company received by FIC FIP as a result of the FIP Redemption, which represent four point thirty-nine percent (4.39%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them.

4.2.2 **Scenario B: Partial Exercise of the Tag Along Rights.** In case only one between Funcef and Petros exercises its respective Tag Along Right ("**Tag Along Quotaholder**") then on the First Purchase Date, Purchaser shall acquire a direct and indirect equity interest in the Company which represents, jointly with the Initial Shares (as the case may be), thirty percent (30%) of its total and voting share capital, as follows ("**Scenario B**"):

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 168

**Execution Version**

(i)     If the Initial Purchase shall not have occurred, Purchaser shall acquire from J&F, and J&F shall sell and transfer to Purchaser, one hundred and ninety-eight million, three hundred and thirty-two thousand, five hundred and ninety-four (198,332,594) common shares issued by the Company, which represent thirteen percent (13%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them;

(ii)    Purchaser shall acquire from the Tag Along Quotaholder, and the Tag Along Quotaholder shall sell and transfer to Purchaser, two hundred and seventy-two million, two hundred and fifty thousand (272,250,000) quotas of FIP Florestal, which represent twenty-four point seventy-five percent (24.75%) of the totality of the quotas issued by FIP Florestal, free and clear from any and all Encumbrances, together with all rights, titles, interest and advantages attached to them, which represent an indirect equity interest of eight point fifty-three percent (8.53%) of the Company's total share capital; and

(iii)   Purchaser shall acquire from J&F, and J&F shall sell and transfer to Purchaser, an amount of quotas of FIC FIP which represent forty-eight point seventy-one percent (48.71%) of the totality of the quotas issued by FIC FIP, free and clear from any and all Encumbrances, together with all rights, titles, interest and advantages attached to them, which represent an indirect equity interest of eight point forty-seven (8.47%) of the Company's total share capital.

(iv)    In Scenario B, the First Purchase Equity Percentage will be as follows:

| Seller | Entity | First Purchase Equity Percentage | | | | | |
|---|---|---|---|---|---|---|---|
| | | % in FIC FIP | | % in FIP Florestal | | % in Company | |
| | | Direct | Indirect | Direct | Indirect | Direct | Indirect |
| Tag Along Quotaholder | FIP Florestal | - | - | 24.75% | - | - | 8.53% |
| J&F | FIC FIP | 48.71% | - | - | 24.60% | - | 8.47% |
| Total | - | 48.71% | | 49.35% | | 17.00% | |

4.2.3   **Scenario C: No Exercise of the Tag Along Rights.** In case neither Funcef nor Petros exercise their respective Tag Along Rights, then, on the First Purchase Date, Purchaser shall acquire a direct and indirect equity interest in the Company which represents, jointly with the shares acquired in Initial Payment, thirty percent (30%) of its total and voting share capital, as follows ("**Scenario C**"):

(i)     If the Initial Purchase shall not have occurred, Purchaser shall acquire from J&F, and J&F shall sell and transfer to Purchaser, one hundred and ninety-eight million, three hundred and thirty-two thousand, five hundred and ninety-four (198,332,594) common shares issued by the Company, which represent thirteen percent (13%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them;

(ii)    Purchaser shall acquire from J&F, and J&F shall sell and transfer to



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 169

**Execution Version**

Purchaser, an amount of quotas of FIC FIP which represent ninety-seven point seventy-two percent (97.72%) of the totality of the quotas issued by FIC FIP, free and clear from any and all Encumbrances, together with all rights, titles, interest and advantages attached to them, which represent an indirect equity interest of seventeen percent (17.00%) of the Company's total share capital.

(iii)    In Scenario C, the First Purchase Equity Percentage will be as follows:

| Seller | Entity | First Purchase Equity Percentage | | | | | |
|--------|--------|--------|--------|--------|--------|--------|--------|
| | | % in FIC FIP | | % in FIP Florestal | | % in Company | |
| | | Direct | Indirect | Direct | Indirect | Direct | Indirect |
| J&F | FIC FIP | 97.72% | - | - | 49.35% | - | 17.00% |
| Total | - | 97.72% | | 49.35% | | 17.00% | |

4.2.4    The equity interest effectively acquired by Purchaser pursuant to Scenario A, Scenario B or Scenario C of this Section 4.2 shall be referred to as the "**First Purchased Shares**", and the percentage of the direct and indirect equity interest of the total and voting capital stock of the Company acquired by the Purchaser from J&F and/or FIC FIP, as the case may be, on the First Purchase Date pursuant to this Section 4.2 shall be referred to as the "**First Purchase Equity Percentage**".

4.2.5    **Adjustment for Preemptive Rights.** For the avoidance of doubt, in case any right of first refusal under the Quotaholders' Agreement or the Company's Shareholders' Agreement is exercised, then (without prejudice to any other provision of this Agreement), the obligations of the Purchaser to acquire a direct and/or indirect stake in the Company of up to thirty percent (30%) under Scenario B or Scenario C shall be adjusted such that the maximum percentage of the total capital of the Company to be acquired by the Purchaser in each such Scenario shall be reduced by the percentage of the total capital of the Company represented by the shares object of such right of first refusal.

4.2.6    **J&F Residual Stake.** In each of Scenario B or Scenario C, to the extent Petros or Funcef remain as indirect shareholder of the Company, J&F shall remain with at least one (1) quota of FIC FIP.

4.3    **First Purchase Conditions Precedent**

4.3.1    **First Purchase Condition Precedent for the Benefit of the Parties.** The obligation of the Parties to consummate the First Purchase is subject to the fulfillment of the following conditions prior to or at the First Purchase Date ("**Parties' First Purchase Condition Precedent**"):

(i)    **No Injunctions or Restraints.** No Governmental Authority shall have issued, enacted, entered into, promulgated or enforced any Law or Restraint (that is final and non-appealable) making illegal or prohibiting the Transaction.

4.3.2    **First Purchase Conditions Precedent for the Benefit of the Purchaser.** In addition to the Parties' First Purchase Conditions Precedent, the obligation of the Purchaser to consummate the First Purchase is further subject to the fulfillment (or

28



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839678-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

if permitted by Law, the waiver in writing by the Purchaser) of the following conditions prior to or at the First Purchase Date ("**First Purchase Purchaser's Conditions Precedent**"):

(i) **Representations and Warranties**. The Sellers' Fundamental Representations and J&F Sellers' Compliance Representations shall be true, correct and complete on the date of this Agreement, and shall remain true, correct and complete on First Purchase Date, as if they had been also given on the First Purchase Date (except when another specific date is provided).

(ii) **Material Adverse Change**. No Material Adverse Change shall have occurred at any time on or prior to the First Purchase Date.

(iii) **Right of First Refusal/Tag Along Right – Company Shareholders' Agreement**. J&F Sellers shall have notified FIP Florestal, in accordance with section 7 of the Company's Shareholders' Agreement and Section 11.1.1 hereof, of its right of first refusal and tag along rights in respect of the Purchased Shares and shall have provided a copy by e-mail of such notice to the Purchaser promptly, but in any event, no later than one (1) Business Day after such notice has been given.

(iv) **Right of First Refusal/Tag Along Right – Quotaholders' Agreement**. FIC FIP shall have notified Funcef and Petros, in accordance with section 11 of the Quotaholders' Agreement and Section 11.1.1 hereof, of their right of first refusal and tag along rights in respect of the Purchased Shares and shall have provided a copy by e-mail of such notice to the Purchaser promptly, but in any event, no later than one (1) Business Day after such notice has been given.

(v) **Leniency**. (A) The approvals and declarations of Governmental Authorities to be obtained in connection with the Transaction in the context of the Leniency Documents, namely: (i) the positive declaration by the Federal Public Prosecutors' Office (*Ministério Público Federal*) in the form stated on the Leniency Agreement stating substantially the following: (1) that the Company and its Company Group Entities have adhered to the Leniency Agreement in the form provided therein; (2) following the First Purchase Date, the acquirer of the Company and the Company Group Entities shall not be subject to indemnification claims (*medidas indenizatórias*) or sanctions (*medidas sancionatórias*) for illicit facts of any nature included in the schedules to the Leniency Agreement, as amended; and (3) the breach or early termination of the Leniency Agreement by any of its signatories other than the Company and Company Group Entities will not affect the validity, full force and effect of the Leniency Agreement, in all of its respects, including in relation to the Company and Company Group Entities, (ii) the confirmation (*homologação*) of the Leniency Agreement by the Fifth Chamber of Coordination and Review of the Federal Prosecutors Office (*5ª Câmara de Coordenação e Revisão do MPF*), which has already been obtained and by the competent federal court (*10ª Vara Federal do Distrito Federal*) ("**Judicial Homologation**") shall have been duly obtained and shall be in force and effect; (B) the validity of the Leniency Agreement shall not be subject to any dispute by the Federal Prosecutors Office; (C) the Company and Company Group Entities shall explicitly have adhered to the Leniency Agreement; (D)

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 171

**Execution Version**

the Leniency Documents shall not have been amended or complemented in any way detrimental Company and Company Group Entities or the Purchaser, or in any way that may impact the consummation of the Transaction; and (E) any new agreement or decision involving the Company and Company Group Entities or the Sellers, related to Anti-Corruption Laws, shall have been made available to the Purchaser prior to the Due Diligence Completion Date, provided that such disclosure is not forbidden by applicable Law or the Leniency Documents, including, but not limited to, any agreement with the Ministry of Transparency and Comptroller General (*Ministério da Transparência e Controladoria Geral da União – CGU*) and the United States Department of Justice under the FCPA ("**Leniency Condition Precedent**").

4.3.3 **First Purchase Conditions Precedent for the Benefit of the Sellers.** In addition to the Parties' First Purchase Conditions Precedent, the obligation of the Sellers to consummate the First Purchase is further subject to the fulfillment (or if permitted by Law, the waiver in writing by the Sellers) of the following conditions prior to or at the First Purchase Date ("**First Purchase Sellers' Conditions Precedent**" and jointly with the Parties' First Purchase Conditions Precedent and the First Purchase Purchaser's Conditions Precedent, "**First Purchase Conditions Precedent**"):

    (i)      **Representations and Warranties.** The Purchaser's Fundamental Representations shall be true, correct and complete on the date of this Agreement, and shall remain true, correct and complete on the First Purchase Date, as if they had been also given on the First Purchase Date (except when another specific date is provided).

4.3.4 **Confirmation of First Purchase Conditions Precedent.** J&F shall notify the Purchaser when each of the First Purchase Conditions Precedent (to the extent applicable to the Sellers) have been satisfied before or on the date of such notice, attaching all relevant documentation to allow the Purchaser to evaluate whether such First Purchase Conditions Precedent has been satisfied. Likewise, the Purchaser shall notify J&F when all First Purchase Conditions Precedent (to the extent applicable to the Purchaser) have been satisfied before or on the date of such notice, attaching all relevant documentation to allow J&F to evaluate whether such Conditions Precedent have been satisfied (each such notice, a "**First Purchase Date Notice**").

4.3.5 **Waivers.**

    (i)      **Waiver by the Parties**. The Conditions Precedent set forth in Section 4.3.1 may be waived (if legally possible), in whole or in part, in writing by the applicable Party, as applicable, acting in its sole discretion.

    (ii)     **Waiver by Purchaser**. The Conditions Precedent set forth in Sections 4.3.2 may be waived (if legally possible), in whole or in part, in writing by the Purchaser, acting in its sole discretion.

    (iii)    **Waiver by J&F Sellers**. The Conditions Precedent set forth in Section 4.3.3 may be waived (if legally possible), in whole or in part, in writing by the J&F Sellers, acting in their sole discretion.

4.3.6 **Binding Obligation**. The fulfillment (or written waiver under this Agreement, as

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

applicable) of all First Purchase Conditions Precedent prior to or at First Purchase shall result in the irrevocable and irreversible binding obligation of the Parties and the Company to complete the First Purchase.

**4.4**  **First Purchase Price.** In consideration for the purchase and acquisition of the First Purchased Shares, the Purchaser shall pay to J&F and/or FIC FIP, as the case may be, in accordance with the Sellers' Equity Percentage, an amount in BRL equal to the Estimated First Purchase Price (as defined below), which shall be either increased or reduced based on the First Purchase Price Adjustment, as the case may be.

    **4.4.1**  **Estimated First Purchase Price.** On the First Purchase Date, as consideration for the sale and purchase of the First Purchased Shares, the Purchaser shall pay to J&F and/or FIC FIP, as the case may be, in accordance with the Sellers' Equity Percentage, an amount resulting from the following formula (the "**Estimated First Purchase Price**"):

$$V = \{ \{ [ (A - B) * (1 + SELIC) ] + C \} - IP \} * FCEP \}$$

Whereas:

"**V**" means the Estimated First Purchase Price;

"**A**" means the Reference Purchase Price;

"**B**" means the First Purchase Estimated Net Debt;

"**IP**" means the Initial Payment;

"**SELIC**" means the accumulated variation of the SELIC rate as from the date hereof (included) up to the First Purchase Date (excluded);

"**C**" means the First Purchase Estimated Working Capital Variance; and

"**FCEP**" means the First Purchase Equity Percentage, to be represented as a percentage (%).

    **4.4.2**  **Estimation by J&F.** No later than ten (10) days prior to the expected First Purchase Date, J&F shall deliver to the Purchaser a statement setting forth, in BRL (i) the amount of the First Purchase Estimated Net Debt and (ii) the First Purchase Estimated Working Capital and the First Purchase Estimated Working Capital Variance, in each case, based on J&F's good faith estimation of such amounts as of the closest date to the expected First Purchase Date which is a full month, together with a calculation of the Estimated First Purchase Price, which shall be prepared in good faith based on the same IFRS principles adopted by the Company in the Financial Statements and shall be accompanied by reasonably detailed supporting documentation (including those data and information reasonably requested by the Purchaser) to support the calculation set forth therein. J&F undertakes to maintain Purchaser aware of J&F's expectations for the First Purchase Date.

    **4.4.3**  **Payment of the Estimated First Purchase Price.** On the First Purchase Date, the Purchaser shall pay to J&F and/or to FIC FIP, as the case may be, the Estimated First Purchase Price, by wire transfer, in immediately available funds, to the bank accounts held in Brazil by J&F and/or to FIC FIP, as the case may be, to be indicated

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



**Execution Version**

in writing by them to the Purchaser, at least, ten (10) days prior to the First Purchase Date.

4.4.4   **Automatic Release**. Proof of receipt of the abovementioned payments into the bank accounts informed by J&F pursuant to Section 4.4.3 above shall be automatically deemed, with no need of additional formalities, as a full, general, irrevocable and irreversible release of the Purchaser's obligations in relation to the payment of the Estimated First Purchase Price.

4.4.5   **No Withholdings.** Any payments of the Estimated First Purchase Price by the Purchaser to J&F and/or to FIC FIP, as the case may be, shall be made in full, without any set off, counterclaim, restriction or condition and without any deduction or withholding. If any deduction or withholding is required by Law then the Purchaser shall be obliged to pay to J&F and/or to FIC FIP, as the case may be, an increased sum that, after such deduction or withholding has been made, leaves J&F and/or to FIC FIP, as the case may be, with the same amount as they would have been entitled to receive in the absence of any such deduction or withholding.

4.4.6   **Delay Penalty**. In case the Purchaser fails to pay to the Sellers the Estimated First Purchase Price on the First Purchase Date, the Purchaser shall pay to the Sellers the Estimated First Purchase Price adjusted by the variation of the SELIC as from the First Purchase Date (included) until the date of its actual payment (excluded) plus (i) a non-compensatory fine in the amount of ten percent (10%) of the First Purchase Price Adjustment and (ii) default interest at the rate of one percent (1%) per month on the due amount, to be applied *pro rata die* as from the date the First Purchase Price Adjustment should have been paid until the date of its actual payment (without prejudice to proven losses and damages (without giving effect to the definition of Losses) and other remedies set forth in this Agreement and in the applicable Law; provided, however, that the penalty shall be considered as part of the payment of the losses and damages suffered or incurred by such Party, according to Article 416 of the Brazilian Civil Code.

4.4.7   **Termination for Failure to Pay Estimated First Purchase Price**. In case the Purchaser fails to pay the Estimated First Purchase Price by the date falling thirty (30) days after the First Purchase Date, this Agreement shall be automatically terminated, without any penalty, cost or liabilities to Sellers.

4.4.8   **Payment of First Purchase Price Adjustment**. For clarification purposes, the positive balance (if any) of the First Purchase Price Adjustment shall be paid pursuant to and on the date set forth in Section 4.6.1 of this Agreement.

4.5   **Proceedings for the First Purchase Price Adjustment.** As promptly as practicable following the First Purchase Date, but in any event within forty-five (45) days thereafter, J&F shall deliver to the Purchaser a statement, in the form of **Exhibit 4.5** ("**First Purchase Price Statement**") setting forth J&F's determination of the actual amounts of First Purchase Net Debt and First Purchase Working Capital, prepared in good faith based on the same IFRS principles adopted by the Company in the Financial Statements consistent with the methodologies, assumptions and using the same financial accounts (*rubricas*) used for the calculation of the First Purchase Estimated Net Debt and First Purchase Estimated Working Capital, and shall be accompanied by reasonably detailed supporting documentation (including those data and information reasonably requested by the Purchaser) to support the calculation set forth therein.

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 174

**Execution Version**

4.5.1 **Final First Purchase Price Statement; Dispute**. The First Purchase Price Statement shall become final, conclusive and binding upon the Purchaser and J&F Sellers on the thirtieth (30th) day following J&F's delivery to Purchaser of the First Purchase Price Statement, unless on or prior to the end of such 30-day period, the Purchaser delivers to J&F a written notice (**"First Purchase Dispute Notice"**) stating that the Purchaser disputes the First Purchase Net Debt and/or the First Purchase Working Capital as determined in the First Purchase Price Statement (each of them, a "**First Purchase Disputed Item**") and specifying in reasonable detail the good faith basis for each First Purchase Disputed Item.

4.5.2 **Access**. J&F Sellers agree with the Purchaser that they shall cooperate in good faith with the Purchaser and its representatives and agents, and provide all reasonable information requested by or on behalf of the Purchaser in order to enable the Purchaser to determine the accuracy and completeness of the First Purchase Price Statement. As from the First Purchase Date, J&F Sellers shall cause the Company to, at Purchaser's request, provide Purchaser's Representatives with reasonable access to all relevant or necessary documentation and information and personnel of the Company and the Company Group Entities in order for Purchaser to verify, understand and review the First Purchase Price Statement, including, without limitation, access to financial records.

4.5.3 **Representation**. The Parties agree that J&F shall represent ZMF and FIP Olímpia (if it is the case) for all purposes under this Section 4.5 and shall be the only Party entitled to send and receive notices on behalf of all Sellers.

4.5.4 **Dispute Resolution**. If the Purchaser timely delivers a First Purchase Dispute Notice, then the Purchaser and J&F shall seek in good faith to resolve the First Purchase Disputed Items (and shall restrict their discussions only to the First Purchase Disputed Items) during the thirty (30)-day period following the date J&F receives the First Purchase Dispute Notice. If the Purchaser and J&F Sellers are unable to resolve the First Purchase Disputed Items during such thirty (30)-day period, then, at the request of either the Purchaser or J&F, the Company shall, within fifteen (15) days, engage and submit the unresolved First Purchase Disputed Items (each of them, a "**First Purchase Unresolved Item**") to the Accounting Firm, who will act as an expert and not as an arbitrator.

4.5.5 **Determination of Unresolved Items**. The Purchaser and J&F shall cause the Accounting Firm to issue its written determination regarding the First Purchase Unresolved Items within thirty (30) days after its engagement. The Accounting Firm shall be instructed to make a determination as to the amount of each First Purchase Unresolved Item (but no other matter) consistent with the methodologies, assumptions and using the same financial accounts (*rubricas*) used for the calculation of the First Purchase Estimated Net Debt and First Purchase Estimated Working Capital and the First Purchase Price Statement shall be revised to reflect such determination. With respect to each First Purchase Unresolved Item, such determination, if not in accordance with the position of either the Purchaser or J&F, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by the Purchaser in the First Purchase Dispute Notice or by J&F in the First Purchase Price Statement with respect to such First Purchase Unresolved Item. For the avoidance of doubt, the Accounting Firm shall not review any line items or make any determination with respect to any matter other than the First Purchase

33



fls. 175

**Execution Version**

Unresolved Items. Each Party shall furnish to the Accounting Firm such work papers and other documents and information pertaining to the First Purchase Unresolved Items as the Accounting Firm may reasonably request (subject to compliance with the customary procedures or release of such work papers, including a customary confidentiality agreement).

4.5.6    **Final Disputed Items.**  The revised First Purchase Price Statement by the Accounting Firm shall be final, conclusive and binding upon the Purchaser and J&F Sellers absent manifest error, and such revised First Purchase Price Statement shall be used for purposes of determining any First Purchase Price Adjustment pursuant to Section 4.6.

4.5.7    **Costs.**  The Party (i.e., either Purchaser or J&F Sellers) that does not prevail in the dispute with respect to the First Purchase Price Statement shall bear and pay all of the fees, costs and expenses of the Accounting Firm. For purposes of determining which Party has prevailed, the prevailing Party shall be the Party that provided the closest amount of the First Purchase Unresolved Items to the amount provided by the Accounting Firm in relation thereto. The Parties shall bear their respective own expenses incurred in relation to this matter, including the fees and costs of their own accountants and advisors who they engage to assist them.

4.6    **First Purchase Price Adjustment.** The Parties agree that the amount resulting from (i) the First Purchase Estimated Net Debt *minus* the First Purchase Net Debt *plus* (ii) the First Purchase Working Capital Variance ("**First Purchase Price Adjustment**") shall be determined and paid as follows:

(i)    If the First Purchase Price Adjustment results in a positive amount, Purchaser shall pay to J&F the corresponding amount in BRL pursuant to the Sellers' Equity Percentage.

(ii)    If the First Purchase Price Adjustment results in a negative amount, J&F shall pay to the Purchaser the corresponding amount in BRL pursuant to the Sellers' Equity Percentage.

4.6.1    **Payment of the First Purchase Price Adjustment.**  Within five (5) Business Days as of (i) the date on which the First Purchase Price Adjustment is agreed by the Purchaser and J&F Sellers or (ii) otherwise determined in accordance with 4.5.4 et. seq. above, as applicable, the Purchaser, on one hand, or J&F, on the other hand shall pay by means of wire transfer in immediately available funds to the other Party, provided that if the First Purchase Price Adjustment is owed by (a) the Purchaser to J&F, such payment shall be made pursuant to the Sellers' Equity Percentage to the bank accounts held in Brazil into which the First Purchase Estimated Purchase Price was paid and (b) J&F to the Purchaser, J&F shall pay its portion of the First Purchase Price Adjustment according to its Sellers' Equity Percentage to a bank account held in Brazil by the Purchaser, which shall be indicated ten (10) days in advance, in writing by the Purchaser to the J&F Sellers.

4.6.2    **Automatic Release.**  Proof of receipt of the First Purchase Price Adjustment into the bank accounts informed by the J&F Sellers or Purchaser, as applicable, pursuant to Section 4.6.1 above shall be automatically deemed, with no need of additional formalities, as a full, general, irrevocable and irreversible release in relation to the payment of the First Purchase Price Adjustment.



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

4.6.3    **Monetary Adjustment**.  The First Purchase Price Adjustment shall be adjusted by the accumulated variation of SELIC as from the First Purchase Date (included) until the date of its actual payment (excluded).

4.6.4    **Delay Penalty**. In case the Purchaser, on one hand, or J&F and/or FIC FIP, as the case may be, on the other hand fails to pay to the other Party the First Purchase Price Adjustment within the term set forth in Section 4.6.1 above, such breaching Party shall pay to the other Party the First Purchase Price Adjustment adjusted by the variation of the SELIC as from the date the First Purchase Price Adjustment should have been paid (included) until the date of its actual payment (excluded) plus (i) a non-compensatory fine in the amount of ten percent (10%) of the First Purchase Price Adjustment and (ii) default interest at the rate of one percent (1%) per month on the due amount, to be applied *pro rata die* as from the date the First Purchase Price Adjustment should have been paid until the date of its actual payment (without prejudice to losses and damages (without giving effect to the definition of Losses) and other remedies set forth in this Agreement and in the applicable Law; provided, however, that the penalty shall be considered as part of the payment of the losses and damages suffered or incurred by such Party, according to Article 416 of the Brazilian Civil Code. In the event of delay of any payment that is being made by the Purchaser to any Seller involving a foreign exchange transaction, the non-compensatory penalty set forth in item (i) above shall not apply if (i) such payment delay exceeds three (3) Business Days, so long as such payment is not made after the Longstop Date; (ii) Purchaser presents to J&F evidence of the reason for the delay; and (iii) Purchaser maintains J&F informed of the status of the payment process daily.

4.7    **First Purchase and First Purchase Acts.** The consummation of the transactions described below in this Section 4.7 ("**First Purchase**") shall occur on the third (3rd) Business Day following fulfillment or waiver in accordance with this Agreement of all of the First Purchase Conditions Precedent ("**First Purchase Date**"). The First Purchase shall take place at the offices of Lefosse Advogados or at another location agreed by the Parties.

4.7.1    **First Purchase Acts**. On the First Purchase Date, subject to the terms and conditions set forth herein, the Parties shall perform and/or shall cause the Company and the Company Group Entities to perform the following acts and obligations, in the following chronological order:

(i)    The Parties shall execute the terms of transfer (*termos de transferência*) of the First Purchased Shares in the Company's Share Transfer Book (*livro de transferências de ações*), as the case may be, in accordance with the scenarios set forth in Section 4. The Company shall update its Share Registry Book (*livro de registro de ações*) accordingly;

(ii)    The administrator of FIP Florestal shall execute the terms of transfer (*termo de transferência*) of the FIP Florestal's quotas in the FIP Florestal's Quota Transfer Book, as the case may be in accordance with the scenarios set forth in Section 4. FIP Florestal shall update its Quotas Registry Book accordingly;

(iii)    The administrator of FIC FIP shall execute the terms of transfer (*termo de transferência*) of the FIC FIP's quotas in the FIC FIP's Quota Transfer Book, as the case may be, in accordance with the scenarios set forth in Section 4. FIC FIP shall update its Quotas Registry Book accordingly;



35

    (iv)    The Purchaser shall pay the Estimated First Purchase Price to J&F and/or FIC FIP, as set forth in Section 4.4.1; and

    (v)    Each of the Parties shall receive an electronic media (e.g. pen drive or a CD), certified by Intralinks, containing the full content of the Data Room displayed in Intralinks' data site until the Due Diligence Completion Date.

**4.7.2**    **Delivery of Additional Documents**. The Parties and the Company shall deliver to each other the original powers-of-attorney and/or other documents evidencing the powers of the legal representative(s) of each of them to execute all Transaction Documents.

**4.7.3**    **Acts after First Purchase**. After the First Purchase, the Parties undertake to take all appropriate action and execute any documents of any kind that may be reasonably necessary to give effect to the First Purchase.

**4.7.4**    **Simultaneous Acts**. All acts listed in Section 4.7 shall be deemed simultaneous, provided that no act and/or obligation shall be deemed to have been effectively carried out until all the other acts and/or obligations have been completed, except if the Parties agree otherwise or if otherwise provided in this Agreement. If for any reason the Purchaser does not pay the Estimated First Purchase Price to J&F and/or FIC FIP, as set forth in Section 4.4.1 on the First Purchase Date, the Purchaser agrees that the Transfer of shares and/or quotas shall be cancelled.

**4.7.5**    **Further Assurances**. Prior to the First Purchase Date, each of the Parties and the Company: (i) shall execute, or shall cause to be executed, such documents and shall take, or shall cause to be taken, such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the First Purchase; and (ii) shall refrain from taking any actions that would reasonably be expected to impair, delay or prevent the First Purchase.

## 5    Second Sale and Purchase of Shares

**5.1**    **Sale and Purchase of the Second Purchased Shares**. Subject to the fulfillment of the Second Purchase Conditions Precedent and on the basis of the representations, warranties, covenants and agreements contained herein, the Parties agree that, on the Second Purchase Date and in accordance with Sellers' Equity Percentage, the Purchaser shall purchase from Sellers, either directly or indirectly, equity interest in the Company, as follows:

    (i)    Purchaser shall acquire from J&F, and J&F shall sell and transfer to Purchaser the totality of the shares of the Company held on the date thereof directly by J&F, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them;

    (ii)    Purchaser shall acquire from FIP Olimpia, and FIP Olimpia shall sell and transfer to Purchaser, twenty-nine million, nine hundred and five thousand, four hundred and ninety-nine (29,905,499) common shares issued by the Company, which represent one point ninety-six percent (1.96%) of the Company's total and voting share capital, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them; and

    (iii)    Purchaser shall acquire from (a) J&F, and J&F shall sell and transfer to Purchaser, the totality of the quotas of FIC FIP held on the date thereof

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 178

**Execution Version**

directly by J&F, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them; and (b) ZMF, and ZMF shall sell and transfer to Purchaser, the totality of the quotas of FIC FIP held on the date thereof by ZMF, free and clear from any and all Encumbrances, and together with all rights, titles, interest and advantages attached to them. For clarification purposes, if the First Purchase was consummated pursuant to Scenario A following a FIP Redemption according to Section 4.2.1, Purchaser shall acquire only a direct interest in the Company (and not acquire quotas issued by the FIC FIP).

5.1.2 The equity interest effectively acquired by Purchaser pursuant to this Section 5.1 shall be referred to as the "**Second Purchased Shares**", and the percentage of the direct and indirect equity interest of the total and voting capital stock of the Company acquired by the Purchaser from the Sellers on the Second Purchase Date pursuant to this Section 5.1 shall be referred to as the "**Second Purchase Equity Percentage**".

5.2 **Second Purchase Conditions Precedent**

5.2.1 **Second Purchase Conditions Precedent for the Benefit of the Parties.** The obligation of the Parties to close the Transaction on the Second Purchase Date is subject to the fulfillment of the following conditions prior to or at the Second Purchase Date ("**Parties' Second Purchase Conditions Precedent**"):

   (i) **No Injunctions or Restraints.** No Governmental Authority shall have issued, enacted, entered into, promulgated or enforced any Law or Restraint (that is final and non-appealable) making illegal or prohibiting the Transaction.

5.2.2 **Second Purchase Conditions Precedent for the Benefit of the Purchaser.** In addition to the Parties' Second Purchase Conditions Precedent, the obligation of the Purchaser to consummate the Second Purchase is further subject to the fulfillment (or if permitted by Law, the waiver in writing by the Purchaser) of the following conditions prior to or at the Second Purchase Date ("**Second Purchase Purchaser's Conditions Precedent**"):

   (i) **Representations and Warranties.** The Sellers' Fundamental Representations and J&F Sellers' Compliance Representations shall be true, correct and complete on the date of this Agreement, and shall remain true, correct and complete on the Second Purchase Date, as if they had been also given on the Second Purchase Date (except when another specific date is provided).

   (ii) **Material Adverse Change.** No Material Adverse Change shall have occurred at any time from the First Purchase Date until the Second Purchase Date.

   (iii) **Compliance with Agreement.** The covenants and obligations of the Sellers in this Agreement, required to have been performed by Sellers or by the Company before or at the Second Purchase Date, shall have been duly performed and complied with in all material respects.

   (iv) **Leniency Documents.** The Leniency Condition Precedent shall continue to be satisfied and to the extent permitted under applicable Law, any new

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 179

**Execution Version**

agreement or decision involving the Company, the Company Group Entities or the Sellers related to Anticorruption Laws shall have been made available to the Purchaser prior to the Second Purchase Date, including, but not limited to, any agreement with the Ministry of Transparency and Comptroller General (*Ministério da Transparência e Controladoria Geral da União – CGU*) or with the United States Department of Justice under the FCPA.

(v) **Fiduciary Assignment of Shares.** J&F, FB and the Purchaser shall have executed the Fiduciary Assignment Agreement pursuant to Section 13 and the Sellers shall have presented evidence of the perfection thereof through the registrations required under applicable Law.

(vi) **Antitrust Approvals.** The Antitrust Authority's Approval having been obtained with respect to the Second Purchase.

5.2.3 **Second Purchase Conditions Precedent for the Benefit of the Sellers.** In addition to the Parties' Second Purchase Conditions Precedent, the obligation of the Sellers to consummate the Second Purchase is further subject to the fulfillment (or if permitted by Law, the waiver in writing by the Sellers) of the following conditions prior to or at the Second Purchase Date ("**Second Purchase Sellers' Conditions Precedent**" and jointly with the Parties' Second Purchase Conditions Precedent and the Second Purchase Purchaser's Condition Precedent, "**Second Purchase Conditions Precedent**"):

(i) **Representations and Warranties.** The Purchaser's Fundamental Representations shall be true, correct and complete on the date of this Agreement, and shall remain true, correct and complete on the Second Purchase Date, as if they had been also given on the Second Purchase Date (except when another specific date is provided).

(ii) **Compliance with Agreement.** The covenants and obligations of the Purchaser in this Agreement, required to have been performed by the Purchaser before or at the Second Purchase Date, shall have been duly performed and complied with in all material respects.

(iii) **Sellers' Guarantees.** All instruments required for the release of Sellers' Guarantees on or prior to the Second Purchase Date shall have been duly executed, in accordance with Section 15.

(iv) **Antitrust Approvals.** The Antitrust Authority rendering a final non-appealable ruling that renders the Second Purchase null and void,

5.2.4 **Confirmation of Second Purchase Conditions Precedent.** J&F shall notify the Purchaser when each of the Second Purchase Conditions Precedent (to the extent applicable to the Sellers) have been satisfied before or on the date of such notice, attaching all relevant documentation to allow the Purchaser to evaluate whether such Second Purchase Conditions Precedent have been satisfied. Likewise, the Purchaser shall notify J&F when all Second Purchase Conditions Precedent (to the extent applicable to the Purchaser) have been satisfied before or on the date of such notice, attaching all relevant documentation to allow J&F to evaluate whether such Second Purchase Conditions Precedent have been satisfied (each such notice, a "**Second Purchase Date Notice**").

5.2.5 **Waivers.**





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justica do Estado de Sao Paulo, protocolado em 14/08/2018 as 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 180

**Execution Version**

(i)   **Waiver by the Parties.** The Conditions Precedent set forth in Sections 5.2.1 may be waived (if legally possible), in whole or in part, in writing by the applicable Party, as applicable, acting in its sole discretion.

(ii)  **Waiver by Purchaser.** The Conditions Precedent set forth in Sections 5.2.2 may be waived (if legally possible), in whole or in part, in writing by the Purchaser, acting in its sole discretion.

(iii) **Waiver by J&F.** The Conditions Precedent set forth in Section 5.2.3 may be waived (if legally possible), in whole or in part, in writing by J&F, acting in their sole discretion.

5.2.6   **Binding Obligation.** The fulfillment (or written waiver under this Agreement, as applicable) of all Second Purchase Conditions Precedent prior to or at Second Purchase shall result in the irrevocable and irreversible binding obligation of the Parties and the Company to close the transactions set forth in this Section 5.

5.3   **Second Purchase Price.** In consideration for the purchase and acquisition of the Second Purchased Shares, the Purchaser shall pay to the Sellers, in accordance with the Sellers' Equity Percentage, an amount in BRL equal to the Estimated Second Purchase Price (as defined below), which shall be either increased or reduced based on the Second Purchase Price Adjustment, as the case may be.

5.3.1   **Estimated Second Purchase Price.** On the Second Purchase Date, as consideration for the sale and purchase of the Second Purchased Shares, the Purchaser shall pay to the Sellers, in accordance with the Sellers' Equity Percentage an amount resulting from the following formula (the "**Estimated Second Purchase Price**"):

$$V = \{ [ (A - B) * (1 + SELIC) ] + C \} * SCEP$$

Whereas:

"**V**" means the Estimated Second Purchase Price;

"**A**" means the Reference Purchase Price;

"**B**" means the Second Purchase Estimated Net Debt;

"**SELIC**" means the accumulated variation of the SELIC rate as from the date hereof (included) up to the Second Purchase Date (excluded);

"**C**" means the Second Purchase Estimated Working Capital Variance; and

"**SCEP**" means the Second Purchase Equity Percentage, to be represented as a percentage (%).

5.3.2   **Estimation by J&F.** At least ten (10) days prior to the Second Purchase Date, J&F shall deliver to the Purchaser a statement setting forth, in BRL (i) the amount of the Second Purchase Estimated Net Debt and (ii) the Second Purchase Estimated Working Capital and the Second Purchase Estimated Working Capital Variance, in each case, based on J&F's good faith estimation of such amounts as of the Second Purchase Date, together with a calculation of the Estimated Second Purchase Price,





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839678-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

which shall be prepared in good faith based on the same IFRS principles adopted by the Company in the Financial Statements and shall be accompanied by reasonably detailed supporting documentation (including those data and information reasonably requested by the Purchaser) to support the calculation set forth therein.

5.3.3    **Payment of the Estimated Second Purchase Price**. On the Second Purchase Date, the Purchaser shall pay to the Sellers the Estimated Second Purchase Price pursuant to the Sellers' Equity Percentage, by wire transfer, in immediately available funds, to the bank accounts held in Brazil by Sellers to be indicated in writing by them to the Purchaser, at least, ten (10) days prior to the Second Purchase Date.

5.3.4    **Automatic Release**. Proof of receipt of the abovementioned payments to the bank accounts informed by the Sellers pursuant to Section 5.3.3 above shall be automatically deemed, with no need of additional formalities, as a full, general, irrevocable and irreversible release of the Purchaser's obligations in relation to the payment of the Estimated Second Purchase Price.

5.3.5    **No Withholdings**. With the exception of the Set Off set forth in Section 5.3.6 below, any payments of the Estimated Second Purchase Price by the Purchaser to the Sellers shall be made in full, without any set off, counterclaim, restriction or condition and without any deduction or withholding. If any deduction or withholding is required by Law then the Purchaser shall be obliged to pay to the Sellers an increased sum that, after such deduction or withholding has been made, leaves the Sellers with the same amount as they would have been entitled to receive in the absence of any such deduction or withholding.

5.3.6    **Set Off**. The Parties hereby agree that Purchaser shall have the right to retain and set off from the First Purchase Price Adjustment, the Second Purchase Price Adjustment and/or the Estimated Second Purchase Price, the amounts of any Payable Losses subject to indemnification by J&F Sellers and FIP Olímpia pursuant to Section 12.1.1 and 12.1.2 ("**Set-Off**").

5.3.7    **Delay Penalty**. In case the Purchaser fails to pay to the Sellers the Estimated Second Purchase Price on the Second Purchase Date, the Purchaser shall pay to the Sellers the Estimated Second Purchase Price adjusted by the variation of the SELIC as from the Second Purchase Date (included) until the date of its actual payment (excluded) plus (i) a non-compensatory fine in the amount of ten percent (10%) of the Estimated Second Purchase Price and (ii) default interest at the rate of one percent (1%) per month on the due amount, to be applied *pro rata die* as from the Second Purchase Date until the date of its actual payment (without prejudice to losses and damages (without giving effect to the definition of Losses) and other remedies set forth in this Agreement and in the applicable Law; provided, however, that the penalty shall be considered as part of the payment of the losses and damages suffered or incurred by such Party, according to Article 416 of the Brazilian Civil Code. In the event of delay of any payment that is being made by the Purchaser to any Seller involving a foreign exchange transaction, the non-compensatory penalty set forth in item (i) above shall not apply if (i) such payment delay exceeds three (3) Business Days, so long as such payment is not made after the Longstop Date; (ii) Purchaser presents to J&F evidence of the reason for the delay; and (iii) Purchaser maintains J&F informed of the status of the payment process daily.

5.3.8    **Payment of Second Purchase Price Adjustment**. For clarification purposes, the

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 182

**Execution Version**

positive balance (if any) of the Second Purchase Price Adjustment shall be paid pursuant and on the date set forth in Section 5.5.2 of this Agreement.

5.4    **Proceedings for the Second Purchase Price Adjustment.** As promptly as practicable following the Second Purchase Date, but in any event within forty-five (45) days thereafter, Purchaser shall deliver to J&F a statement, in the form of **Exhibit 5.4** ("**Second Purchase Price Statement**") setting forth the Purchaser's determination of the actual amounts of Second Purchase Net Debt and Second Purchase Working Capital, prepared in good faith based on the same IFRS principles adopted by the Company in the Financial Statements consistent with the methodologies, assumptions and using the same financial accounts (*rubricas*) used for the calculation of the Second Purchase Estimated Net Debt and Second Purchase Estimated Working Capital, and shall be accompanied by reasonably detailed supporting documentation (including those data and information reasonably requested by J&F) to support the calculation set forth therein. The Sellers agree that Purchaser may perform a full inventory count and confirmation in order to determine the Second Purchase Estimated Working Capital and J&F shall procure that Purchaser and its representatives shall have reasonable access to all information, personnel and premises of the Company and/or the Company Group Entities for this purpose.

5.4.1    **Final Second Purchase Price Statement; Dispute.** The Second Purchase Price Statement shall become final, conclusive and binding upon the Purchaser and Sellers on the thirtieth (30th) day following Purchaser's delivery to J&F of the Second Purchase Price Statement, unless on or prior to the end of such 30-day period, J&F delivers to Purchaser a written notice ("**Second Purchase Dispute Notice**") stating that Sellers dispute the Second Purchase Net Debt and/or the Second Purchase Working Capital as determined in the Second Purchase Price Statement (each of them, a "**Second Purchase Disputed Item**") and specifying in reasonable detail the good faith basis for each Second Purchase Disputed Item.

5.4.2    **Representation.** The Parties agree that J&F shall represent FIC FIP, ZMF and FIP Olímpia for all purposes under this Section 5 and shall be the only Party entitled to send and receive notices on behalf of all Sellers.

5.4.3    **Dispute Resolution.** If J&F timely delivers a Second Purchase Dispute Notice, then the Parties shall seek in good faith to resolve the Second Purchase Disputed Items (and shall restrict their discussions only to the Second Purchase Disputed Items) during the thirty (30)-day period following the date Purchaser receives the Second Purchase Dispute Notice. If the Parties are unable to resolve the Second Purchase Disputed Items during such thirty (30)-day period, then, at the request of either the Purchaser or the Sellers, the Company shall, within fifteen (15) days, engage and submit the unresolved Second Purchase Disputed Items (each of them, an "**Second Purchase Unresolved Item**") to the Accounting Firm, who will act as an expert and not as an arbitrator.

5.4.4    **Determination of Unresolved Items.** The Parties shall cause the Accounting Firm to issue its written determination regarding the Second Purchase Unresolved Items within thirty (30) days after its engagement. The Accounting Firm shall be instructed to make a determination as to the amount of each Second Purchase Unresolved Item (but no other matter) consistent with the methodologies, assumptions and using the same financial accounts (*rubricas*) used for the calculation of the Second Purchase Estimated Net Debt and Second Purchase Estimated Working Capital and the Second Purchase Price Statement shall be revised to reflect such determination.



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

With respect to each Second Purchase Unresolved Item, such determination, if not in accordance with the position of either the Purchaser or the Sellers, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by the Sellers in the Second Purchase Dispute Notice or by the Purchaser in the Second Purchase Price Statement with respect to such Second Purchase Unresolved Item. For the avoidance of doubt, the Accounting Firm shall not review any line items or make any determination with respect to any matter other than the Second Purchase Unresolved Items. Each Party shall furnish to the Accounting Firm such work papers and other documents and information pertaining to the Second Purchase Unresolved Items as the Accounting Firm may reasonably request (subject to compliance with the customary procedures or release of such work papers, including a customary confidentiality agreement).

5.4.5 **Final Disputed Items**. The revised Second Purchase Price Statement by the Accounting Firm shall be final, conclusive and binding upon the Parties absent manifest error, and such revised Second Purchase Price Statement shall be used for purposes of determining any Second Purchase Price Adjustment pursuant to Section 5.5.

5.4.6 **Costs**. The Party (i.e., either Purchaser or Sellers) that does not prevail in the dispute shall bear and pay all of the fees, costs and expenses of the Accounting Firm. For purposes of determining which Party has prevailed, the prevailing Party shall be the Party that provided the closest amount of the Second Purchase Unresolved Items to the amount provided by the Accounting Firm in relation thereto. The Parties shall bear their respective own expenses incurred in relation to this matter, including the fees and costs of their own accountants and advisors who they engage to assist them.

5.5 **Second Purchase Price Adjustment**. The Parties agree that the amount resulting from (i) the Second Purchase Estimated Net Debt *minus* the Second Purchase Net Debt *plus* (ii) the Second Purchase Working Capital Variance (**"Second Purchase Price Adjustment"**) shall be determined and paid as follows:

(i) If the Second Purchase Price Adjustment results in a positive amount, Purchaser shall pay to Sellers the corresponding amount in BRL pursuant to the Sellers' Equity Percentage.

(ii) If the Second Purchase Price Adjustment results in a negative amount, the Sellers shall pay to the Purchaser the corresponding amount in BRL pursuant to the Sellers' Equity Percentage.

5.5.2 **Payment of the Second Purchase Price Adjustment**. Within five (5) Business Days as of (i) the date on which the Second Purchase Price Adjustment is agreed by the Parties or (ii) otherwise determined in accordance with Section 5.4.4 above, as applicable, the Purchaser, on one hand, or the Sellers, on the other hand (as the case may be) shall pay by means of wire transfer in immediately available funds to the other Party, provided that if the Second Purchase Price Adjustment is owed by (a) the Purchaser to the Sellers, such payment shall be made pursuant to the Sellers' Equity Percentage to the bank accounts held in Brazil into which the Second Purchase Estimated Purchase Price was paid or (b) the Sellers to the Purchaser, each Seller shall pay its portion of the Second Purchase Price Adjustment according to its Sellers' Equity Percentage to a bank account held in Brazil by the Purchaser,





42

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 184

**Execution Version**

which shall be indicated, reasonably in advance, in writing by the Purchaser to the Sellers.

5.5.3 **Automatic Release**. Proof of receipt of the Second Purchase Price Adjustment into the bank accounts informed by the Sellers or Purchaser, as applicable, pursuant to Section 5.5.2 above shall be automatically deemed, with no need of additional formalities, as a full, general, irrevocable and irreversible release in relation to the payment of the Second Purchase Price Adjustment.

5.5.4 **Monetary Adjustment**. The Second Purchase Price Adjustment shall be adjusted by the accumulated variation of the SELIC as from the Second Purchase Date (included) until the date of its actual payment (excluded).

5.5.5 **Delay Penalty**. In case the Purchaser, on one hand, or the Sellers, on the other hand (as the case may be) fails to pay to the other Party the Second Purchase Price Adjustment within the term set forth in Section 5.5.2 above, such breaching Party shall pay to other Party the Second Purchase Price Adjustment adjusted by the variation of the SELIC as from the date the Second Purchase Price Adjustment should have been paid (included) until the date of its actual payment (excluded) plus (i) a non-compensatory fine in the amount of ten percent (10%) of the Second Purchase Price Adjustment and (ii) default interest at the rate of one percent (1%) per month on the due amount, to be applied *pro rata die* as from the date the Second Purchase Price Adjustment should have been paid until the date of its actual payment (without prejudice to losses and damages (without giving effect to the definition of Losses) and other remedies set forth in this Agreement and in the applicable Law; provided, however, that the penalty shall be considered as part of the payment of the losses and damages suffered or incurred by such Party, according to Article 416 of the Brazilian Civil Code. In the event of delay of any payment that is being made by the Purchaser to any Seller involving a foreign exchange transaction, the non-compensatory penalty set forth in item (i) above shall not apply if (i) such payment delay exceeds three (3) Business Days, so long as such payment is not made after the Longstop Date; (ii) Purchaser presents to J&F evidence of the reason for the delay; and (iii) Purchaser maintains J&F informed of the status of the payment process daily.

5.6 **Second Purchase and Closing Acts.** Provided that the Second Purchase Conditions Precedent have been fulfilled or waived, as the case may be, the consummation of the transactions described below in Section 5.6.1 ("**Second Purchase**") shall occur within five (5) Business Days from the receipt of the last Second Purchase Date Notice or any other date agreed by the Parties ("**Second Purchase Date**"). The Second Purchase shall take place at the offices of Lefosse Advogados or at another location agreed by the Parties.

5.6.1 **Second Purchase Acts**. On the Second Purchase Date, subject to the terms and conditions set forth herein, the Parties shall perform and/or shall cause the Company and the Company Group Entities to perform the following acts and obligations:

(i) Sellers shall deliver or cause the delivery to the Purchaser of all Books and Records of the Company and the Company Group Entities to the extent not in the possession of the Company and the Company Group Entities;

(ii) Sellers shall deliver to the Purchaser resignations of and releases from each Managing Person of the Company and the Company Group Entities;





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

43

fls. 185

Execution Version

(iii)     The Parties shall execute the respective terms of transfer (*termos de transferência*) of the Second Purchased Shares in the Company's Share Transfer Book (*livro de transferências de ações*). The Company shall update its Share Registry Book (*livro de registro de ações*) accordingly;

(iv)     The administrator of FIC FIP shall execute the terms of transfer (*termo de transferência*) of the FIC FIP's quotas in the FIC FIP's Quota Transfer Book. FIC FIP shall update its Quotas Registry Book accordingly; and

(v)      The Purchaser shall pay the Estimated Second Purchase Price to the Sellers, as set forth in Section 5.3.1.

5.6.2     **Shareholders' Meetings**. No later than five (5) Business Days following a written request from Purchaser, J&F shall call a shareholders' meeting of the Company (and shall cause the Company, as applicable, to call similar shareholders' meetings for the Company and the Company Group Entities) to be held on the Second Purchase Date (or on such later date on which such shareholders' meeting can be installed, in case, notwithstanding J&F having complied on a timely manner with Purchaser's request hereunder, such shareholders' meeting cannot be installed by the Second Purchase Date) to resolve on the replacement of the members of the Board of Directors and/or management of the Company Group Entities.

5.6.3     **Meeting of the Board of Directors**. Prior to the Second Purchase Date, J&F shall cause the chairman of the board of directors to call a board of directors' meeting within twenty (20) days prior to the Second Purchase Date, and shall comply with any and all measures necessary under each of the organizational documents of the Company and the Company Group Entities, the Company's Shareholders' Agreement and the Quotaholders' Agreement in order for such board of directors' meeting to be held on the Second Purchase Date for the Purchaser to be able to elect all executive officers of the Company and the Company Group Entities.

5.6.4     **Acts after Second Purchase**. After the Second Purchase, the Parties undertake to take all appropriate action and execute any documents of any kind that may be reasonably necessary to give effect to the Second Purchase.

5.6.5     **Simultaneous Acts**. All acts listed in Section 5.6.1 shall be deemed simultaneous, provided that no act and/or obligation shall be deemed to have been effectively carried out until all the other acts and/or obligations have been completed, except if the Parties agree otherwise or if otherwise provided in this Agreement.

5.6.6     **Further Assurances**. Prior to the Second Purchase Date, each of the Parties and the Company: (i) shall execute, or shall cause to be executed, such documents and shall take, or shall cause to be taken, such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the Second Purchase; and (ii) shall refrain from taking any actions that would reasonably be expected to impair, delay or prevent the Second Purchase.

## 6     Signing Acts and Post-Signing Acts

6.1     **Second Shareholders' Agreement and the FIC FIP Quotaholders' Agreement**. On the date hereof, J&F and the Purchaser shall execute the Second Shareholders' Agreement and J&F, ZMF and the Purchaser shall execute the FIC FIP Quotaholders' Agreement, as the case may be in accordance with the scenarios set forth in Section 4, pursuant to Section 20





44

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 186

**Execution Version**

below.

## 7   **Conduct of Business**

7.1   **Conduct of Business.** J&F hereby agrees that from the Due Diligence Completion Date until the Second Purchase Date, J&F shall (i) refrain from doing the following activities to the extent it is an action a Controlling shareholder can refrain from doing directly; and (ii) direct management of the Company (a) to conduct the activities and business of the Company in the Ordinary Course of Business and (b) to the extent it is an action related to activities and businesses of the Company and the Company Group Entities, to refrain from taking any of the following actions:

(i)   amend the Company, the Company Group Entities' or FIP Florestal's by-laws or articles of association, as the case may be, in a manner that is adverse to Purchaser or to the consummation of the Transaction;

(ii)   amend the Company's Shareholders Agreement or the Quotaholders' Agreement or adopt any action under such agreements in a manner that is adverse to Purchaser or to the consummation of the Transaction;

(iii)   authorize any change in the capital stock of the Company, or any action that would have the effect of directly or indirectly diluting the Purchaser's interest in the Company, including, without limitation, means of the issuance of or creation of any Encumbrance other than Existing Encumbrances over (A) any shares issued by or other equity or voting interest in the Company or (B) any securities convertible into, exchangeable for, or evidencing the right to subscribe for or acquire any shares or other equity or voting interest in the Company including rights, warrants or options, including stock options, provided that changes in relation to the capital stock of the Company Group Entities can happen as long as they do not dilute the Company's participation;

(iv)   except as otherwise required by Law, declare, pay or set aside any dividend or make any distribution (whether in cash, stock, property or other assets) with respect to the Company and the Company Group Entities;

(v)   enter into any agreement or undertake any financial obligation or assumption of collateral or Encumbrance of assets or rights, which results in the net debt/EBITDA ratio of the Company being higher than five (5) to be determined according to the December 31 audited financial statements relating to the fiscal year in which the relevant agreements or undertakings are being executed;

(vi)   amend the terms of any of the existing long term financial obligations of the Company and the Company Group Entities unless such amendment would result in better financing condition to the Company or to the Company Group Entities;

(vii)   fail to comply with any obligation under the terms of any of each of the financial agreements and/or Material Contracts to which the Company and the Company Group Entities are parties that may result in an event of default or give cause to early termination, acceleration or other penalties under such agreements;

(viii)   enter into any merger or merger of shares, spin-off, dissolution, liquidation, winding up, suspension of payment, bankruptcy or judicial or extrajudicial restructuring, contribution of assets to the capital stock or reduction or any other corporate restructuring involving the Company and the Company Group Entities except if




45

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 1083967872018826010.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 187

**Execution Version**

occurs among the Company and the Company Group Entities or make any other change in the capital structure of the Company and the Company Group Entities, provided that such changes can happen as long as they do not dilute the Company's participation;

(ix) except with regard to acts taken in the Ordinary Course of Business, materially amend or terminate, or waive or assign any rights under, any Material Contract or any real estate lease;

(x) acquire any business, line of business or Person by merger or consolidation, purchase of substantially all assets or interests, or by any other manner, in a single transaction or a series of related transactions, or enter into any contract, letter of intent or similar arrangement (whether or not enforceable or binding) with respect to the foregoing;

(xi) except as required by IFRS or a Governmental Authority, make any change in any method of accounting, accounting practice or auditing practice;

(xii) enter into any transaction with or to the benefit of any Related Party or with or to the benefit of any non Related Party which is not, at the current management of the Company's reasonable opinion, in the best interest of the Company;

(xiii) allow to lapse, or fail to make any applications for renewal as and when required, any Permits necessary for the conduct of the Company's and the Company Group Entities' business as currently conducted;

(xiv) make any contributions to any political party, political candidate or any official of a Governmental Authority;

(xv) engage in business practices that are prohibited or provided as criminal conduct or take any action that would violate applicable Anti-Corruption Laws or otherwise give, offer, agree or promise to give, or authorize the giving directly or indirectly, of any money or other thing of value to anyone as an inducement or reward for favorable action or forbearance from action or the exercise of influence;

(xvi) initiate any judicial or administrative proceeding to challenge or settle any judicial or administrative proceeding, in each case, against any Governmental Authority, and that involve an amount higher than ten million Reais (BRL 10,000,000.00), other than proceedings that are necessary or advisable for the protection of the Company's and of the Company Group Entities' business and assets for the renewal of Licenses or challenge of tax matters or that are advisable or necessary to protect J&F and its Affiliates with the matters in respect of Anti-Corruption Laws or the matters described in the Leniency Documents or any matter related to the foregoing;

(xvii) take any action or make any request or filing relating to the bankruptcy, reorganization or similar proceeding with respect to the Company or any Company Group Entity and/or with respect to the suspension of payment or rescheduling or any form of compromise (however described) with respect to any Indebtedness of the Company and/or any Company Group Entity;

(xviii) contract, commit to make or undertake any obligation in connection with any new capital expenditures other than in the Ordinary Course of Business;

(xix) assume, guarantee or endorse any obligations of any other Person, except for Company and Company Group Entities;



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 188

**Execution Version**

(xx) plant and/or coppice (*condução de floresta*) less than the amount of hectares harvested taking into consideration the Forestry Assets as of December 31, 2016; and/or

(xxi) authorize, approve or enter into any agreement, arrangement or commitment with respect to any of the foregoing.

## 8    Representations and Warranties of the Sellers

### 8.1    Representations and Warranties of J&F

J&F hereby represents and warrants to the Purchaser, in respect of itself, that the following statements are true, accurate and complete in respect of itself on the date hereof and shall remain true on each of the First Purchase Date and the Second Purchase Date, as the case may be:

8.1.1    **Organization.** J&F is a closely held corporation (*sociedade por ações de capital fechado*) validly existing and duly incorporated under the Laws of Brazil. J&F is duly licensed and qualified to do business and in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its businesses as currently conducted makes such licensing or qualification necessary.

8.1.2    **Power, Capacity and Authorization.** J&F has full power, capacity and authority, and, as applicable, has taken all required corporate and other actions necessary to execute the Transaction Documents, to fulfill its obligations hereunder and thereunder, and to consummate the Transaction. The copies of the bylaws of J&F and similar governing documents furnished to Purchaser reflect all amendments made thereto and are correct and complete.  J&F is not in violation of any of the provisions of its governing documents.

8.1.3    **Enforceability.** The Transaction Documents constitute legal, valid and binding obligations, enforceable against J&F in accordance with their terms. There is no legal or arbitration proceedings or any investigation (about which the investigated party has received a written notice) involving any Governmental Authority that, if adversely decided, could affect the capacity of J&F to comply with its obligations resulting from the Transaction Documents.

8.1.4    **No Breach or Violations by J&F.** J&F has performed and/or complied with, in all material respects, all of its covenants and agreements to be performed or complied with by it under this Agreement.

8.1.5    **No Conflicts and/or Consents.** The execution, compliance with and performance by J&F of the Transaction Documents do not, and the consummation of the Transaction does not and shall not: (i) constitute a violation of or default under any license, permit, authorization, Law or any judicial, administrative or arbitration decision from any Governmental Authority with jurisdiction over J&F, the Company or the Company Group Entities; (ii) constitute a breach, conflict, violation, default or depend on any consent or approval arising from, or otherwise give to any other contracting party any rights (including without limitation preemptive right) or additional compensation by virtue of, or the right to accelerate, terminate or make any amendment to, any agreement, contract, consortium, loan, credit facility, financial instrument, guarantee, insurance policy or any other arrangement to which J&F, the Company or the Company Group Entities are a party, intervening party or



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 189

Execution Version

hold participation in, or to which J&F, the Company or the Company Group Entities or any of their properties or assets are subject to, related to or bound by, including without limitation any contract with Governmental Authorities or by which J&F is bound and which may affect the J&F's ability to execute, perform and comply with the Transaction Documents; (iii) constitute a violation or breach of any rights of Third Parties which may affect the J&F's ability to execute, perform and comply with the Transaction Documents; (iv) depend on any consent, approval or authorization from, notification to, or filing or registration with any Person, entity, court or any other Governmental Authority; (v) result in the creation of any Encumbrances on any of the J&F's, the Company's or the Company Group Entities' properties, assets and contractual rights; and (vi) result in non-compliance or breach of the corporate documents and bylaws of J&F, the Company or the Company Group Entities.

8.1.6  **No Brokerage Fees.** Except for lawyers, financial advisors and other professional advisors hired by J&F to assist it in the implementation of the Transaction (which costs and expenses shall be borne and paid exclusively by J&F), no broker, finder, investment banker or similar agent: (i) has been retained or employed by or on behalf of J&F in connection with the Transaction; (ii) is authorized to act on behalf of J&F within the scope of the Transaction; or (iii) is or might be entitled to any fee, legal fees, commission or payment from J&F in connection with the preparation, negotiation and execution of the Transaction Documents or the consummation of the Transaction.

8.1.7  **Solvency.** J&F is not insolvent and there is no threat related to its assets that may affect the Transaction set forth in this Agreement. In particular, but without limiting the generality of the foregoing statement: (a) the execution of and compliance with this Agreement by J&F will not entail its insolvency for the purposes of the Brazilian Code of Civil Procedure; and (b) the economic and financial situation of J&F will not entail frustration of any enforcement arising from any litigation or existing Claims against J&F (*fraude contra credores ou fraude à execução*). No Order has been made, petition presented, resolution passed or meeting convened, for the winding up, judicial restructuring or out-of-court restructuring of J&F or for the appointment of an administrator or provisional judicial administrator to them or whereby its assets are to be distributed to its creditors.

8.1.8  **Leniency Documents.** J&F has made available to Purchaser the Leniency Documents, which constitute all agreements that can be disclosed under applicable Law executed by J&F and any related Person with Governmental Authorities making any reference to the Company and the Company Group Entities and based on any Anticorruption Laws, including any agreement with the United States Department of Justice. J&F is fulfilling all the terms and conditions of all Leniency Documents.

8.1.9  **Anticorruption investigations.** J&F has not been notified or otherwise made aware that the Company and the Company Group Entities are subject, party or target in any proceeding or investigation carried out by any Governmental Authority due to any other civil, criminal or administrative investigation in any foreign or domestic jurisdiction related to bribery, corruption, money laundering, tax evasion or other fraudulent or unlawful transaction under the applicable Anticorruption Laws other than those explicitly covered by the Leniency Documents.

8.1.10  **Corrupt acts.** Neither the J&F, nor any former or current officer, director or employee of J&F, nor any former or current agent or representative acting on behalf of J&F has



48

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 190

**Execution Version**

violated any Anticorruption Law apart from the facts explicitly covered by the Leniency Documents. All payments made by J&F to any former or current agent or representative acting on behalf of J&F, the Company and the Company Group Entities do not represent any kind of bribe, rebate or any other unlawful kind of payment to any official of any Governmental Authorities or to any third party in violation or potential violation of the Anti-Corruptions Laws, apart from the facts explicitly covered by the Leniency Documents in relation to J&F and any related Person.

8.1.11 **Negotiation of settlements and agreements related to corrupt acts.** J&F, together and/or on behalf of the Company and the Company Group Entities, may be negotiating settlements and agreements with Brazilian and foreign Governmental Authorities in charge of investigating and sanctioning corrupt acts, including the Ministry of Transparency and Comptroller General (*Ministério da Transparência e Controladoria Geral da União* – CGU), the Federal Attorneys Office (*Advocacia Geral da União* – AGU) and the United States Deparment of Justice (DOJ), and should this be the case neither the execution of these settlements and/or agreements nor the failure to do so will not, in any event, negatively impact the Company and the Company Group Entities.

8.2 **Representations and Warranties of ZMF**

ZMF hereby represents and warrants to the Purchaser, in respect of itself, severally and not jointly, that the following statements are true, accurate and complete in respect of itself on the date hereof and shall remain true on each of the First Purchase Date and the Second Purchase Date, as the case may be:

8.2.1 **Organization.** ZMF is a limited liability company validly existing and duly incorporated under the Laws of Brazil and is duly licensed and qualified to do business and in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its businesses as currently conducted makes such licensing or qualification necessary.

8.2.2 **Power, Capacity and Authorization.** ZMF has full power, capacity and authority, and, as applicable, has taken all required corporate and other actions necessary to execute the Transaction Documents, to fulfill its obligations hereunder and thereunder, and to consummate the Transaction. The copies of the bylaws of ZMF and similar governing documents furnished to Purchaser reflect all amendments made thereto and are correct and complete. ZMF is not in violation of any of the provisions of its governing documents.

8.2.3 **Enforceability.** The Transaction Documents constitute legal, valid and binding obligations, enforceable against ZMF in accordance with their terms. There is no legal or arbitration proceedings or any investigation (about which the investigated party has received a written notice) involving any Governmental Authority that, if adversely decided, could affect the capacity of ZMF to comply with its obligations resulting from the Transaction Documents.

8.2.4 **No Breach or Violations by ZMF.** ZMF has performed and/or complied with, in all material respects, all of its covenants and agreements to be performed or complied with by it under this Agreement.

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



8.2.5 **No Conflicts and/or Consents.** The execution, compliance with and performance by ZMF of the Transaction Documents do not, and the consummation of the Transaction does not and shall not: (i) constitute a violation of or default under any license, permit, authorization, Law or any judicial, administrative or arbitration decision from any Governmental Authority with jurisdiction over ZMF, the Company or the Company Group Entities; (ii) constitute a breach, conflict, violation, default or depend on any consent or approval arising from, or otherwise give to any other contracting party any rights (including without limitation preemptive right) or additional compensation by virtue of, or the right to accelerate, terminate or make any amendment to, any agreement, contract, consortium, loan, credit facility, financial instrument, guarantee, insurance policy or any other arrangement to which ZMF is a party, intervening party or hold participation in, or to which ZMF or any of its properties or assets are subject to, related to or bound by, including without limitation any contract with Governmental Authorities or by which ZMF is bound and which may affect ZMF's ability to execute, perform and comply with the Transaction Documents; (iii) constitute a violation or breach of any rights of Third Parties which may affect ZMF's ability to execute, perform and comply with the Transaction Documents; (iv) depend on any consent, approval or authorization from, notification to, or filing or registration with any Person, entity, court or any other Governmental Authority; (v) result in the creation of any Encumbrances on any of ZMF's properties assets and contractual rights; and (vi) result in non-compliance or breach of the corporate documents and bylaws of ZMF.

8.2.6 **No Brokerage Fees.** Except for lawyers, financial advisors and other professional advisors hired by ZMF to assist it in the implementation of the Transaction (which costs and expenses shall be borne and paid exclusively by ZMF), no broker, finder, investment banker or similar agent: (i) has been retained or employed by or on behalf of ZMF in connection with the Transaction; (ii) is authorized to act on behalf of ZMF within the scope of the Transaction; or (iii) is or might be entitled to any fee, legal fees, commission or payment from ZMF in connection with the preparation, negotiation and execution of the Transaction Documents or the consummation of the Transaction.

8.2.7 **Solvency.** ZMF is not insolvent and there is no threat related to its assets that may affect the Transaction set forth in this Agreement. In particular, but without limiting the generality of the foregoing statement: (a) the execution of and compliance with this Agreement by ZMF will not entail its insolvency for the purposes of the Brazilian Code of Civil Procedure and (b) the economic and financial situation of ZMF will not entail frustration of any enforcement arising from any litigation or existing Claims against ZMF (*fraude contra credores ou fraude à execução*). No Order has been made, petition presented, resolution passed or meeting convened, for the winding up, judicial restructuring or out-of-court restructuring of ZMF or for the appointment of an administrator or provisional judicial administrator to it or whereby its assets are to be distributed to their creditors.

## 8.3 Representations and Warranties of FIP Olímpia

FIP Olímpia hereby represents and warrants to the Purchaser, in respect of itself, that the following statements are true, accurate and complete in respect of itself on the date hereof and shall remain true on each of the First Purchase Date and the Second Purchase Date, as the case may be:





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

Execution Version

8.3.1 **Organization.** FIP Olímpia is an investment fund organized as a closed-end condominium under Rule CVM 578, of August 30, 2016, validly existing and duly incorporated under the Laws of Brazil. FIP Olímpia is duly licensed and qualified to do business and in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its businesses as currently conducted makes such licensing or qualification necessary.

8.3.2 **Power, Capacity and Authorization.** FIP Olímpia has full power, capacity and authority, and, as applicable, has taken all required corporate and other actions necessary to execute the Transaction Documents, to fulfill its obligations hereunder and thereunder, and to consummate the Transaction. The copies of the bylaws of FIP Olímpia and similar governing documents furnished to Purchaser reflect all amendments made thereto and are correct and complete. FIP Olímpia is not in violation of any of the provisions of its governing documents.

8.3.3 **Enforceability.** The Transaction Documents constitute legal, valid and binding obligations, enforceable against FIP Olímpia in accordance with their terms. There is no legal or arbitration proceedings or any investigation (about which the investigated party has received a written notice) involving any Governmental Authority that, if adversely decided, could affect the capacity of FIP Olímpia to comply with its obligations resulting from the Transaction Documents.

8.3.4 **No Breach or Violations by FIP Olímpia.** FIP Olímpia has performed and/or complied with, in all material respects, all of its covenants and agreements to be performed or complied with by it under this Agreement.

8.3.5 **No Conflicts and/or Consents.** The execution, compliance with and performance by FIP Olimpia of the Transaction Documents do not, and the consummation of the Transaction does not and shall not: (i) constitute a violation of or default under any license, permit, authorization, Law or any judicial, administrative or arbitration decision from any Governmental Authority with jurisdiction over FIP Olimpia, the Company or the Company Group Entities; (ii) constitute a breach, conflict, violation, default or depend on any consent or approval arising from, or otherwise give to any other contracting party any rights (including without limitation preemptive right) or additional compensation by virtue of, or the right to accelerate, terminate or make any amendment to, any agreement, contract, consortium, loan, credit facility, financial instrument, guarantee, insurance policy or any other arrangement to which FIP Olímpia is a party, intervening party or hold participation in, or to which FIP Olímpia or any of their properties or assets are subject to, related to or bound by, including without limitation any contract with Governmental Authorities or by which FIP Olímpia is bound and which may affect FIP Olímpia's ability to execute, perform and comply with the Transaction Documents; (iii) constitute a violation or breach of any rights of Third Parties which may affect FIP Olímpia's ability to execute, perform and comply with the Transaction Documents; (iv) depend on any consent, approval or authorization from, notification to, or filing or registration with any Person, entity, court or any other Governmental Authority; (v) result in the creation of any Encumbrances on any of FIP Olímpia's properties assets and contractual rights; and (vi) result in non-compliance or breach of the corporate documents and bylaws of FIP Olímpia.

8.3.6 **No Brokerage Fees.** Except for lawyers, financial advisors and other professional advisors hired by FIP Olímpia to assist it in the implementation of the Transaction

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



(which costs and expenses shall be borne and paid exclusively by FIP Olímpia), no broker, finder, investment banker or similar agent: (i) has been retained or employed by or on behalf of FIP Olímpia in connection with the Transaction; (ii) is authorized to act on behalf of FIP Olímpia within the scope of the Transaction; or (iii) is or might be entitled to any fee, legal fees, commission or payment from FIP Olímpia in connection with the preparation, negotiation and execution of the Transaction Documents or the consummation of the Transaction.

8.3.7    **Solvency.** FIP Olímpia is not insolvent and there is no threat related to its assets that may affect the Transaction set forth in this Agreement. In particular, but without limiting the generality of the foregoing statement: (a) the execution of and compliance with this Agreement by FIP Olímpia will not entail its insolvency for the purposes of the Brazilian Code of Civil Procedure and (b) the economic and financial situation of FIP Olímpia will not entail frustration of any enforcement arising from any litigation or existing Claims against FIP Olímpia (*fraude contra credores ou fraude à execução*). No Order has been made, petition presented, resolution passed or meeting convened, for the winding up, judicial restructuring or out-of-court restructuring of FIP Olímpia or for the appointment of an administrator or provisional judicial administrator to them or whereby its assets are to be distributed to their creditors.

## 9    Representations and Warranties regarding the Company

The J&F Sellers hereby represent and warrant to the Purchaser with respect to the Company and the Company Group Entities that the following statements are true, accurate and complete on the date hereof and shall be true, accurate and complete on each of the First Purchase Date and the Second Purchase Date, as the case may be. Except for the representations given under Sections 9.9 and 9.24, all the representations in this Section 9 are qualified by Sellers' Knowledge and materiality, and all information contained in the Company Disclosure Package, the Leniency Documents, this Agreement and the Transactions Documents shall be deemed disclosed to Purchaser for purpose of this Section 9.

9.1    **Organization.** (A) The Company is a corporation (*sociedade anônima de capital aberto*) validly existing, duly incorporated and in good standing under the Laws of Brazil; (B) Rishis is a corporation (*sociedade anônima de capital fechado*) validly existing, duly incorporated and in good standing under the Laws of Brazil; (C) Eldorado Austria is a company validly existing, duly incorporated and in good standing under the Laws of Austria; (D) Eldorado USA is a company validly existing, duly incorporated and in good standing under the Laws of its State of incorporation; (E) Eldorado Asia is a company validly existing, duly incorporated and in good standing under the Laws of China; (F) Eldorado Finance is a company validly existing, duly incorporated and in good standing under the Laws of Austria; (G) FIC FIP is an investment fund (*fundo de investimento em cotas de fundo de investimento em participações*) validly existing, duly incorporated and in good standing under the Laws of Brazil; and (H) FIP Florestal is an investment fund (*fundo de investimento em participações*) validly existing, duly incorporated and in good standing under the Laws of Brazil. The Company, each of the Company Group Entities, FIC FIP and FIP Florestal is duly licensed and qualified to do business and in good standing in each jurisdiction in which the properties owned or leased by them or the operation of their businesses as currently conducted makes such licensing or qualification necessary.



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 194

Execution Version

9.2 **Power, Capacity and Authorization.** The Company, the Company Group Entities, FIC FIP and FIP Florestal have the corporate power and authority and all authorizations, licenses, permits and certifications necessary to own and operate their properties and to carry on its business as now conducted and presently proposed to be conducted. Each of the Company and FIC FIP has full power, capacity and authority, and, as applicable, has taken all required corporate and other actions necessary to execute the Transaction Documents, to fulfill its obligations hereunder and thereunder, and to consummate the Transaction. The copies of the bylaws or any similar governing documents for the Company and each of the Company Group Entities, FIC FIP and FIP Florestal furnished by Sellers to Purchaser in the Data Room reflect all amendments made thereto and are correct and complete. Neither the Company nor any of the Company Group Entities, FIC FIP or FIP Florestal is in violation of any of the provisions of its governing documents. The Company and each of the Company Group Entities is qualified to do business as a foreign corporation in every jurisdiction in which they currently conduct their business.

9.3 **Enforceability.** The Transaction Documents constitute legal, valid and binding obligations, enforceable against the Company and FIC FIP in accordance with their terms. There is no legal or arbitration proceedings or any investigation (about which the investigated party has received a written notice) involving any Governmental Authority that, if adversely decided, could affect the capacity of the Company and FIC FIP to comply with its obligations resulting from the Transaction Documents.

9.4 **No Conflicts and/or Consents.** The execution, compliance with and performance by the Company with the Transaction Documents do not, and the consummation of the Transaction does not and shall not: (i) constitute a violation of or default under any license, permit, authorization, Law or any judicial, administrative or arbitration decision from any Governmental Authority with jurisdiction over the Company or the Company Group Entities; (ii) constitute a violation, breach, conflict, default or depend on any consent or approval arising from, or otherwise give to any other contracting party any rights (including without limitation preemptive right) or additional compensation by virtue of, or the right to accelerate, terminate or make any amendment to, any agreement, contract, consortium, loan, credit facility, financial instrument, guarantee, insurance policy or any other agreement to which Company or the Company Group Entities are a party, or to which the Company or the Company Group Entities or any of their properties or assets are subject to, related to or bound by, including without limitation any contract with Governmental Authorities or by which the Company or the Company Group Entities are bound and which may affect the Company's and the Company Group Entities' ability to execute, perform and comply with the Transaction Documents; (iii) constitute a violation or breach of any rights of Third Parties which may affect the Company's or the Company Group Entities' ability to execute, perform and comply with the Transaction Documents; (iv) depend on any waiver, consent, approval or Authorization from, notification to, or filing or registration with any Person, entity, court or any other Governmental Authority; (v) result in the creation of any Encumbrances on any of the Company and the Company Group Entities' properties, assets and contractual rights; and (vi) result in non-compliance or breach of the corporate documents and bylaws of the Company and the Company Group Entities.

9.5 **Subsidiaries.** The Company does not: (i) own, of record, beneficially or otherwise, directly or indirectly, any shares of capital stock or securities convertible into capital stock of another corporation or any ownership or participating interest in any Person other than in Company Group Entities; (ii) controls, directly or indirectly, any other entity, other than the Company Group Entities; or (iii) has any contractual obligation to provide funds to, or make any



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

investment (in the form of a loan, capital contribution or otherwise) in, any other Person. No Company Group Entity: (a) owns, of record, beneficially or otherwise, directly or indirectly, any shares of capital stock or securities convertible into capital stock of another corporation or in any Person other than the equity interest in the relevant Company Group Entities; (b) controls, directly or indirectly, any other entity; or (c) has any contractual obligation to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person.

9.6     **Title to Equity Interest.**

9.6.1   **Title to Shares of the Company.** All of the issued shares of the Company are duly authorized, validly issued and outstanding, fully paid and non-assessable and, except for the Existing Encumbrances, are free and clear of any Encumbrances. On the date hereof, the total issued and outstanding capital stock of the Company consists of one billion, five hundred and twenty-five millions, five hundred and fifty-eight thousand, four hundred and nineteen (1,525,558,419) shares of common stock, which represent one hundred percent (100%) of the Company's total and voting capital stock, of which the record and beneficial owners are:

| Shareholder | Common Shares | Percentage of Total and Voting Capital Stock of the Company |
|---|---|---|
| J&F | 970,094,501 | 63.59% |
| FIP Olimpia | 29,905,499 | 1.96% |
| FIP Florestal | 525,558,419 | 34.45% |
| Total: | 1,525,558,419 | 100.00% |

All of the issued and outstanding shares of the capital stock of the Company (a) are duly authorized, validly issued, fully paid and non-assessable; (b) were offered, sold, issued and delivered in compliance with applicable securities Laws; and (c) are not subject to, and were not issued in violation of, any preemptive rights or any other Third Party rights created by statute, the governing documents or any agreement to which the Company is a party or by which the Company is bound. No shares of the capital stock of the Company are held in treasury or are reserved for any purpose.

9.6.1   **Title to Quotas of FIP Florestal.** All of the issued quotas of FIP Florestal that are held by the J&F Sellers are duly authorized, validly issued and outstanding, fully paid and non-assessable and, except for the Existing Encumbrances, are free and clear of any Encumbrances. On the date hereof, the total issued and outstanding capital stock of FIP Florestal consists of one billion and one hundred million (1,100,000,000) quotas, which represent one hundred percent (100%) of FIP Florestal's total and voting capital stock, of which the record and beneficial owners are:

| Quotaholder | Quotas | Percentage of Total and Voting Capital Stock of FIP Florestal | Percentage of Indirect Equity Interest in the Company |
|---|---|---|---|
| FIC FIP | 555,500,000 | 50.50% | 17.40% |
| Petros | 272,250,000 | 24,75% | 8.53% |
| Funcef | 272,250,000 | 24,75% | 8.53% |
| Total: | 1,100,000,000 | 100,00% | 34.45% |





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

All of the issued and outstanding quotas of the capital stock of FIP Florestal (a) are duly authorized, validly issued, fully paid and non-assessable; (b) were offered, sold, issued and delivered in compliance with applicable securities Laws; and (c) are not subject to, and were not issued in violation of, any preemptive rights or any other Third Party rights created by statute, the governing documents or any agreement to which FIP Florestal is a party or by which FIP Florestal is bound. No quotas of the capital stock of FIP Florestal are reserved for any purpose.

9.6.1    **Title to Quotas of FIC FIP.**  All of the issued quotas of FIC FIP are duly authorized, validly issued and outstanding, fully paid and non-assessable and, except for the Existing Encumbrances, are free and clear of any Encumbrances. On the date hereof, the record and beneficial owners of the total issued and outstanding capital stock of FIC FIP are:

| Quotaholder | Percentage of Total and Voting Capital Stock of FIC FIP | Percentage of Indirect Equity Interest in FIP Florestal | Percentage of Indirect Equity Interest in the Company |
|---|---|---|---|
| J&F | 99.50% | 50.25% | 17.31% |
| ZMF | 0.50% | 0.25% | 0.09% |
| Total: | 100,00% | 50.50% | 17.40% |

All of the issued and outstanding quotas of the capital stock of FIC FIP (a) are duly authorized, validly issued and non-assessable; (b) were offered, sold, issued and delivered in compliance with applicable securities Laws; and (c) are not subject to, and were not issued in violation of, any preemptive rights or any other Third Party rights created by statute, the governing documents or any agreement to which FIC FIP is a party or by which FIC FIP is bound. No quotas of the capital stock of FIC FIP are reserved for any purpose.

9.6.2    **Title to Equity Interest in the Company Group Entities.** All of the issued shares, equity interest and/or quotas, as applicable, of the Company Group Entities are duly authorized, validly issued and outstanding, fully paid and non-assessable and, except for the Existing Encumbrances, are free and clear of any Encumbrances. The capital stock of each of the Company Group Entities, and the number of issued and outstanding shares, equity interest and/or quotas of the capital stock of each Company Group Entities, are set forth in the Company Disclosure Package. All issued and outstanding shares, equity interest and/or quotas of capital stock of the Company Group Entities are owned beneficially and of record by the Company, free and clear of all Encumbrances other than the Existing Encumbrances. All of the issued and outstanding shares, equity interest and/or quotas of the capital stock each of the Company Group Entities: (a) are duly authorized, validly issued, fully paid and non-assessable; (b) were offered, sold, issued and delivered in compliance with applicable securities Laws; and (c) are not subject to, and were not issued in violation of, any preemptive rights or any other Third Party rights created by statute, the governing documents or any agreement to which the Company Group Entity is a party or by which the Company Group Entity is bound. No shares of the capital stock of any of the Company Group Entities are held in treasury or are reserved for any purpose.

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 197

**Execution Version**

9.6.3   The Company, FIP Florestal, FIC FIP and the Company Group Entities do not have any equity securities or securities containing any equity features authorized, issued or outstanding. There are no: (i) agreements or other rights or arrangements existing which provide for the manner of voting, dividend rights, sale or issuance by the Company, FIP Florestal, FIC FIP and the Company Group Entities of the capital stock of, respectively, the Company, FIP Florestal, FIC FIP and the Company Group Entities; (ii) rights, subscriptions, warrants, options, conversion rights, stock appreciation rights, phantom stock, agreements or arrangements of any kind outstanding to purchase, exchange, exercise for, transfer, sell, register or otherwise acquire from the Company, FIP Florestal, FIC FIP and/or the Company Group Entities any shares of capital stock or other securities of any kind of the Company, FIP Florestal, FIC FIP and the Company Group Entities; or (iii) agreements or other obligations (contingent or otherwise) which may require the Company, FIP Florestal, FIC FIP and/or the Company Group Entities to repurchase, redeem or otherwise acquire any shares of the capital stock of the Company, FIP Florestal, FIC FIP and/or the Company Group Entities; and (iv) there are no agreements or other obligations (contingent or otherwise) that may prohibit or restrict the ability of the Company, FIP Florestal, FIC FIP and the Company Group Entities to do any of the foregoing.

9.6.4   There are no future capital increase advances, intercompany loans or any other financial support of any nature whatsoever extended by any of the Sellers or their Affiliates or Related Parties to the Company, FIP Florestal, FIC FIP and the Company Group Entities. Upon the acquisition of the Purchased Shares by the Purchaser, the Purchaser shall have the valid and effective right to the totality of the Purchased Shares, free and clear of any and all Encumbrances other than the Existing Encumbrances, and, subject to the provisions of this Agreement, the Company's Shareholders' Agreement, the Quotaholders Agreement, the FIC FIP Quotaholders Agreement and the Second Shareholders' Agreement may fully exercise all political and economic rights inherent thereto.

9.7   **Shareholders' Agreement.** Except for the Company's Shareholders' Agreement and the Quotaholders' Agreement and for the Existing Encumbrances, there is no agreement, of any nature whatsoever, which directly or indirectly binds the Purchased Shares or the shares/quotas issued by any Company Group Entity or by FIC FIP or restricts the right to vote or to transfer of the Purchased Shares or shares/quotas issued by the Company Group Entities or FIC FIP, regardless if they are filed at the Company's, at the Company Group Entities' or at FIC FIP's headquarters or not.

9.8   **Dividends.** There is no dividend, interest on net equity (*juros sobre o capital próprio*) or any other remuneration, distribution or payment due to the Sellers or any other Person which has been declared or approved by the Company, FIP Florestal or FIC FIP and is pending payment.

9.9   **Financial Statements and Books and Records.**

9.9.1   The Financial Statements and the financial statements of the Company dated June 30, 2017: (i) are true, correct and complete, have been prepared according to the applicable Law and the Company's and the Company Group Entities' bookkeeping, on a consistent basis, on the date they were prepared and according with the past practices adopted by the Company and the Company Group Entities; (ii) fairly represent the Company's and the Company Group Entities' equity and financial position, the results of operations and changes in such financial position, as





56

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839967201882601001.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

applicable, within the relevant periods; and (iii) have been prepared according to IFRS, consistently, in the period covered by the financial statements, including in relation to any accounted provisions. Except for the specifications contained in the financial statements and as provided for in IFRS, the Company and the Company Group Entities have no debts, liabilities or obligations, either overdue or not matured, hidden, contingent, unsettled or of any other nature. The Company's and the Company Group Entities' Books and Records (including without limitation the mandatory corporate and accounting books required by Law) are accurate in all material respects, correct and complete and have been prepared according to the applicable Law. Such books are duly recorded, they are kept according to the good commercial practice and show all the transactions that involve the Company's and the Company Group Entities' business and activities, and they do not contain any material errors or omissions.

9.9.2   The financial statements of FIP Florestal dated December 31, 2016 (i) are true, correct and complete, have been prepared according to the applicable Law and the Company's and the Company Group Entities' bookkeeping, on a consistent basis, on the date they were prepared and according with the past practices adopted by FIP Florestal; (ii) fairly represent FIP Florestal's equity and financial position, the results of operations and changes in such financial position, as applicable, within the relevant periods; and (iii) have been prepared according to IFRS, consistently, in the period covered by the financial statements, including in relation to any accounted provisions. Except for the specifications contained in the financial statements, FIP Florestal has no debts, liabilities or obligations, either overdue or not matured, hidden, contingent, unsettled or of any other nature. FIP Florestal's Books and Records (including without limitation the mandatory corporate and accounting books required by Law) are accurate, correct and complete and have been prepared according to the applicable Law. Such books are duly recorded, they are kept according to the good commercial practice and show all the transactions that involve FIP Florestal's business and activities, and they do not contain any material errors or omissions.

9.9.3   The financial statements of FIP FIC dated December 31, 2016 (i) are true, correct and complete, have been prepared according to the applicable Law and the Company's and the Company Group Entities' bookkeeping, on a consistent basis, on the date they were prepared and according with the past practices adopted by FIP FIC; (ii) fairly represent FIP FIC's equity and financial position, the results of operations and changes in such financial position, as applicable, within the relevant periods; and (iii) have been prepared according to IFRS, consistently, in the period covered by the financial statements, including in relation to any accounted provisions. Except for the specifications contained in the financial statements, FIP FIC has no debts, liabilities or obligations, either overdue or not matured, hidden, contingent, unsettled or of any other nature. FIP FIC's Books and Records (including without limitation the mandatory corporate and accounting books required by Law) are accurate, correct and complete and have been prepared according to the applicable Law. Such books are duly recorded, they are kept according to the good commercial practice and show all the transactions that involve FIP FIC's business and activities, and they do not contain any material errors or omissions.

9.10   **Indebtedness.** The Company and the Company Group Entities do not have, on the date hereof, any Indebtedness. No amount borrowed by the Company or the Company Group



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 199

**Execution Version**

Entities under any credit transaction depends on any guarantee provided by a Third Party. The total amount borrowed by the Company or the Company Group Entities under any credit transaction does not exceed the limitations to enter into credit transactions described in the corporate documents of the Company or of the Company Group Entities or in any other document that binds the Company or the Company Group Entities. The Company and the Company Group Entities: (i) have no overdue and unpaid loans and have not given any loan that has not been paid on maturity and there are no debts due to the Company or the Company Group Entities; (ii) are not liable for any Indebtedness or non-performance of any obligations of any other Person; and (iii) are not subject to any arrangement for receipt or repayment of grants, subsidies or financial assistance from Governmental Authorities. There is no Indebtedness that is not: (a) fully reflected in the contracts to which the Company or the Company Group Entities is (are) a party; and (b) properly accounted for in the Financial Statements.

9.11 **Accounts Receivable.** The Company's and the Company Group Entities' accounts receivable, reflected in the Financial Statements, and all accounts receivable subsequent to such date: (i) result from services rendering or from regular sales, within the Ordinary Course of Business, and are accounts receivable based on regular commercial terms; (ii) are legal, valid and binding obligations of the respective debtors, enforceable according to the terms and conditions thereof; (iii) may be fully collected according to the procedures required by Law, as applicable, and in the ordinary course of business, consistent with past practices, by the amounts accounted for in the Financial Statements; and (iv) are not subject to any lawsuits or proceedings filed by or on behalf of the Company or the Company Group Entities. The Company and the Company Group Entities have not received written any notice related to any dispute, lawsuit or claim challenging the collection of any accounts receivable, or denying any goods or services which supply or rendering by the Company or the Company Group Entities supports any of the accounts receivable.

9.12 **Conduct of Business.** Since December 31, 2016: (i) the Company and the Company Group Entities have conducted their respective business in the Ordinary Course of Business and according to their organizational documents, in material compliance with the applicable Law, with no material change whatsoever; (ii) there has been no change to accounting practices, record-keeping policies, or to the terms and conditions according to which the Company or the Company Group Entities operate their business as a whole and renders its services to customers, clients and/or Affiliates, except when so determined by any applicable Law; (iii) there has been no change in the Company's and the Company Group Entities' assets, liabilities, business, operating results or financial, legal, economic or commercial condition, other than those resulting from the Ordinary Course of Business; (iii) no Material Adverse Change or circumstance has occurred that might result in a substantial change in the activities, business or the value of the Company's and the Company Group Entities' assets.

9.13 **Material Contracts.** (A) Each of the agreements material to the activities of the Company and the Company Group Entities ("**Material Contracts**") (i) is valid and binding on the Company and the Company Group Entities; (ii) is in full force and effect and enforceable in accordance with its terms (except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar Laws in effect that affect the enforcement of creditors' rights). The execution, performance and compliance with the Transaction Documents by the Company will not result, according to the terms of the Material Contracts, in the early termination/revocation of any Material Contract; (B) The Company and the Company Group Entities are not, on the date hereof, parties to any contract, pre-contract, memorandum of understanding, letter of intent, agreement, loan, financial instrument,

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 200

**Execution Version**

guarantee or commitment, including any contract with Governmental Authorities, that do not strictly arise from the ordinary course of their business, or that prevent or restrict, in any way, the conduct of their businesses; (C) (i) the Company and the Company Group Entities have not delivered or received until the date hereof any breach or default notice, or any notice of partial or complete termination or request for any penalty or compensation in respect of any of the Material Contracts, including the Contracts with Governmental Authorities, which are in full force and effect, are enforceable against the respective counterparties and are legal and binding obligations of their respective parties; and (ii) the Company and the Company Group Entities have complied with all the provisions of each of the Material Contracts, including the Agreements with Governmental Authorities, and are not in default with any of them; and (iii) there are no Claims of any nature whatsoever pending against the Company or the Company Group Entities in relation to the Material Contracts, including the Contracts with Governmental Authorities.

9.14 **Exclusivity Agreements.** The Company and the Company Group Entities are not party to any Contracts, including contracts with Governmental Authorities, that: (i) contain any exclusivity clause preventing the Company or the Company Group Entities to enter into contracts of similar or identical scope with Third Parties or that impose any penalty in case such contracts are entered into with Third Parties; (ii) contain non-competition obligations or any other obligations that might restrict the engagement or operation of the Company or the Company Group Entities in any business, market or geographical area; and (iii) contain any provision that restricts, limits or prohibits the sale of any assets by the Company or by the Company Group Entities, including the shares issued by the Company.

9.15 **Transactions with Related Parties.** Neither the Sellers nor any of their Related Parties, directly or indirectly, participate in any transaction with the Company or the Company Group Entities, including, without limitation, in any supply contract or services contract. There are no assets or liabilities of any kind, including, without limitation, with respect to any credit, debt, rights or obligations of any other nature between, on the one side, the Company or the Company Group Entities, and on the other side, the Sellers, their Related Parties or the Company's Related Parties.

9.16 **Inventory.** In all material aspects, all inventories related to the Company's and the Company Group Entities businesses are duly recorded in their respective accounting books according to the IFRS, to the applicable Laws and the Ordinary Course of Business.

9.17 **Powers of Attorney.** All powers of attorney needed to conduct the Company's and the Company Group Entities' business were granted by the Company and the Company Group Entities in the Ordinary Course of Business.

9.18 **IP Rights.**

9.18.1 The Company Disclosure Package contains a list indicating ownership of all the IP Rights held or used by the Company and the Company Group Entities, including all applications and registrations of IP Rights licensed, owned or used by the Company and the Company Group Entities. The Company and the Company Group Entities do not own or use any other IP Rights other than the IP Rights provided in the Company Disclosure Package.

9.18.2 The Company and the Company Group Entities own all rights, title and interest in the Company's and the Company Group Entities' IP Rights, free and clear of any Encumbrances;



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

9.18.3   The Company and the Company Group Entities have not received prior to the date of this Agreement any Claims alleging that any of the Company's and the Company Group Entities' IP Right infringes any rights of any Third Parties;

9.18.4   The Company and the Company Group Entities own or have valid licenses or applications to use the Company's and the Company Group Entities' IP Rights;

9.18.5   The consummation of the transactions contemplated herein shall not result in loss of any such IP Right. The Company and the Company Group Entities own, or have licenses for the utilization of, the IP Rights necessary to allow them to proceed with their businesses as they have been conducted up to the date hereof;

9.18.6   There are no Claims by clients, employees, former employees or service providers (current or not) against the Company or it's the Company Group Entities, claiming the ownership, wholly or partially, of any of the Company's or the Company Group Entities' IP Rights or right to use any IP Right, the absence of which would impact the businesses of the Company and the Company Group Entities as currently conducted. No Seller nor any employee of or consultant to the Company or the Company Group Entities owns any IP Rights used by the Company or the Company Group Entities;

9.18.7   The Sellers have taken all necessary and appropriate steps to protect and preserve the validity and ownership of the IP Right listed in the Company Disclosure Package, as well as the confidentiality of all information of the Company and the Company Group Entities which is confidential, including information related to customers, suppliers and pricing. The Sellers are not aware that any of such information has been disclosed to any Third Party. The Company and the Company Group Entities have not licensed or assigned to Third Parties nor in any other way permitted the use of the Company's and the Company Group Entities' IP Right by any Third Party;

9.18.8   All of the employees of the Company and of the Company Group Entities are subject to IP Right assignment and confidentiality provisions to the benefit of the Company and the Company Group Entities, in the terms of the Law or pursuant to their employment agreements. No employee, representative, sales agents or consultant has any rights or claims against the Company or the Company Group Entities with respect to any IP Right. Any employee or partner that has contributed to the development of IP Right by the Company or its Company Group Entities has legally assigned all rights related to such IP Right to the Company and the Company Group Entities, as applicable.

9.19   **Real Estate.**

9.19.1   The Company Disclosure Package contains a complete list of all real properties owned, on the date hereof, in whole or in part, by the Company and the Company Group Entities (the "**Properties**"). (i) All Properties are free and clear of any Encumbrances; (ii) the Company and the Company Group Entities are the legitimate owners of the Properties; and (iii) there is no debt related to the Properties, including, without limitation, debts related to the Urban Real Estate Tax (*IPTU*), the Rural Real Estate Tax (*ITR*), the Real Estate Conveyance Tax (*ITBI*), *foros*, *laudêmios* or applicable condominium obligations and expenses;

9.19.2   The Company Disclosure Package contains an accurate and complete list of all real estate leases in which the Company and the Company Group Entities, on the date



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

hereof, are parties as lessee, sub-lessee, lessor or sub lessor (collectively, the "**Leased Properties**"). Each lease agreement related to the Leased Properties (each, a "**Lease**") is a valid and binding obligation of the Company or the Company Group Entities and of the counterparties thereof, and is in full force and effect, (i) there is no condition, state of facts or events which, by lapse of time or delivery of a notice, would constitute default by the Company or the Company Group Entities under any of such Leases; (ii) the Company or the Company Group Entities have not received any communication in writing from the lessee or lessor of any of the Leased Properties alleging that the Company or the Company Group Entities are breaching in any material respect their obligations under the respective Leases that are due and not yet paid, including rent or other penalties and/or charges due but not paid; (iii) the Company and the Company Group Entities are the only possessors of the Leased Properties and did not assign, sublease, license, mortgage or convey to Third Parties any part of their respective interests in any of the Leased Properties under any of Leases; (v) there are no pending Claims, condition, state of facts or circumstances which may restrict the ability of the Company or the Company Group Entitites to renew the Lease Agreements in the Ordinary Course of Business; (vi) the duration and expiration dates of the Lease Agreements that are described in the Company Disclosure Package accurately represent the terms of each such Lease Agreements as currently in force; and

9.19.3   The Company Disclosure Package contains an accurate and complete list of all agricultural partnerships in which the Company and the Company Group Entities, on the date hereof, are parties (collectively, the "**Agricultural Partnerships**"). Each agricultural partnership agreement related to the Rural Partnership (each, a "**Agricultural Partnership Agreement**") is a valid and binding obligation of the Company or the Company Group Entities and of the counterparties thereof, and is in full force and effect. (i) The Company or the Company Group Entities are not in default under or in breach of any such Agricultural Partnership Agreements as of the date of this Agreement and no other counterparty of any of such Agricultural Partnership Agreements is in default thereunder or in breach thereof; (ii) there is no condition, state of facts or events which, by lapse of time or delivery of a notice, would constitute default by the Company or the Company Group Entities under any of such Agricultural Partnership Agreements; (iii) the Company or the Company Group Entities have not received any communication in writing from the partners of any of the Agricultural Partnership Agreements alleging that the Company or the Company Group Entities are breaching in any material respect their obligations under the respective Agricultural Partnership Agreements that are due and not yet paid, including rent or other penalties and/or charges due but not paid; (iv) the Company and the Company Group Entities are the only possessors of the Agricultural Partnerships and did not assign, sublease, license, mortgage or convey to Third Parties any part of their respective interests in any of the Agricultural Partnerships under any of the Agricultural Partnership Agreements; (v) there are no pending Claims, condition, state of facts or circumstances which may restrict the ability of the Company or the Company Group Entitites to renew the Agricultural Partnership Agreements in the Ordinary Course of Business; (vi) the duration and expiration dates of the Agricultural Partnership Agreements that are described in the Company Disclosure Package accurately represent the terms of each such Agricultural Partnership Agreements as currently in force; and

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de Sao Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 108396787201882601000.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 203

**Execution Version**

9.19.4   The Company and the Company Group Entities have not waived, taken or failed to take any measures that they should have taken prior to the date hereof, that could have annulled or cancelled the full right to exercise any option, the right of first refusal or the preemption right under any Lease, Agricultural Partnership Agreement, or sublease, including, without limitation, any option related to the purchase, renewal or extension of any Lease or Agricultural Partnership Agreement.

9.20   **Insurance.** The Company Disclosure Package describes each of the insurance policies contracted by the Company and the Company Group Entities, including: (i) type of policy; (ii) form of coverage; (iii) policy number; (iv) expiration date; and (v) name of the insurer. The Company and the Company Group Entities have subscribed all relevant insurance policies pursuant to the applicable Law which are provided in the Company Disclosure Package and have all mandatory insurance coverage in place. Such insurances are all in full force and effect and the Company and the Company Group Entities have paid the insurance premiums relating thereto and are in compliance with all contractual and legal insurance obligations. The Company and the Company Group Entities have not failed to timely give any notice or file any claim under any such policies. Neither the Company, the Company Group Entities nor any of the Sellers have received written notice of (a) actual or potential cancellation of any such insurance or refusal of coverage thereunder, (b) refusal of any coverage or rejection of any claim under any insurance policy, and (c) material adjustment in the amount of the premiums payable with respect to any insurance policy. There are no Claims pending with respect to any of such insurance policies which are reasonably likely to exceed the amount of coverage provided by the applicable policy.

9.21   **Forestry Assets.** The Company Disclosure Package accurately and faithfully describes the forestry assets that are used by the Company in its Ordinary Course of Business ("**Forestry Assets**"). The Forestry Assets, as described in the Company Disclosure Package, are sufficient for the operations of the Company as currently conducted, in the Ordinary Course of Business. As a result of acts of god and force majeure, there are no condition, state of facts or circumstances that may impact the use of the Forestry Assets by the Company in its Ordinary Course of Business.

9.22   **Assets.** (i) The Company and the Company Group Entities own, lease or have the legal right to use all of the assets, properties and rights of every kind, nature, character and description, including, without limitation, Properties, Leased Properties, used, or necessary for, the conduct of the businesses of the Company and the Company Group Entities or otherwise owned or leased by the Company and the Company Group Entities and, with respect to contractual rights, are parties to and enjoy the right to the benefits of all contracts, agreements and other arrangements used by the Company and the Company Group Entities in or relating to the conduct of the businesses of the Company and the Company Group Entities (all such properties, assets and contractual rights being the "**Assets**"); (ii) the Company and the Company Group Entities have good and marketable title to or, in the case of leased or subleased Assets, valid and subsisting leasehold interests in, provided that all the Assets, free and clear of any Encumbrances, and all such good and marketable title is properly recorded in the Financial Statements; (iii) the Assets owned, leased or otherwise used by the Company and the Company Group Entities are sufficient to run their businesses as currently run, and in accordance with past practices, in an ordinary course, without any disruptions or interruptions; and (iv) the equipment of the Company and the Company Group Entities used in the operation of their businesses is, taken as a whole, in good operating condition and repair, ordinary wear and tear excepted.





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 204

Execution Version

9.23 **Licenses and Permits.** The Company and the Company Group Entities hold all licenses, permits and authorizations issued by Governmental Authorities necessary to conduct their activities as they have been developed in the Ordinary Course of Business ("**Licenses**"). All of such Licenses are in full force and effect or undergoing renewal and all information and data necessary to obtain such renewals with the Governmental Authorities have been delivered in due time and adequately. The Company's and the Company Group Entities' business is conducted in material compliance with such Licenses. The implementation of the Transaction shall not cause any breach or result in the cancellation, revocation, modification or termination of any such licenses, permits or authorizations reasonably expected to impact the Company's and the Company Group Entities' business as a whole. There is no Claim against the Company or the Company Group Entities that could be expected to result in loss, cancellation or non-renewal of any Licenses.

9.24 **Operational Assets**. Each of the Assets and the Forestry Assets are, in all material respects, in good and adequate operating condition (except for wear and tear in the Ordinary Course of Business), free of any Encumbrances and are not subject to any other circumstances or impediments that may impact its use by the Company and the conduction of Company's businesses in the Ordinary Course of Business. The Company holds full legal title to use the Properties, Leased Properties and Agricultural Partnerships, as applicable, and there are no circumstances that, to the Seller's Knowledge, may impact the conduct of the Company's business in the Ordinary Course of Business. The Company holds, in relation to the Assets and the Forestry Assets, all material Permits to conduct its activities in the Ordinary Course of Business.

9.25 **Environmental Matters.**

9.25.1 The Company and the Company Group Entities are in good standing and have all necessary environmental Licenses required by all Governmental Authorities under any Law to conduct their business and no condition or event resulting in any Encumbrance to the Company, the Company Group Entities or any of their Properties, Leased Properties or Assets, projects or activities, or constituting any violation has occurred, according to those Laws, that could result in the cancellation of any such Licenses.

9.25.2 The Company and the Company Group Entities are in compliance with all Environmental Laws and have conducted its business in accordance with all Environmental Laws.

9.25.3 The Company and the Company Group Entities have not received any notification to the effect that any aspect of their business, operations, projects or facilities is infringing any Law, including without limitation, a notification concerning the environment, or stating that the Company or the Company Group Entities are liable, or potentially liable, for cleansing and sanitization of any substance, or for remediating or redressing any damage to the environment, in any place.

9.25.4 The Company and the Company Group Entities have not used, discarded, stored or disposed of any substance or pollutant, contaminants, toxic or hazardous materials, either in the form of material or energy, in the atmosphere or soil, or otherwise, in any of the Properties, Leased Properties, Assets or facilities of the Company and the Company Group Entities, except in accordance with the Law and with the Licenses, and have no knowledge that prior to their occupation of these properties or facilities, any other Person has used, stored or disposed of any of such

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.




fls. 205

**Execution Version**

substances or materials, nor have disposed of waste and/or pollutants and hazardous materials to service providers or any Third Party that used, discarded, stored or disposed of such waste, pollutants and hazardous materials in violation of any Law and/or in a manner that caused degradation or damages to the environment.

9.25.5   There are no Claims against the Company and the Company Group Entities with respect to any breach of Environmental Laws reasonably expected to impact the Company's and the Company Group Entities' business taken as a whole.

## 9.26   Employment Matters.

9.26.1   The Company and the Company Group Entities are in compliance with all applicable labor and social security Laws, including collective bargaining agreements, relating to their managers, officers and employees, including, without limitation, those relating to wages, record, the Severance Payment Fund (FGTS), working hours, fair labor practices, health, safety, Tax payments relating to social security and other similar ones;

9.26.2   (i) The Company and the Company Group Entities are not party to any Claim of a labor or social security nature, either as directly or severally responsible; (ii) there is no pending lawsuit against the Company or the Company Group Entities before any Governmental Authority or entity with jurisdiction to decide on labor or social security disputes, either as directly or severally responsible, and there is no actual formal complaint against the Company or the Company Group Entities, before any Governmental Authority or entity with jurisdiction to resolve on labor or social security disputes;

9.26.3   The Company and the Company Group Entities have not changed or agreed to change in any way employment policies, including those applicable to increase of salary, deferred compensation, fringe benefits, severance pay plans or retirement plans related to employees, directors and/or officers, other than in order to comply with applicable regulations or collective bargaining agreements;

9.26.4   The Company and the Company Group Entities have paid in full to its employees, managers, executives and officers all wages, salaries, commissions, bonuses, benefits and any other compensation due or payable to such individuals in accordance with the applicable Laws;

9.26.5   The Company Disclosure Package lists all labor unions to which the Company's and the Company Group Entities' employees are affiliated and the Company and the Company Group Entities are not party to or bound by any other collective bargaining agreement (*convenção coletiva de trabalho*), collective labor agreement (*acordo coletivo de trabalho*) or agreement of any kind with any union or labor organization;

9.26.6   The Company Disclosure Package lists all individuals that render services to the Company or to the Company Group Entities. The Company and the Company Group Entities take all necessary or required measures to avoid establishing an employment relationship between the Company or the Company Group Entities and such individuals. Furthermore, the Company and the Company Group Entities regularly request sufficient evidence that the employers of such individuals are timely complying with the labor and social security obligations with





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 206

**Execution Version**

respect to outsourcing and subcontracting;

9.26.7 The execution of this Agreement and the completion of the transactions hereunder shall not give rise to any extraordinary payment or compensation increase to any managers, officers or employees of the Company or the Company Group Entities;

9.26.8 No Company's or Company Group Entities' managers, officers or employees renders any service, directly or indirectly, to any Related Party of the Sellers, of the Company or of the Company Group Entities; and

9.26.9 There have been no strikes, slowdowns, and interruptions of work or other industrial action of the Company's employees over the past five (5) years.

9.27 **No Partnerships.** The Company is not a member of any partnership, joint venture or consortium.

9.28 **Litigation.** The Company is not involved in any Claim (with respect to any nature other than labor and tax, which are addressed by Section 9.26 Section 9.30, respectively) against the Sellers (when relating to the Company and/or the Company Group), the Company and/or the Company Group.

9.29 **No Brokerage Fees.** No broker, finder, investment banker, other professional advisor or similar agent: (i) has been retained or employed by or on behalf of the Company or the Company Group Entities in connection with the Transaction; (ii) is authorized to act on behalf of the Company or the Company Group Entities within the scope of the Transaction; or (iii) is or might be entitled to any fee, legal fees, commission or payment from the Company or the Company Group Entities in connection with the preparation, negotiation and execution of the Transaction Documents or the consummation of the Transaction.

9.30 **Tax.** The Company and the Company Group Entities have:

9.30.1 Timely paid, withheld or collected, as the case may be all applicable Taxes and are not subject to any collection or action, proceeding or pending Claim that in any way could result in any liability to the Company or to the Company Group Entities;

9.30.2 Complied with all Tax Laws and Tax incentive programs;

9.30.3 Made appropriate provisions in the Financial Statements for payment of any Taxes accrued as a result of the performance of acts, facts or events occurred up to and on the date hereof; and

9.30.4 For the past five (5) fiscal years prior to the date hereof, timely filed all Tax Returns and executed all other material ancillary obligations required to have been filed and executed under applicable Law, all such Tax Returns and other material ancillary obligations were complete in all their material aspects and presented information required by the Brazilian Federal Revenue (RFB), the Ministry of Labor and Employment (MTE), the Brazilian Social Security Institute (INSS) and any other Governmental Authority within such period, have been presented in accordance with the applicable Law and represent, correctly and accurately, all Taxes due by the Company and the Company Group Entities with respect to the periods to which they relate.

9.30.5 There are no matters under discussion with any Governmental Authority which



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 207

Execution Version

could result in the assessment of additional Taxes in relation to the Company or the Company Group Entities.

9.30.6    No Tax incentives have been granted to the Company or the Company Group Entities until the Closing Date.

9.30.7    The Company and the Company Group Entities are not part and are not subject to any Tax-deficiency notice, process or Tax assessment claim, collection of pending Taxes, whether filed in court or conducted by any Governmental Authority.

9.30.8    The Company and the Company Group Entities have not borrowed or are part of any Tax incentive program, or any Tax installment program for the payment of overdue Taxes.

9.31    **Solvency.** The Company and the Company Group Entities are not insolvent and there is no threat related to their assets that may affect the Transaction set forth in this Agreement. In particular, but without limiting the generality of the foregoing statement: (a) the execution of and compliance with this Agreement by the Company will not entail its or the Company Group Entities insolvency for the purposes of the Brazilian Code of Civil Procedure; (b) the economic, financial and equity situation of the Company and the Company Group Entities will not entail frustration of any execution arising from any litigation or existing Claims against the Company or the Company Group Entities; (c) there are no securities issued by the Company or the Company group Entities or drawn against it that have been protested; and (d) the Company and the Company Group Entities are not debtors of any Taxes, whether federal, state or local, which enforcement or collection has not been suspended according to the applicable Law. No Order has been made, petition presented, resolution passed or meeting convened, for the winding up, judicial restructuring or out-of-court restructuring of the Company or the Company Group Entities or for the appointment of an administrator or provisional judicial administrator to it or whereby its assets are to be distributed to its creditors.

9.32    **Compliance with Laws.** Neither the Company, the Company Group Entities, nor any officer, director or employee of the Company or the Company Group Entities, nor any former or current agent or representative acting on behalf of the Company or the Company Group Entities has violated any Anticorruption Law other than as covered by the Leniency Documents. The Company and the Company Group Entities are conducting, and have at all times conducted, its operations in compliance with the Anticorruption Laws. Except as disclosed in the Leniency Documents, neither the Company, the Company Group Entities nor their respective directors, officers, agents, representatives, consultants, employees has (a) used any Company's funds for unlawful contributions, presents, gifts, entertainment of other unlawful expense relating to political activity, to Third Parties and/or any official of any Governmental Authority; (b) on behalf of the Company and the Company Group Entities directly or indirectly, offered, paid or delivered any fee, commission, kickback, any other illegal compensation to any official of any Governmental Authorities, or other sum of money or item of property, however characterized, to any finder, agent, or other party which is in any manner illegal under any applicable Law; (c) on behalf of the Company and the Company Group Entities induced such Third Party and/or official of Governmental Authorities, or their agents or employees, to make or omit from making any act in violation of applicable Law conduct for such Third Party or official of Governmental Authority, or their agents or employees; or (d) on behalf of the Company and the Company Group Entities induced such Third Party and/or official of Governmental Authorities, or their agents or



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

employees, to use from its influence and obtain any illegal advantage or illegal favorable treatment in order to assist the Company or the Company Group Entities at any title.

9.32.1   All material financial transactions involving each of the Company and the Company Group Entities has been duly recorded on each of their respective accounting records pursuant to the applicable Law and IFRS, and the Financial Statements do not omit any transaction that relates to any of the practices set forth in Section 9.32 and that should be recorded pursuant to the applicable Laws and IFRS.

9.33   **Further Representations and Warranties.** Except as to those matters covered by the representations and warranties expressly set out in this Agreement, neither any of the Sellers nor the Company makes any other representations or warranties whatsoever (including any implied or express warranty as to the condition, value or quality of the business of the Company Group Entities or other implied or express warranty) to the Purchaser.

## 10   Representations and Warranties of the Purchaser and of the Purchaser Parent Company

The Purchaser and the Purchaser Parent Company hereby expressly represent and warrant to the Company and the Sellers that the following statements are true, accurate and complete and shall be true, accurate and complete on the Closing Date:

10.1   **Organization.** (i) The Purchaser is a corporation (*sociedade por ações de capital fechado*) validly existing and duly incorporated under the Laws of Brazil and (ii) the Purchaser Parent Company is a limited liability company. The Purchaser and the Purchaser Parent Company are duly licensed and qualified to do business and are in good standing in each jurisdiction in which the properties owned or leased by it or the operation of their businesses as currently conducted makes such licensing or qualification necessary.

10.2   **Power, Capacity and Authorization.** The Purchaser and the Purchaser Parent Company have the corporate power and authority and all authorizations, licenses, permits and certifications necessary to own and operate its properties and to carry on their business as now conducted and presently proposed to be conducted. The Purchaser and Purchaser Parent Company have full power, capacity and authority, and, as applicable, have taken all required corporate and other actions necessary to execute the Transaction Documents, to fulfill its obligations hereunder and thereunder, and to consummate the Transaction. The copies of the bylaws or any similar governing documents of the Purchaser and the Purchaser Parent Company furnished to Sellers prior to the date hereof reflect all amendments made thereto and are correct and complete. Neither the Purchaser nor the Purchaser Parent Company is not in violation of any of the provisions of its governing documents.

10.3   **Enforceability.** The Transaction Documents constitute legal, valid and binding obligations, enforceable against the Purchaser and the Purchaser Parent Company in accordance with their terms. There is no legal or arbitration proceedings or any investigation (about which the investigated party has received a written notice) involving any Governmental Authority that, if adversely decided, could affect the capacity of the Purchaser and the Purchaser Parent Company to comply with their obligations resulting from the Transaction Documents.

10.4   **No Breach or Violations by Purchaser and the Purchaser Parent Company.** Purchaser and Purchaser Parent Company have performed and/or complied with, in all material respects, all of the covenants and agreements to be performed or complied with by it under this Agreement.

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839678720188260100.82018.8.26.0100 e código 4C8DFAC.



**Execution Version**

10.5 **No Conflicts and/or Consents.** The execution, compliance with and performance by the Purchaser and by the Purchaser Parent Company with the Transaction Documents do not, and the consummation of the Transaction does not and shall not: (i) constitute a violation of or default under any license, permit, authorization, Law or any judicial, administrative or arbitration decision from any Governmental Authority with jurisdiction over the Purchaser and the Purchaser Parent Company; (ii) constitute a violation, breach, conflict, default or depend on any consent or approval arising from, or otherwise give to any other contracting party any rights (including without limitation preemptive right) or additional compensation by virtue of, or the right to accelerate, terminate or make any amendment to, any agreement, contract, consortium, loan, credit facility, financial instrument, guarantee, insurance policy or any other arrangement to which the Purchaser or the Purchaser Parent Company is a party, intervening party or hold participation in, or to which the Purchaser or the Purchaser Parent Company or any of their properties or assets are subject to, related to or bound by, including without limitation any contract with Governmental Authorities or by which either the Purchaser or the Purchaser Parent Company is bound and which may affect the Purchaser's or the Purchaser Parent Company's ability to execute, perform and comply with the Transaction Documents; (iii) constitute a violation or breach of any rights of Third Parties which may affect the Purchaser's or the Purchaser Parent Company's ability to execute, perform and comply with the Transaction Documents; (iv) depend on any consent, approval or Authorization from, notification to, or filing or registration with any Person, entity, court or any other Governmental Authority; (v) result in the creation of any Encumbrances on any of the Purchaser's or the Purchaser Parent Company's properties, assets and contractual rights; and (vi) result in non-compliance or breach of the corporate documents and bylaws of the Purchaser and of the Purchaser Parent Company.

10.6 **No Implied Representation or Warranty.** The Purchaser and the Purchaser Parent Company hereby acknowledge and agree that (i) other than the representations made in Sections 8 and 8.2, no Seller, nor any of their respective Representatives or Affiliates, make or have made any representation or warranty, express or implied, at law or in equity, with respect to the business of the Company and the Company Group Entities.

## 11 Other Covenants

11.1 **Certain Actions.** The Parties, including the Sellers' Intervening Parties, shall cooperate with each other and act diligently and expeditiously in order to obtain all waivers and approvals from Third Parties in connection with the consummation of the Transaction. Without limiting the generality of the foregoing, the Parties agree as follows:

   11.1.1 No later than two (2) Business Days from the date hereof, the J&F Sellers and FIP Olimpia shall issue (and/or cause FIC FIP to issue, as the case may be) the notices to (a) Petros and Funcef under Section 11.4 of the Quotaholders' Agreement and (b) to FIP Florestal under Section 7.4 of the Company's Shareholders' Agreement, and substantially in the form set forth in **Exhibit 11.1.1**.

   11.1.2 No later than three (3) Business Days following execution of this Agreement, J&F shall cause (directly and/or through FIC FIP) the trustee (*Administrador*) of FIP Florestal to call a meeting of the quotaholders' of FIP Florestal to be held no later than thirty (30) days following the notice set forth in Section 11.1.1 above, with the following agenda: (i) decision by FIP Florestal as to the exercise of the FIP Preemptive Right or the right of FIP Florestal to tag along pursuant to Section 7.5 of the Company's Shareholders' Agreement; (ii) a capital call by FIP Florestal to fund





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

the exercise of the FIP Preemptive Right; and (iii) a resolution for the FIP Redemption.

11.1.3   The J&F Sellers undertake to exercise their voting rights in all quotaholders' meetings of FIP Florestal and/or of FIC FIP and all board of directors and shareholders' meetings of the Company in order to implement the acts and transactions contemplated in this Agreement, including, without limitation, exercising to the fullest extent permitted by Law their voting rights as quotaholders of FIP Florestal against the exercise, by FIP Florestal, of the FIP Preemptive Right and/or capital call provided for in Section 11.1.2 above.

11.1.4   Without prejudice to the foregoing, the Sellers agree to cooperate with Purchaser and undertake their best efforts and, to the extent that it does not represent any adverse effect to Sellers, to analyze any alternative structure proposed by the Purchaser to maximize the percentage of the Company's indirect equity interest held by Funcef, Petros and FIC FIP through FIP Florestal that may purchased by Purchaser directly as shares of the Company.

11.1.5   J&F and ZMF, as the sole quotaholders of FIC FIP, undertake to cause FIC FIP to perform all necessary acts for the fulfillment of this Agreement.

11.1.6   No later than thirty (30) days as from the date of execution of this Agreement, the Parties shall perform all acts necessary to cause the execution of an amendment to this Agreement, whereby the Company and FIC FIP shall adhere to this Agreement as intervening-consenting Party.

11.2   **Access**. After the Second Purchase, Purchaser shall cause the Company and the Company Group Entities to, upon reasonable prior written notice, give the Sellers access to all such materials, documents, data and information of the Company and the Company Group Entities as the Seller may reasonably request to comply with applicable Laws. The Sellers agree that any such inspection or request for information shall be conducted during normal business hours in such a manner as not to interfere or disrupt unreasonably with the operations of the Company and the Company Group Entities.

11.3   **Exclusivity**. Except as otherwise provided for under the Company's Shareholders' Agreement and the Quotaholders' Agreement, from the date of this Agreement to the earlier of (a) the date on which this Agreement is terminated in accordance with Section 19 and (b) the date on which Second Purchase occurs, each of the Sellers jointly and severally undertake not to, and not permit any of their representatives and/or agents to, directly or indirectly:

(i)   solicit or encourage the initiation or submission of any expression of interest, inquiry, proposal or offer from any person relating to or in connection with a possible transaction with respect to the sale of shares owned by J&F Sellers in the Company and any Company Group Entities; or

(ii)   participate in any discussions or negotiations or enter into any agreement with, or provide any non-public information to, any person (other than the Purchaser and its Affiliates and/or representatives) relating to or in connection with a transaction with respect to the sale of shares owned by J&F Sellers in the Company and any Company Group Entities

11.4   **Termination of Powers of Attorney**. By no later than the date falling ten (10) Business Days in advance of the Second Purchase Date, J&F shall deliver to Purchaser a list of all

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 211

**Execution Version**

valid powers of attorney granted by the Company or the Company Group Entities or to which any of the Company and the Company Group Entities is a party, and, upon Purchaser's request, cause the Company and the Company Group Entities to terminate, effective at or prior to the Second Purchase, the powers of attorney which termination has been required by it.

11.5 **Leniency Documents.** Without prejudice to Sections 4.3.2(v), 5.2.2(iv) and 12.1.1(vii), J&F and its Affiliates shall not amend, modify or supplement (or permit the amendment, modification or supplement of) any of the terms of the Leniency Documents except for any amendments, modifications or supplements that, cumulatively do not negatively impact and, directly or indirectly, any of the Company or the Company Group Entities. J&F undertakes to provide Purchaser and Company with access to any amendments to the Leniency Documents or other documents relating to any Anti-Corruption Indemnifiable Matter to the extent applicable Law permits.

11.6 **Compliance with Company's Shareholders' Agreement and Quotaholders' Agreement.** The Sellers shall comply with the terms and conditions of the Company's Shareholders' Agreement and the Quotaholders' Agreement as applicable as a result of the Transaction. The Purchaser hereby undertakes not to enter into the Company's Shareholders' Agreement or the Quotaholders' Agreement at any time after the date of execution of this Agreement, except that the Purchaser shall be entitled to fully accede to the Company's Shareholders' Agreement in case Petros and Funcef exercise their rights of first refusal under the Quotaholders' Agreement and the Second Purchase occurs.

11.7 **Transactional Taxes.** Except as otherwise provided under this Agreement, each Party shall be solely responsible for the timely payment of any applicable Taxes that are charged to such Party, including taxation on revenues, income, gain and similar Taxes arising out of or in connection with the Transaction contemplated hereby (**"Transactional Taxes"**) and such Party shall (i) file all necessary Tax Returns and other documentation with respect to the Transactional Taxes for which it is responsible and (ii) indemnify, defend and hold harmless the other Party with respect to any Losses incurred in connection with the Transactional Taxes or the related Tax obligations, returns and other requirements which such Party is responsible for.

   11.7.1 Notwithstanding the above, the Purchaser shall bear the IOF costs and financial institutions' fees and costs related to the remittance to the Sellers of the Purchase Price. The Purchaser shall therefore remit to the Sellers the full amount of the Purchase Price plus, if necessary, the amount of the IOF cost and the financial institutions' fees and costs in connection with the remittance to the Sellers of the Purchase Price.

11.8 **ANTAQ Approval**

   11.8.1 The Parties shall undertake all measures necessary, shall mutually cooperate and in good faith shall endeavor their best efforts, including by providing all required documents and information in order to obtain the approval in connection with the change of control of Rishis in accordance with *Portaria* SEP/PR 50/2015, Decree 8.033/2013 and ANTAQ's Normative Resolution 7/2016 on or before the Second Purchase Date (**"ANTAQ Approval"**).

   11.8.2 In the event that the ANTAQ Approval is not obtained by the Second Purchase Date or that ANTAQ imposes any restriction or condition upon the use of Rishis' port terminal and logistic facilities by the Company, the Parties further agree to, on the



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

Second Purchase Date, enter into the necessary instruments, to the extent permitted by applicable Law, the Quotaholders' Agreement and the Company's Shareholders Agreement, to implement an alternative structure so as to allow the Company to continue operating with Rishis' port terminal consistently with its current operations, provided that such alternative structure shall not have any adverse economic impact to the Parties. The Parties agree that such structures may include a spin-off of Rishis followed by lease, take-or-pay contracts or services contracts to be entered into with the Company.

## 12   Indemnification

### 12.1   Indemnification Obligations

12.1.1   **Indemnification by J&F Sellers**. Subject to the limitations provided for in Section 12.3 below, J&F undertakes to indemnify, defend and hold harmless the Purchaser, the Assigned Purchaser and the Company (**"Purchaser's Indemnified Parties"**), in respect of all Losses incurred by the Purchaser's Indemnified Parties arising from:

(i)   any acts, facts or omissions attributed or related to the Company or the Company Group Entities, regardless of whether or not they are Disclosed Indemnifiable Matters, which occurred prior to the Second Purchase Date (even if the effects or consequences of the relevant act, fact or omission are materialized only after the Second Purchase Date and/or if a Claim in connection therewith is brought only after the Second Purchase Date); provided, however, that, if the Second Purchase does not occur, the provisions of this item shall apply only with respect to acts, or omissions occurred prior to the date of Initial Payment, or if the First Purchase occurred, the First Purchase Date; and/or

(ii)   any breach of the representations and warranties undertaken by J&F in Sections 9.9 (Financial Statements) and/or 9.24 (Operational Assets); and/or

(iii)   if Purchaser or Assigned Purchaser become a quotaholder of FIP Florestal, any acts, facts or omissions related to FIP Florestal, which occurred prior to the Second Purchase Date (even if the effects or consequences of the relevant act, fact or omission are materialized only after the Second Purchase Date and/or if a Claim in connection therewith is brought only after the Second Purchase Date); provided, however, that, if the Second Purchase does not occur, the provisions of this item shall apply only with respect to acts, events, omissions, circumstances or facts occurred prior to the First Purchase Date; and/or

(iv)   if Purchaser or Assigned Purchaser become a quotaholder of FIC FIP, any acts, facts or omissions related to FIC FIP, which occurred prior to the Second Purchase Date (even if the effects or consequences of the relevant act, fact or omission are materialized only after the Second Purchase Date and/or if a Claim in connection therewith is brought only after the Second Purchase Date); provided, however, that, if the Second Purchase does not occur, the provisions of this item shall apply only with respect to acts, events, omissions, circumstances or facts occurred prior to the First Purchase Date; and/or

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 213

**Execution Version**

    (v)    breach of any covenant or any other obligation undertaken by any of J&F's Sellers under the Transaction Documents; and/or

    (vi)    breach of J&F Sellers' Fundamental Representations; and/or

    (vii)    any Anti-Corruption Indemnifiable Matter.

**12.1.2**  **Indemnification by FIP Olímpia.** FIP Olímpia undertakes to indemnify, defend and hold harmless the Purchaser's Indemnified Parties in respect of all Losses incurred by the Purchaser's Indemnified Parties arising from:

    (i)    breach of representations and warranties given by FIP Olimpia under Section 8.3; or

    (ii)    breach of any covenant or any other obligation undertaken by the FIP Olímpia under the Transaction Documents.

**12.1.3**  **Indemnification by the Purchaser.** The Purchaser undertakes to indemnify and hold harmless the Sellers (**"Sellers' Indemnified Parties"**) in respect of Losses incurred by the Sellers' Indemnified Parties arising from any breach of any covenant or any other obligation undertaken by the Purchaser or the Company under the Transaction Documents.

## 12.2  Amount of the Losses to be Indemnified by J&F Sellers

**12.2.1**  **Losses to be Indemnified to Purchaser or the Company.** The amount of the Losses to be indemnified by J&F to the Purchaser Indemnified Parties or Company shall vary according to the origin of such Loss, as provided below:

    (i)    If the Payable Loss results from a Loss incurred by the Purchaser, and is going to be paid by J&F to the Purchaser, then the indemnification amount shall not be paid on a Grossed-Up Basis and shall be calculated as follows:

        (a)    if the indemnification is due under Section 12.1.1(i) and/or Section 12.1.1(ii), then the indemnification amount shall be equal to the Loss incurred by the Purchaser multiplied by Indemnity Equity Percentage; and/or

        (b)    if the indemnification is due under Section 12.1.1(iii), then the indemnification amount shall be equal to the Loss incurred by the Purchaser multiplied by the equity interest in FIP Florestal acquired by Purchaser from J&F; and/or

        (c)    if the indemnification is due under Section 12.1.1(iv), 12.1.1(v), 12.1.1(vi), and/or 12.1.1(vii), then the indemnification amount shall be equal to one hundred percent (100%) of the Loss incurred by the Purchaser; and/or

    (ii)    If the Payable Loss results from a Loss incurred by the Company, and is going to be paid by J&F to the Purchaser, then the indemnification amount shall not be paid on a Grossed-Up Basis and shall be calculated as follows:

        (a)    if the indemnification is due under Section 12.1.1(i) and/or Section12.1.1(ii), then the indemnification amount shall be equal to the Loss incurred by the Purchaser multiplied by Indemnity Equity Percentage; and/or

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



**Execution Version**

(b)     if the indemnification is due under Section 12.1.1(iii), then the indemnification amount shall be equal to the Loss incurred by the Purchaser, multiplied by the equity interest in FIP Florestal acquired by Purchaser from J&F; and/or

(c)     if the indemnification is due under Section 12.1.1(iv), 12.1.1(v), 12.1.1(vi), and/or 12.1.1(vii), then the indemnification amount shall be equal to one hundred percent (100%) of the Loss incurred by the Purchaser; and/or

(iii)     If the Payable Loss results from a Loss incurred directly by the Company, and is going to be paid (at Purchaser's discretion) by J&F to the Company, then the indemnification amount shall be paid to the Company on a Grossed-Up Basis, if applicable, and shall be calculated as follows:

(a)     if the indemnification is due under Section 12.1.1(i), then the indemnification amount shall be equal to the Loss incurred by the Company, multiplied by Indemnity Equity Percentage; and/or

(b)     if the indemnification is due under Section 12.1.1(iii), then the indemnification amount shall be equal to the Loss incurred by the Company multiplied by the equity interest in FIP Florestal acquired by Purchaser from J&F; and/or

(c)     if the indemnification is due under Section 12.1.1(iv), 12.1.1(v), 12.1.1(vi), and/or 12.1.1(vii), then the indemnification amount shall be equal to one hundred percent (100%) of the Loss incurred by the Purchaser.

12.2.2   Any Losses subject to indemnification by Sellers to a Purchaser Indemnified Party shall be adjusted based on the SELIC from the date on which such Losses became a Payable Loss until the date of the payment to the Purchaser's Indemnified Party, provided however, that interests on Losses in no event shall imply duplication if such interest is already captured on the amount of Losses to be indemnified to the Purchaser Indemnified Party, as determined in accordance with this Agreement.

12.2.3   Losses indemnified by FIP Olímpia shall correspond to one hundred percent (100%) of the Loss incurred by Purchaser or the Company, as the case may be.

## 12.3   Limitations

12.3.1   **Cap.** The total liability of the J&F Sellers for Losses under this Agreement shall not exceed five hundred million Brazilian Reais (BRL 500,000,000.00) ("**Indemnity Cap**"), except with respect for Losses arising out of Anti-Corruption Indemnifiable Matters or any breach of J&F Sellers' Fundamental Representations and Warranties, which shall not be limited to any amount and, therefore, shall not count for the Indemnity Cap set forth herein. For the avoidance of doubt, Losses arising from Disclosed Indemnifiable Matters shall only be considered for the Indemnity Cap set forth herein after the Threshold provided for in Section 12.3.3 below is exceeded, and only with respect to the amounts that effectively exceed it. The Indemnity Cap shall be adjusted based on the SELIC *pro rata die* from the date of execution of this Agreement.





73

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

Execution Version

12.3.2 **Minimum Claim**. The indemnification shall only apply in relation to Losses with an individual amount (including any related expenses and costs) exceeding fifty thousand Brazilian Reais (BRL 50,000.00) for labor claims and one hundred thousand Brazilian Reais (BRL 100,000.00) for any other Claims ("**Minimum Claim**"), provided that, for purposes hereof, Losses arising out of different Claims but relating to the same subject matter shall be deemed as a single matter for purposes of the Minimum Claim. The balance of the Minimum Claim amounts shall be adjusted based on the SELIC *pro rata die* as from the date of execution of this Agreement.

12.3.3 **Threshold**. With respect to Payable Losses arising from Disclosed Indemnifiable Matters, the indemnification shall only apply if the aggregate amount of such Payable Losses exceeds four hundred million Brazilian Reais (BRL 400,000,000.00) ("**Threshold**"). The balance of the Threshold amounts shall be adjusted based on the SELIC *pro rata die* from the date of execution of this Agreement. Once the Threshold is reached, the indemnification for Payable Losses arising from Disclosed Indemnifiable Matters shall only apply to the amount that exceeds the Threshold. For clarification purposes, the Threshold set forth herein does not apply to indemnification for Payable Losses arising from acts, facts or omissions that are not Disclosed Indemnifiable Matters and/or to the Anti-Corruption Indemnifiable Matters.

12.3.4 **Survival Period**. The indemnification under Sections 12.1.1, 12.1.2 and 12.1.3 shall be valid:

(i) for the duration of the applicable statute of limitations, in the case of any Losses arising from Anti-Corruption Indemnifiable Matters and J&F Sellers' Fundamental Representations;

(ii) for six (6) years counted as from the Second Purchase Date (or, in case the Second Purchase does not occur by the Longstop Date, the date of Initial Payment, or if the First Purchase occurred, the First Purchase Date) with respect to (A) any Tax obligation or liability; or (B) any Loss arising from breach of any Environmental Laws;

(iii) for five (5) years counted as from the Second Purchase Date (or, in case the Second Purchase does not occur by the Longstop Date, the date of Initial Payment, or if the First Purchase occurred, the First Purchase Date) with respect any labor obligation or liability;

(iv) for three (3) years counted as from the Second Purchase Date (or, in case the Second Purchase does not occur by the Longstop Date, the date of Initial Payment, or if the First Purchase occurred, the First Purchase Date) with respect any obligation or liability of any other nature.

Notwithstanding the expiration of the survival period above, if the relevant Indemnified Party has provided a Notice of Direct Claim or a Notice of Third Party Claim within the survival period, the respective indemnification obligation shall survive, solely with respect to such Claim, until there is a final and non-appealable decision for the Claim and the respective Loss is duly indemnified by the Indemnifying Party to the Indemnified Party under the terms of this Agreement.





74

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

Execution Version

**12.3.5** **Indirect Damages**. The Parties shall not be liable for any loss of profits, nor indirect, consequential, incidental, special, punitive or related losses and/or damages incurred by the Person that has incurred the Loss.

**12.3.6** **No Double Negative Adjustment for Liability**. No indemnification shall apply more than once in respect of the same Loss (notwithstanding such Loss may result from multiple Claims).

**12.3.7** **Insurance**. No indemnification shall apply in respect of any Claim to the extent that the Losses in respect of which such Claim: (i) are covered by an insurance policy in force; or (ii) would have been covered if the insurance policies for the benefit of any Company or of any Affiliate of any Company in force at the respective Closing Date had been maintained after the First Purchase or the Second Purchase, as the case may be, on no less favorable terms.

**12.3.8** **Exclusive Remedy.** Without prejudice to Section 12.4 below, the indemnification pursuant to this Section 12 shall be the sole and exclusive remedy of Purchaser incurred by them under this Agreement. Any statutory Claims for termination, rescission or damages are excluded to the extent permitted by the applicable Law.

**12.4** **Exceptions**. J&F Sellers shall not be obligated to indemnify, defend and hold harmless the Purchaser, in respect of any and all Losses incurred arising from the following cases:

    (i)    a write-off of the ICMS Tax credits reflected in the Financial Statements;

    (ii)    any matter or thing done or omitted to be done pursuant to this Agreement or at the written request of Purchaser;

    (iii)    any act, omission or transaction of the Purchaser; or

    (iv)    any change in accounting or Tax policy introduced or having effect after the Second Purchase, other than any change required by applicable Law and/or IFRS.

**12.5** **Indemnification Procedure**

**12.5.1** **General Rules Applicable to Indemnification**: In the event of any Claim which may result in a Loss indemnifiable pursuant to this Agreement as a result of Section 12.1 ("**Indemnification Event**"), the Purchaser or the Sellers' Indemnified Parties, as the case may be ("**Indemnified Parties**"), shall deliver a notice ("**Indemnification Notice**") to the Purchaser or to the Sellers, as the case may be ("**Indemnifying Party**"), about such Indemnification Event in the shorter period between:

    (i)    within ten (10) days counted as from the date when the Indemnified Party becomes aware of occurrence of an Indemnification Event; or

    (ii)    in case of a Third Party Claim, the period that is one third (1/3) of the legal timeframe to file defenses or counterclaims against the relevant Third Party Claim.

**12.5.2** As from the date of receipt of the Indemnification Notice, the Indemnifying Party shall have a term of the shorter period between ten (10) Business Days or one third (1/3) of the legal timeframe to file defenses or counterclaims against the relevant Third Party Claim, as the case may be, to either:

    (i)    solve the Indemnification Event, if it is subject to a solution; or




Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

**Execution Version**

      (ii)     in case of a Third Party Claim, undertake the defense of the Third Party Claim as set forth in Section 12.5.4(iii), or not to undertake the defense of the Third Party Claim as set forth in Section 12.5.4(ii).

12.5.3    The Parties agree that in case of failure or delay in the delivery of the Indemnification Notice, the Indemnifying Party shall remain responsible for paying any Payable Losses related to Indemnification Notices, <u>unless</u>, in the case of Third Party Claims, the conduction of the defense of the respective Claim has been materially impaired and/or the ability of the Indemnifying Party to properly adopt any material procedural matters has been adversely affected by such delay.

**12.5.4    Third Party Claims**

      (i)      In the case of an Indemnification Event arising from or relating to Third Party Claims, the Indemnification Notice shall provide details of the Third Party Claim, quantifying the amount of the relevant potential Loss and a copy of such Third Party Claim.

      (ii)     In case of a Third Party Claim, if the Indemnifying Party elects not to undertake the defense of the Third Party Claim, the Indemnified Party shall not settle or voluntarily enter into any binding agreement and shall conduct the defense diligently. Otherwise, the Indemnifying Party shall be released from indemnifying the Indemnified Party.

      (iii)    The Parties agree that should the Indemnifying Party elect to undertake the defense of the Third Party Claim in accordance with Section 12.5.2(ii), the Indemnified Party shall provide, at the Indemnifying Party's expense, any and all reasonable documents required for the proper defense of the Third Party Claim, including power of attorneys. In this case, if the final and non-appealable decision or judgment of the relevant Third Party Claim is favorable to the claimant, the Indemnifying Party shall be solely responsible for the prompt payment of the relevant final and non-appealable decision or judgment when rendered or delivered by the relevant tribunal.

      (iv)    All costs incurred by the Indemnifying Party with the defense of the Third Party Claim (including attorneys' fees, collateral, administrative or judicial deposits, procedural costs, fines, monetary adjustment etc.) shall be borne by the Indemnifying Party. In addition, should the Indemnifying Party not elect to undertake the defense of the Third Party Claim in accordance with Section 12.5.2(ii), all costs incurred by the Indemnified Parties with the defense of the Third Party Claim (including lawyers' fees, procedural costs, fines, monetary adjustment etc.) shall constitute a Loss and be indemnified by the Indemnifying Party to the relevant Indemnified Party, provided that such costs are reasonable and previously approved by the Indemnifying Party.

      (v)     The Company and the Indemnified Party shall always allow reasonable access to the Indemnifying Party and/or their Representatives during normal business hours to all records, documents and information related to any Third Party Claim for which the Indemnifying Party is conducting the defense, and shall make employees available on a mutually convenient basis for such purpose.





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

    (vi)    The Party responsible for conducting the defense against any Third Party Claim shall: (a) pursue such Third Party Claim in good faith; and (b) keep the other Parties informed of all material developments and events relating to such Third Party Claim (including promptly forwarding copies to the other Parties of any related correspondence and petitions).

    (vii)    Notwithstanding anything to the contrary set forth in this Agreement, in the event that a Third Party Claim is asserted against Company or any Company Group Entity involving a violation of any Anti-Corruption Indemnifiable Matter or any matter related thereto, J&F shall be entitled to assume the control of the defense of such Third Party Claim, including the execution of any settlement or agreement, provided however that in case any new settlement or agreement imposes any commitment, obligation or financial liability upon the Company or any Company Group Entity, J&F will only be entitled to take any such action without the Purchaser's prior written consent if no financial liability is imposed on the Company and the Company Group Entity The Purchaser shall notify J&F within two (2) days counted from the date that Purchaser receives the Third Party Claim so that J&F may assume the control of the defense and shall, until J&F effectively assumes such control of the defense, conduct such defense diligently and in good faith. If J&F elects to assume control of the defense hereunder, J&F shall, in relation to such Third Party Claim:

    (a) consult, as far as reasonably practicable, with Company and Purchaser;

    (b) provide, to the extent possible under applicable Law, the Company and Purchaser with copies of material documents, correspondence and communications in connection with such Third Party Claim;

    (c) where requested by the Purchaser, allow persons nominated by the Purchaser to attend a sufficient number of hearings, meetings and calls in such third Party Claim; and

    (d) where the Third Party Claim is brought by or primarily concerns a Governmental Authority, take reasonable account in good faith of any concerns raised by, or comments and/or proposals made by, the Purchaser.

    (e) For the avoidance of doubt, J&F confirms that any Third Party Claim assumed under this Section 12.5.4(vii) are indemnifiable to Purchaser pursuant to this Agreement.

12.6    **Payable Loss.** For the purposes of the Parties' respective obligations under this Section 12, with the limitations of Section 12.3, the Parties agree that a Loss shall only be payable within ten (10) days as of (i) the date in which the Indemnifying Party and the Indemnified Party agreed with its payment or (ii) a final non-appealable judgment, arbitration award or similar decision (*trânsito em julgado*) ("**Payable Loss**").

    12.6.1    The sums of Payable Losses shall be reduced to (i) give full effect to any insurance recoveries the Indemnified Party actually receives as a consequence of the fact, condition or circumstance giving rise to such misrepresentation, breach, or nonperformance; and (ii) give appropriate effect to any amounts actually recovered





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 219

**Execution Version**

by the Company from Third Parties in connection with the Payable Loss, including any benefits, expenses or reductions related to Taxes arising as a result of such Loss (including, but not limited to, the reduction of income Taxes due by virtue of the deduction of the relevant Loss from the entity's Tax basis). Purchaser undertakes to make use of any insurance available to itself to mitigate Losses under this Agreement.

## 13    Fiduciary Assignment of Shares

13.1    By no later than three (3) Business Days prior to the Second Purchase Date, in order to guarantee the indemnification obligations undertaken by the Sellers exclusively with respect to the Anti-Corruption Indemnifiable Matters, J&F, FB and the Purchaser shall enter into a fiduciary assignment agreement (*contrato de alienação fiduciária*) pursuant to which J&F shall transfer to the Purchaser the fiduciary property to common shares issued by JBS and held by J&F, free of any Encumbrances, substantially in the form of **Exhibit 13.1** hereto, representing at least the Collateral Value ("**Assigned Shares**" and "**Fiduciary Assignment Agreement**"), and the Fiduciary Assignment Agreement shall be perfected on the Second Purchase Date pursuant to applicable Law.

13.2    The total amount of Assigned Shares under the Fiduciary Assignment Agreement shall be calculated based on the closing trading prices of JBS's common shares at B3 on the trading date that is immediately prior to the execution of the Fiduciary Assignment Agreement, but in any event, no earlier than ten (10) trading days at B3 prior to the Second Purchase Date.

13.3    Jointly with the execution of the Fiduciary Assignment Agreement, J&F and Purchaser shall also enter into an escrow agreement to be mutually agreed, which shall regulate the deposit of any amount resulting from foreclosure of the Assigned Shares in the cases provided forth in the Fiduciary Assignment Agreement.

## 14    Antitrust Approvals

14.1    Pursuant to applicable Law, this Agreement is entered into subject to the Conditions Precedent, as set out in Sections 5.2.2(vi) and 5.2.3(iv), which may be waived, in accordance with this Agreement.,.

14.2    The Purchaser shall take all actions necessary to obtain the Antitrust Authority's Approval and agrees to submit the Transaction for the Antitrust Authority's review as soon as practicable following the date hereof. The submission shall be actively and diligently conducted by legal advisors appointed by the Purchaser, and the Sellers and the Company shall timely provide to the Purchaser, upon written request, all information required in connection with the submission. The Parties hereby commit to fully and in a timely manner cooperate with each other in order to submit the relevant documents and forms to the Antitrust Authority, and provide each and all required information to obtain the approval from the Antitrust Authority.

14.3    The Purchaser hereby undertakes to timely accept, bear any costs and take all actions to comply with any requirements or remedies made and/or imposed by the Antitrust Authority, as a condition for the approval. For the avoidance of doubt, such requirements or remedies might include the prompt divestiture of assets or businesses or the adoption of special commercial obligations with relation to Third Parties.

14.4    If the Second Purchase does not occur by the Longstop Date due to the non satisfaction or



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 220

Execution Version

waiver of the Conditions Precedent as set out in Sections 5.2.2(vi) and 5.2.3(iv) then the provisions of section 5.3 and 6 of the Second Shareholders' Agreement shall no longer be valid.

14.5 The Purchaser shall bear all costs incurred in connection to the Antitrust Authority's review of the Transaction, including any filing fees, expert opinion costs and their respective legal representation during the review process.

    14.5.1 The Sellers and the Company shall bear their respective expenses and may indicate their own counsel to monitor the filing process with the Antitrust Authority on their behalf (including, but not limited to, fees and expenses related to accountants, financial consultants and other professionals hired by each of the Sellers and the Company).

    14.5.2 Each of the Parties is responsible for the information concerning it or its respective economic groups provided to the Antitrust Authority, and any penalties, fines, administrative sanctions, costs and expenses (including reasonable attorneys' fees) which relate to, or arise out of, the provision of misleading or inaccurate information shall be paid by the Party who provided the misleading or inaccurate information.

14.6 The Parties and the Company agree that the exchange of sensitive commercial information and documents shall occur exclusively among their respective external advisors, subject to the limits set forth by the applicable Law, to the extent such exchange is reasonably necessary to obtain the Antitrust Authority's Approval.

## 15 Seller Guarantees Release

15.1 **Exhibit 15.1-A** hereto contains a list, submitted by Sellers, of the Company's financial obligations which are guaranteed by Sellers and/or Sellers' Affiliates or Related Parties ("**Sellers' Guarantees**"). Prior to the Longstop Date, Purchaser shall seek to enter into the appropriate contractual arrangements such that, on or prior to the Second Purchase Date, such Seller Guarantees will be fully released ("**Sellers' Guarantees' Release**"). If all such instruments required to achieve the Sellers' Guarantees Release are not entered into by the Longstop Date, the Sellers shall not be obligated to perform the Second Purchase, and shall have the right to terminate this Agreement in accordance with Section 19.3(iv).

    15.1.1 Upon completion of the Seller Guarantees Release, the Purchaser shall provide a notice to the Sellers and, provided that all other Second Purchase Conditions Precedent are fulfilled, Sellers will be required to consummate the Second Purchase.

    15.1.2 For the avoidance of doubt, the Purchaser shall not be required to consummate the Second Purchase before the Sellers Guarantees Release has been completed and the notice set forth in Section 15.1.1 has been served.

    15.1.3 Termination of this Agreement pursuant to Section 15.1 above shall not subject the Purchaser to any penalty, liability, and shall not impair the rights of the Purchaser to the ownership of the First Purchased Shares and the validity of the Second Shareholders' Agreement pursuant to Section 20.1, except that section 2.3 of the Second Shareholders' Agreement will be triggered.

15.2 **Exhibit 15.1-B** hereto contains a list, submitted by Sellers, of the Company's financial obligations which do not contain Seller Guarantees but which would be subject to acceleration by virtue of the occurrence of the Second Purchase in the absence of waivers from the respective lenders ("**Lender Waivers**"). Prior to the Longstop Date, Purchaser shall

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 221

**Execution Version**

seek to obtain the Lender Waivers, provided, however, that failure to obtain such waivers shall not exempt any Party from performing the Second Purchase.

15.3 The Parties shall cooperate with each other and act diligently and expeditiously so as to negotiate with all applicable Third Parties the terms of the Seller Guarantee Release and Lender Waivers. Without limiting the generality of the foregoing, Sellers shall, and shall cause the Company and the Company Group Entities to, obtain any required corporate approvals necessary for such purpose, and to execute all documents necessary prior to the Second Purchase Date, which effectiveness will be conditioned upon completion of the Transaction on the Second Purchase Date, in each case in order to ensure that the Seller Guarantee Release and Lender Waivers are completed on or prior to the Second Purchase Date.

15.4 Any all costs incurred in connection with the release of the guarantees and Lenders Waivers (such as registration and attorneys' fees) shall be borne by the Sellers, whilst all costs for the implementation or replacement of guarantees (such as waiver costs) shall be borne by Purchaser.

## 16 Non-Compete/Non-Solicitation/Non-Hire

16.1 **Non-Compete**. During the period of five (5) years as from the Second Purchase Date ("**Restrictive Period**"), the J&F Sellers shall, and shall cause their respective Affiliates within the territory of Brazil, refrain from manufacturing and commercialization of market pulp and engaging in the activity of growing, buying and maintaining eucalyptus forests larger than one hundred thousand (100,000) hectares in any one hundred kilometers (100 km) radius ("**Restricted Business**"), including without limitation by (i) directly or indirectly participating as controlling shareholder or similar capacity in any Restricted Business. Each of the J&F Sellers also agrees and acknowledges that this non-compete obligation was taken into consideration for the formation of the Purchase Price, as well as represents and warrants that they have been fully compensated for the non-compete obligation under this Agreement and pursuant to this Section 16.

16.2 **Non-Solicitation**. During the applicable Restrictive Period, the Non-Compete Parties shall, and shall cause any Affiliates to, refrain from seeking to solicit business that competes with the Restricted Business of the Company and the Company Group Entities' customers and/or suppliers, or in any manner interfere in the relationship maintained between the Company or the Company Group Entities and such customers and/or suppliers, without the prior written approval of the Purchaser, the Company and each of the Company Group Entities.

16.3 **Non-Solicit of Employees**. J&F Sellers further agree not to solicit, directly or indirectly through another Person, in the Brazilian territory, for the applicable Restrictive Period, either by themselves or by any of their Affiliates, Related Parties or otherwise, either existing or to be organized, any employee of the Company and any of the Company Group Entities who occupies positions from the level of general manager (*gerente geral*) and above, except (i) upon the prior written consent from the Purchaser; or (ii) in case of dismissal of such employees by the Company or by the relevant Company Group Entities. The placing of an advertisement of a post available to a member of the public generally and the recruitment of a Person through an employment agency shall not constitute a breach of this Section 16.3 provided that none of J&F Sellers encourages or advises such agency to approach any such person.

16.4 **Adequate Consideration**. J&F Sellers agree that the Purchase Price to be paid by the



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 222

**Execution Version**

Purchaser to the Sellers under this Agreement is an adequate and sufficient consideration for the non-compete, non-solicitation and non-hire obligations assumed by the Sellers in this Section 16.

## 17 Confidentiality

17.1 Other than for public announcements of the Company in the Ordinary Course of Business in relation to the Company's activities, the Parties shall jointly agree, in writing and prior to their disclosure, the manner, content and timing of the disclosure of any other press releases, announcements or any disclosures whatsoever relating to this Agreement and the Transaction, except to the extent such release, announcement or disclosure may be required by Law to which any of the Parties, the Company or any of their Affiliates are subject or if a Party or the Company (or their Related Parties) becomes compelled in any Claim or is requested by a competent Governmental Authority to make any disclosure that is prohibited or otherwise constrained hereby. In these cases, the Party required to make the release, announcement or disclosure (or which Affiliate is required to make the release, announcement or disclosure) shall allow the other Parties reasonable time – taking into account the deadlines relating to any such disclosure – to comment on such release, announcement or disclosure (including the content thereof) in advance of such issuance or disclosure (provided that any comment or suggestion of the latter on the release, announcement or disclosure cannot be unreasonably denied).

17.2 Except as set forth above, each Party and the Company, for itself and its respective Related Parties, Representatives, employees, counsels, accountants and other authorized representatives, undertakes to keep this Agreement, its provisions and Exhibits, and all information and materials, whether written, oral, electronic or otherwise, obtained or received from the other Party or the Company (or their Related Parties) during the negotiation, preparation, execution and performance of this Agreement, as well as all business information related to the business and operations of the Company and the Company Group Entities, strictly confidential (**"Confidential Information"**).

17.3 Disclosure of information shall not be considered as violation hereof in case:

(i) A prior written consent to the disclosure is obtained from the Person which owns the Confidential Information;

(ii) The information is or becomes generally available to the public other than as a result of a breach hereof;

(iii) The information is or becomes known or available to the disclosing Person or any of its Related Parties on a non-confidential basis from a source (other than the Person owning the information or any of its Related Parties) that, to the disclosing Person's knowledge, after due inquiry, is not prohibited from disclosing such information as a consequence of an obligation owed to the Person owning the information or any of its Related Parties;

(iv) The information is developed by the disclosing Person independently and without reference to any Confidential Information of the Person owning the information;

(v) The information was already lawfully known to the receiving Person or its Related Parties as of the date of its disclosure by the other Person; or

(vi) The information is required to be disclosed under applicable Laws or under the Company's Shareholders' Agreement or the Quotaholders' Agreement.

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 223

**Execution Version**

**17.4** The confidentiality obligations undertaken herein shall be valid and enforceable against the Parties and the Company (and their Related Parties) for a period counted as from the date hereof until three (3) years as from the Second Purchase Date or the Longstop Date (as applicable).

## 18   Specific Performance

**18.1** Without prejudice to any other rights or remedies which any Party or the Company may have under this Agreement, the Parties and the Company acknowledge and agree that damages and penalties would not be an adequate remedy for any breach of this Agreement and the remedies of injunction, specific performance and other equitable relief are appropriate for any threatened or actual breach of this Agreement and no proof of special damages shall be necessary for the enforcement of the rights under this Section 18.

## 19   Termination

**19.1** **Termination prior to the First Purchase Date**. This Agreement may be terminated in full at any time prior to the First Purchase Date only as follows:

(i) by mutual written agreement of the Sellers and the Purchaser;

(ii) by Purchaser at any time until or on the Due Diligence Completion Date by delivery to Sellers of a written notice to such effect;

(iii) by Purchaser, if the Initial Purchase Unwinding occurs;

(iv) by Sellers, in case Purchaser does not complete the Initial Purchase on the Initial Purchase Date or the First Purchase on the First Purchase Date;

(v) by Purchaser, if any Brazilian Governmental Authority having competent jurisdiction shall have issued (a) a final, non-appealable Order (other than a temporary restraining Order) or taken any other non-appealable action prohibiting the consummation of the transactions contemplated by this Agreement or (b) a preliminary injunction or temporary Order (including any restraining Orders) prohibiting the consummation of the transactions contemplated by this Agreement that remains in effect on the Longstop Date;

(vi) by Purchaser, if there has been a breach to any material covenant or obligation of any of the Sellers or the Company under this Agreement, which breach (a) has not been waived in writing by the Purchaser, or (b) if capable of being cured, was not cured by Sellers (acting together) or the Company as applicable, within fifteen (15) days after written notice thereof; and/or

(vii) by J&F Sellers, if there has been a breach to any material covenant or obligation of the Purchaser under this Agreement, which breach (a) has not been waived in writing by the Sellers, or (b) if capable of being cured, was not cured by the Purchaser within fifteen (15) days after written notice thereof.

**19.1.2** **Effects of Termination prior to the First Purchase Date**.

(i) The termination of this Agreement prior to the First Purchase Date shall not entail the right of either Party to receive any fine or penalty. Furthermore, termination of this Agreement (a) pursuant to paragraphs (ii) or (iii) of Section 19.1 above shall not give rise to any right to indemnification of any nature by any of the Parties, the Company or any Company Group Entity from each

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 224

other, without prejudice to any right to indemnification under this Agreement unrelated to any such termination; and (b) pursuant to paragraph (iv) of Section 19.1 above shall not give rise to any right to indemnification of any nature by Purchaser against any Seller or the Company or any Company Group Entity, without prejudice to any right to indemnification under this Agreement unrelated to any such termination.

(ii) The obligations provided in Sections 12 (*Indemnification*), 17 (*Confidentiality*), 21 (*Governing Law and Dispute Resolution*) and 22 (*Miscellaneous*) shall survive for an indefinite term and shall not be terminated under Section 19.1.

**19.1.3 Termination Notice.** In order to terminate this Agreement prior to the First Purchase Date, written notice thereof shall promptly be given by the terminating Party to the other Parties, and this Agreement shall thereupon be terminated.

**19.2 Longstop Date and Partial Release.** In the sole event that the Second Purchase has not occurred within 12 (twelve) months as from the date hereof ("**Longstop Date**") the Parties shall be automatically released from their respective obligations under Section 5 of this Agreement, without any fine or penalty of any nature, or any indemnification other than for breach of obligations hereunder.

**19.3 Termination prior to the Second Purchase.** This Agreement may be terminated in full at any time between the First Purchase Date and the Longstop Date only as follows:

(i) by mutual written agreement of the Parties;

(ii) by Purchaser, if any Brazilian Governmental Authority having competent jurisdiction shall have issued a final, non-appealable Order (other than a temporary restraining Order) or taken any other non-appealable action prohibiting the consummation of the transactions contemplated by this Agreement;

(iii) by Purchaser, if there has been a breach to any material covenant or obligation of any of the Sellers or the Company under this Agreement, which breach (a) has not been waived in writing by the Purchaser, or (b) if capable of being cured, was not cured by Sellers (acting together) or the Company as applicable, within fifteen (15) days after written notice thereof; and

(iv) by J&F Sellers, if there has been a breach to any material covenant or obligation of the Purchaser under this Agreement, which breach (a) has not been waived in writing by the Sellers, or (b) if capable of being cured, was not cured by the Purchaser within fifteen (15) days after written notice thereof.

**19.3.2 Effects of Termination prior to the Second Purchase Date.**

(i) The termination of this Agreement prior to the Second Purchase Date shall not entail the right of either Party to receive any fine or penalty.

(ii) The obligations provided in Sections 12 (*Indemnification*), 17 (*Confidentiality*), 21 (*Governing Law and Dispute Resolution*) and 22 (*Miscellaneous*) shall survive for an indefinite term and shall not be terminated under Section 19.1.

**19.3.3 Termination Notice.** In order to terminate this Agreement prior to the Longstop Date, written notice thereof shall promptly be given by the terminating Party to the



Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100. Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 225

Execution Version

other Parties, and this Agreement shall thereupon be terminated.

## 20 Second Shareholders' Agreement and FIC FIP Quotaholders' Agreement

20.1 On the date hereof, J&F and the Purchaser shall execute a shareholders agreement of the Company ("**Second Shareholders' Agreement**"), which shall become effective as provided for therein.

20.2 On the date hereof, J&F and the Purchaser shall execute a quotaholders' agreement of the FIC FIP ("**FIC FIP Quotaholders' Agreement**"), which validity shall be conditioned upon (i) the acquisition of quotas issued by FIC FIP by Purchaser, as the case may be in accordance with the scenarios set forth in Section 4; and (ii) the Second Purchase not having occurred by the Longstop Date.

## 21 Governing Law and Dispute Resolution

21.1 This Agreement and the arbitration agreement contained herein shall be governed by and construed in accordance with the Laws of Brazil.

21.2 The Parties and the Company shall settle in good faith and in compliance with their mutual interests any and all controversy, litigation, disputes or claims resulting from, relating to, or arising out of this Agreement or any related documents or obligations, including, but not limited to, any challenge regarding their existence, validity, interpretation, construction, performance, breach or enforceability ("**Dispute**"). In the event of any Dispute, the interested Party(ies) (or the Company, as applicable) ("**Demanding Party**") shall submit a written notice to the other Party(ies) (and to the Company, as applicable) ("**Demanded Party**") identifying the Dispute ("**Notice of Dispute**"). If, and to the extent that, any such Dispute remains unresolved for thirty (30) days (or another term, as mutually agreed) as of the date of receipt of the Notice of Dispute, or for such other period as the Parties may agree in writing, the Dispute shall be finally settled under the terms of Section 21.3 of this Agreement.

21.3 In the event the Dispute is not settled after the discussion period provided above (or otherwise in this Agreement), the Dispute shall be finally, exclusively and conclusively settled by arbitration, as provided below.

21.3.1 The arbitration shall be exclusively (i) administered by the International Court of Arbitration of the Chamber of Commerce ("**ICC**"); and (ii) conducted under the Rules of Arbitration of the International Chamber of Commerce ("**ICC Rules**"). The Dispute shall be resolved in accordance with Laws of Brazil. The arbitration panel shall be composed by three (3) arbitrators, with one arbitrator being appointed by the claimant(s) and another jointly by the respondent(s). The arbitrators appointed by the Parties shall, jointly and by mutual agreement, choose the third arbitrator, who shall preside over the arbitral tribunal. If the arbitrators appointed by the Parties fail to agree on the choice of the third arbitrator, such appointment shall be made by the ICC.

21.3.2 In case there are multiple claimants or multiple respondents in the Dispute referred to arbitration, the multiple claimants, jointly, and the multiple respondents, jointly, shall nominate an arbitrator for confirmation pursuant to Article 13 of the ICC Rules.

21.3.3 The arbitration procedures shall be conducted under the Laws of Brazil and the language of the arbitration shall be Portuguese, but documents may be submitted in English or Portuguese. The seat of the arbitration shall be the City of São Paulo, State of São Paulo, Brazil, where the arbitral award shall be rendered.





Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.

fls. 226

**Execution Version**

21.3.4   All costs and expenses of the arbitral proceedings shall be borne by the parties equally throughout the arbitration proceeding. The arbitral award shall then allocate to the losing party, or to both parties, in proportion to their relative success on their claims and counterclaims, the arbitration costs and expenses, including non-contractual attorneys' fees. Other expenses as contractual attorney fees, experts' fees, general expenses and any other costs incurred by the parties to defend its case shall not be reimbursed.

21.3.5   The existence and content of the arbitral proceedings and/or any documents, including but not limited to, rulings or awards, and the information disclosed therein, shall be kept confidential by the Parties and the Company except as may be imposed or required by mandatory provisions of Law.

21.4   As the emergency arbitrator provisions shall not apply, the Parties and the Company shall have the right, consistent with this Agreement, to apply for provisional and/or conservatory relief, including pre-arbitral attachments or preliminary injunctions, provided, however, that, after the arbitral tribunal is constituted, the arbitral tribunal shall have sole jurisdiction to consider applications for provisional and/or conservatory relief. Any Party or the Company shall have the right to request the enforcement or specific proceeding with respect to any obligation to pay a certain sum under this Agreement.

21.4.1   In such cases, the Parties and the Company hereby agree and elect that the courts of the City of São Paulo, State of São Paulo, Brazil, shall have exclusive jurisdiction to hear and decide on provisional and/or conservatory reliefs, with express waiver of any other, no matter how privileged it may be. Even in instances where a provisional judicial relief has been granted, the merits of the matter in dispute shall be decided by the arbitral tribunal. Any such measures taken by the Parties and the Company before the competent judicial authority shall not be deemed to be an infringement or a waiver of the arbitration agreement. Such measures shall be notified without delay to the Secretariat of the ICC.

21.5   The arbitral award shall be final and, as any orders and interim measures rendered by the Arbitral Tribunal, shall be legally binding on the Parties and their successors, and may be enforced in any court having jurisdiction thereof or having jurisdiction over the relevant party and/or any of its assets.

## 22   Miscellaneous

22.1   **Payments.** All payments to be made under this Agreement shall be in immediately available funds to the bank accounts indicated by the relevant Party.

22.2   **Binding Effect.** With observance of the provisions of Sections 4.3 and 5.2, this Agreement constitutes an irrevocable and binding obligation of the Parties and the Company (as applicable) and their respective permitted successors and permitted assignees.

22.3   **Entire Agreement.** This Agreement and its Exhibits constitute the entire agreement among the Parties and the Company on the matters referred to herein and supersede any and all previous agreements and understandings, oral or written, among the Parties and the Company and/or any of their Affiliates relating to the subject matter hereof.

22.4   **Amendments.** No amendment to any of the terms or conditions set forth in this Agreement shall be of any effect unless it is made in writing and signed by each of the Parties.

22.5   **Assignment.** None of the Parties or the Company shall be entitled to directly or indirectly

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839677-87.2018.8.26.0100 e código 4C8DFAC.



**Execution Version**

assign or transfer any right or obligation arising out of this Agreement or related to it without the prior written consent of each of the Parties, provided that any assignment by the Purchaser to an Affiliate of the Purchaser shall be authorized for all purposes under this Agreement.

22.6 **Benefit of the Parties**. This Agreement is solely for the benefit of the Parties and no provision of this Agreement shall be deemed to confer upon any other Person any claim, cause of action, remedy or other right whatsoever.

22.7 **Invalid Provisions.** Should any provision herein be deemed invalid, illegal or unenforceable in any aspect, the validity, legality or enforceability of the other provisions contained herein shall not be affected or hindered in any way as a result of such fact. The Parties shall negotiate, in good faith, the replacement of the invalid, illegal or unenforceable provision for valid, legal and enforceable provisions the economic effect and other relevant implications of which are as close as possible to the economic effect and other relevant implications of the invalid, illegal or unenforceable provision.

22.8 **Waiver and Tolerance.** The Parties and the Company acknowledge that, except if otherwise provided for herein in writing: (i) the partial exercise, the non-exercise, the granting of a term, the forbearance or the delay in regard to any right granted to them by this Agreement and/or by Law shall not constitute renewal or waiver of such right, nor shall it impair its exercise in the future; (ii) the waiver of any right shall be interpreted in a restrict manner, and shall not be considered to be a waiver of any other right granted by this Agreement or by Law to any of the Parties; and (iii) any waivers shall only be considered as such if granted in writing.

22.9 **Taxes.** Except as otherwise provided for herein, each of the Parties shall bear its own respective fees, Taxes and expenses related to the compliance of this Agreement and the Transaction Documents. Should a Party be held liable for any payments due by the other Party, the latter shall defend, hold harmless, reimburse and indemnify the former against the payment which is unduly assessed.

22.10 **Currency Matters.** Except as otherwise set forth herein, all payments hereunder shall be made in Brazilian Reais. Each Party's obligations hereunder to make payments in Brazilian Reais shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than Brazilian Reais, except to the extent that such tender or recovery results in the effective receipt by the respective party of the full amount of Brazilian Reais expressed to be payable to such party under this Agreement.

22.11 **Notices.** All notices under this Agreement shall be made in writing and shall be delivered personally, by e-mail or by registered post (always with receipt confirmation) at the addresses indicated below, to the attention of the persons indicated below, or as otherwise specified by the relevant Party or the Company by written notice:

    (i)    **If to J&F:**

        Avenida Marginal Direita do Tietê, No. 500, Vila Jaguara
        São Paulo, São Paulo, Brasil, CEP 05118-100
        Attn: ricardo.gaaertner@jfinvest.com.br
        e-mail: Ricardo Menin Gaertner

    (ii)   **If to ZMF:**

        Avenida Marginal Direita do Tietê, No. 500, Vila Jaguara,

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 228

Execution Version

São Paulo, São Paulo, Brasil, CEP 05118-100
Attn: ricardo.gaaertner@jfinvest.com.br
e-mail: Ricardo Menin Gaertner

(iii)  **If to FIP Olímpia:**

Rua Iguatemi, No. 151
São Paulo, São Paulo, Brasil, CEP 01451-011
Attn: Daniela Assarito Bonifacio Borovicz/ Clara Marques
e-mail: dbonifacio@brltrust.com.br/ cmarques@brltrust.com.br

(iv)  **If to the Purchaser:**

Alameda Santos, 1.293, 6° andar, conjunto 63, Cerqueira Cesar
São Paulo, São Paulo, Brasil, CEP 01419-904
Attn: Peter Wardhana
e-mail: pwardhana@paperexcellence.com

With copy to, which shall not be deemed a notice under this Agreement:
Stocche Forbes Advogados
Avenida Brigadeiro Faria Lima, 4.100, 10° andar,
São Paulo, São Paulo, Brasil, CEP 04538-132
Attn: Guilherme Forbes
e-mail: gforbes@stoccheforbes.com.br

(v)  **If to the Company:**

Avenida Marginal Direita do Tietê, No. 500, Bloco II, Subsolo, Sala 18, Vila
Jaguara
São Paulo, São Paulo, Brasil, CEP 05118-100
Attn: José Carlos Grubisich Filho
e-mail: jose.grubisich@eldoradobrasil.com.br/ juridico@eldoradobrasil.com.br

(vi)  **PAPER EXCELLENCE B.V.:**

De Cuserstraat 91, 1081CN, Amsterdam, the Netherlands
Attn: Peter Wardhana
e-mail: pwardhana@paperexcellence.com

With copy to, which shall not be deemed a notice under this Agreement:
Stocche Forbes Advogados
Avenida Brigadeiro Faria Lima, 4.100, 10° andar,
São Paulo, São Paulo, Brasil, CEP 04538-132
Attn: Guilherme Forbes
e-mail: gforbes@stoccheforbes.com.br

22.11.1  All notices sent in accordance with Section 22.11 shall be deemed as having been
delivered on the date of receipt thereof by the addressee at the correct address,
except in case of notifications received outside of normal business hours, which shall
be deemed to be received on the immediately subsequent Business Day.

22.12  **Language.** This Agreement is executed in the English language.

22.13  **Exhibits.** All Exhibits hereto, after being initialed by the Parties and the Company, shall
constitute an integral part of this Agreement. In case of discrepancies between this
Agreement and any Exhibits, the provisions of this Agreement shall prevail.

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 1083967-87.2018.8.26.0100 e código 4C8DFAC.



fls. 229

**Execution Version**

22.14 ZMF and FIP Olimpia hereby expressly authorize J&F to individually receive any notice under this Agreement on their behalf and to individually take any action under this Agreement on their behalf. J&F has full power and authority to represent ZMF, FIC FIP and FIP Olímpia in any and all matters related to this Agreement, being authorized by ZMF, FIC FIP and FIP Olímpia to take any action, make any notification and waive any rights hereunder.

22.15 J&F hereby agrees with the Purchaser to provide by no later than the date falling five (5) Business Days after the date hereof, the amount of quotas of FIC FIP not specifically reflected in this Agreement, including in Sections 4.2.2(iii) and 4.2.3(ii).

22.16 **Initials.**

22.16.1 The Sellers and the Company hereby grant to the following individuals the right to, individually, initialize this Agreement, as well as any and all of its Exhibits, on behalf of them and in their stead:

| Individual | Initial |
| --- | --- |
| Bruna Centola Andreoli, Brazilian citizen, single, lawyer, bearer of identity card RG No. 41875008-7 and enrolled with the CPF/MF under No. 357.962458-05 | |
| Marcela Pinedo, Brazilian citizen, single, student, bearer of identity card RG No. 41.992.121-7 and enrolled with the CPF/MF under No. 417.630.278-05 | |

22.16.2 Purchaser and Purchaser Parent Company hereby grant to the following individuals the right to, individually, initialize this Agreement, as well as any and all of its Exhibits, on behalf of them and in their stead:

| Individual | Initial |
| --- | --- |
| Giuliana Pescarolli Spadoni, Brazilian citizen, single, student, bearer of identity card RG No. 50.229.997-6 and enrolled with the CPF/MF under No. 432.063.658-99 | |

*          *          *

**IN WITNESS WHEREOF** the Parties and the Company execute this Agreement in six (6) identical counterparts, in the presence of the two (2) undersigned witnesses.

São Paulo, September 2nd, 2017.

[*Remainder of this page intentionally left blank*]

Este documento é cópia do original, assinado digitalmente por GUILHERME GASPARI COELHO e Tribunal de Justiça do Estado de São Paulo, protocolado em 14/08/2018 às 15:07 , sob o número 10839678720188260100.
Para conferir o original, acesse o site https://esaj.tjsp.jus.br/pastadigital/pg/abrirConferenciaDocumento.do, informe o processo 10839678-87.2018.8.26.0100 e código 4C8DFAC.