EXHIBIT  15

## <u>IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE</u>

Suit No.        of 2019

Between

**C.A. Investment (Brazil) S.A. (suing in a representative capacity as a substantial minority shareholder of Eldorado Brasil Celulose S.A.)**
(Registration No: 28.132.263/0001-73)

…Plaintiff

And

1. **Joesley Mendonça Batista**
   (Identification No.:        )

2. **Wesley Mendonça Batista**
   (Identification No.:        )

3. **José Batista Sobrinho**
   (Identification No.:        )

4. **Emerson Fernandes Loureiro**
   (Identification No.:        )

5. **Sergio Longo**
   (Identification No.:        )

6. **Francisco de Assis e Silva**
   (Identification No.:        )

7. **José Antonio Batista Costa**
   (Identification No.:        )

8. **Aguinaldo Gomes Ramos Filho**
   (Identification No.:        )

9. **BDO RCS Auditores Independentes S.S**
   (Registration No.        )

10. **J&F Investimentos S.A.**
    (Registration No: 00.350.763/0001-62)

**11. Eldorado Brasil Celulose S.A.**
   (Registration No: 07.401.436/0002-12)

…Defendants

**Table of Contents**

I.   PARTIES / INTRODUCTION.................................................................. 1
    A.  The Plaintiff ............................................................................ 1
    B.  The Defendants....................................................................... 2
II.  BACKGROUND TO THE CLAIMS MADE HEREIN ...................................... 6
    A.  The Batista Brothers............................................................... 6
    B.  CA Investment's acquisition of Eldorado.................................. 19
    C.  Efforts to frustrate the completion of the purchase of Eldorado's shares 22
    D.  CA Investment's injunction relating to the Share Purchase Agreement  25
    E.  The Proposed Bonds................................................................ 28
    F.  The Offering Memoranda ......................................................... 31
III. PARTICULARS OF DEFICIENCIES IN THE OFFERING MEMORANDA .. 32
    A.  Gross Overstatement of EBITDA............................................. 32
    B.  Arbitration proceedings between CA Investment, J&F and Eldorado .... 39
    C.  Materially inaccurate description of Share Purchase Agreement injunction
        .................................................................................................. 39
    D.  Materially inaccurate and/or inadequate disclosure with respect to related
        party transactions ................................................................... 40
    E.  Materially inaccurate and/or inadequate disclosure with respect to certain
        investigations conducted in Brazil............................................ 41
    F.  Materially inaccurate and/or inadequate disclosure with respect to material
        deficiencies in Eldorado's management................................... 42
    G.  Material inaccuracies and/or deficiencies in relation to BDO's role as
        Eldorado's auditor ................................................................... 58
    H.  The Singapore Bond Injunction ............................................... 63
    I.   The Brazilian Bond Injunction ................................................. 64
IV.  THE PROPOSED BONDS ISSUANCE WAS CALCULATED TO HARM
     ELDORADO........................................................................................ 65
V.   THE BATISTA BROTHERS WERE AND ARE SHADOW DIRECTORS OF
     ELDORADO........................................................................................ 66
VI.  DERIVATIVE ACTION ........................................................................ 67
VII. BREACH OF FIDUCIARY DUTY / DUTY OF GOOD FAITH ...................... 69
VIII. BREACH OF DUTY OF CARE .............................................................. 73
IX.  DISHONEST ASSISTANCE IN BREACH OF FIDUCIARY DUTIES........... 75
X.   CONSPIRACY ................................................................................... 79
XI.  BREACH OF STATUTORY DUTY ......................................................... 81
XII. ELDORADO HAS SUFFERED LOSS AND DAMAGE............................... 82

**STATEMENT OF CLAIM**

I.      **PARTIES / INTRODUCTION**

      A.  **The Plaintiff**

1.      The Plaintiff, CA Investment (Brazil) S.A. ("**CA Investment**") is a corporation formed and existing under the laws of Brazil. It presently owns 49.41% of the total issued and outstanding shares of the 11th Defendant, Eldorado Brasil Cellulose S.A., ("**Eldorado**") and is therefore a very substantial shareholder of Eldorado. The Plaintiff brings these proceedings in a representative capacity for and on behalf of Eldorado (which is joined as a nominal defendant). References herein to "the Plaintiff" are references to the Plaintiff in that capacity. Where the Plaintiff is referred to as "CA Investment", this is a reference to it in a non-representative capacity.

2.      The remaining 50.59% of the issued and outstanding shares in Eldorado are owned by the 10th Defendant, J&F Investimentos S.A. ("**J&F**"). By virtue of certain rulings in Interlocutory Appeal No. 2197455-12.2018.8.26.0000 before the 1st Chamber Reserved for Business Law of the Sao Paulo Court of Appeals in Brazil (as to the details of which, see paragraphs 47 to 48 below) (the "**Sao Paulo Court of Appeals**"), CA Investment has the benefit of certain orders that (a) prohibits J&F from disposing of its 50.59% shareholding interest in Eldorado and (b) restricts Eldorado's ability to carry on business outside the ordinary course without the prior consent of CA Investment.

### B.  The Defendants

3.      Eldorado is a company incorporated under the laws of Brazil. Eldorado is in the pulp-producing business and is the second largest vertically integrated producer of market bleached hardwood kraft pulp in Brazil. It is the sixth largest producer of such pulp in the world in terms of production capacity. Eldorado is currently controlled by the 1st Defendant (**"Joesley Batista"**) and 2nd Defendant ("**Wesley Batista**") (collectively, the "**Batista Brothers**"), through the 10th Defendant, J&F. Save where otherwise stated, averments to things done by Eldorado herein should be read as things that the 1st to 8th and/or 10th Defendants caused Eldorado to do.

4.      The Batista Brothers are shadow directors of Eldorado in that the 3rd to 8th Defendants are accustomed to and habitually act in accordance with their directions and instructions. The Batista Brothers are criminals who have confessed to perpetrating fraud and corruption on a massive scale, particularly in Brazil (as to which, see paragraphs 16 to 33 below). They have been central culprits in the creation of a culture of fraud, deception and corruption in the empire of companies (many of which are Brazilian) that they have created or acquired. This includes Eldorado.

5.      The 10th Defendant, J&F, holds 50.59% of the shares in Eldorado, and is controlled by the Batista Brothers.

6.    The individuals named as the 3rd to 7th Defendants are all directors of Eldorado who were nominated to Eldorado's Board of Directors ("**BOD**") by J&F and therefore the Batista Brothers. The Plaintiff avers that the 3rd to 7th Defendants, who comprise all of the named current members of the BOD of Eldorado (other than Mr Jose Luis de Salles Freire ("**Mr. Freire**"), who is CA Investment's BOD nominee), have at all material times, acted and continue to act under the direction of the Batista Brothers. Accordingly, the Plaintiff further avers that the 1st and 2nd Defendants have been and continue to be shadow directors of Eldorado given that Eldorado consistently and habitually takes, or fails to take, actions, based on the wishes and directions of the Batista Brothers.

7.    The named members of Eldorado's BOD, and their capacities therein, are presently as follows:

| Defendant | Director | Position | Nominated by |
|---|---|---|---|
| 3rd | José Batista Sobrinho | Chairman | J&F |
| 4th | Emerson Fernandes Loureiro | Alternate member | J&F |
| 5th | Sergio Longo | Vice-chairman | J&F |
| 6th | Francisco de Assis e Silva | Member | J&F |
| 7th | José Antonio Batista Costa | Member | J&F |
| N/A | José Luis de Salles Freire | Member | CA Investment |

8.    The individual named as the 8th Defendant, Aguinaldo Gomes Ramos Filho ("**Aguinaldo**"), is a member of Eldorado's Board of Executive Officers and is Eldorado's Chief Executive Officer ("**CEO**"). He had no experience in the pulp industry prior to being appointed to his position as CEO on 1 December 2017 (the Plaintiff refers to paragraphs 100 to 102 below). The only reason for his appointment as the CEO of Eldorado is his family relationship, being a grandson of José Batista Sobrinho (the patriarch of the Batista family) and a nephew of the Batista Brothers. The 8th Defendant therefore occupies the role of CEO in order to carry out the directions and instructions of the Batista Brothers.

9.    The 9th Defendant, BDO RCS Auditores Independentes S.S ("**BDO**"), is an accounting firm with its registered address at Rua Major Quedinho, 90, Consolação São Paulo, SP – Brasil, 01050-030, and was appointed as Eldorado's independent auditors on 15 December 2016. In that capacity, the 9th Defendant has reviewed and issued certain reports and confirmations with respect to the financial statements of Eldorado. As described in paragraphs 136 to 144 below, this includes certain reports contained in the preliminary offering memorandum dated 30 January 2019 (the "**30 January Offering Memorandum**") and 4 February 2019 (the "**Supplemental Offering Memorandum**" and collectively with the 30 January Offering Memorandum, the "**Offering Memoranda**") pursuant to which bonds in the amount of US$500 million (the "**Proposed Bonds**") were intended to be listed on the Singapore Exchange Securities Trading Limited ("**SGX-ST**") by Eldorado Intl. Finance GmbH ("**Eldorado Finance**") and were to be

guaranteed by Cellulose Eldorado Austria GmbH and Eldorado (such bond issuance being referred to herein as the "**Proposed Bonds Issuance**"). The appointment of BDO was not and is not permitted by Eldorado's By-laws (as to which, see paragraphs 136 to 138 below).

10.   The 10th Defendant, J&F, is a corporation established under the laws of Brazil and having its registered address at Avenida Marginal Direita do Tietê, No. 500, Vila Jaguara, CEP 05118-100. As noted above, J&F owns 50.59% of the total issued and outstanding shares of Eldorado. The Plaintiff avers that, in its capacity as such, the 10th Defendant is liable for knowingly assisting the 1st to 8th Defendants in breaching their fiduciary duties to Eldorado.

11.   The present action is a derivative action commenced by the Plaintiff against the Defendants based on their fiduciary and other duties and/or obligations owed to Eldorado with respect to the preparation and dissemination of the Offering Memoranda and in connection with the attempted or proposed listing of the Proposed Bonds on the SGX-ST. The Offering Memoranda state that the Proposed Bonds would not be registered under the Securities Act, 1933 of the United States (as amended) ("**US Securities Act**") but instead would be issued in reliance on the exemption from registration provided by Rule 144A under the US Securities Act. Accordingly, there are certain disclosure standards that apply to the Offering Memoranda as a matter of law (including, without limitation, under Singapore law) that have not been met (as to which, see paragraphs 63 to 145 below).

## II.    BACKGROUND TO THE CLAIMS MADE HEREIN

### A.    The Batista Brothers

12.    The Batista Brothers control J&F, the 10th Defendant. J&F appointed the 3rd to 8th Defendants as directors and/or officers of Eldorado. The Batista Brothers therefore "pull all the strings" with respect to the actions and activities of Eldorado. The Batista Brothers control Eldorado and another substantial company established in Brazil named JBS S.A. ("**JBS**") through J&F and have used J&F as an important tool or device in committing and implementing massive fraud and corruption schemes.

13.    The Batista Brothers have been notoriously central culprits in the creation of a culture of fraud, deception and corruption in the empire of companies (many of which are Brazilian) that they have created or acquired. These include Eldorado and JBS, both being companies controlled by the Batista Brothers that have been the victims of widescale corruption and self-dealing. As explained herein, the criminal activities of the Batista Brothers lie at the heart of the Proposed Bonds Issuance and the breaches of Singapore law in the Offering Memoranda.

14.    The Batista Brothers built their wealth by cultivating and bribing Brazilian government officials in exchange for millions of dollars of financing (often from Brazilian Government-controlled banks and institutions), huge tax breaks from Brazilian state and federal authorities, lax review and oversight of the companies they control and other egregiously bad practices.

15.   Non-exhaustive particulars of the Batista Brothers' criminal notoriety in Brazil (and elsewhere) follow below.

      **(i)**      ***Particulars of the Batista Brothers' criminal activity: Operation Car Wash, Plea Bargain and Leniency Agreement***

16.   In 2014, the Brazilian Federal Police and Judge Sérgio Moro (as he then was, and who is now the Minister of Justice and Public Security of Brazil, appointed to that office by the recently elected President of Brazil, Mr. Jair Messias Bolsonaro) commenced a broad criminal investigation that began as a money laundering investigation and evolved into a huge corruption crackdown. This involved the investigation of bribery, corruption and misappropriation of public funds by Brazilian political authorities. This investigation became known as Operation Car Wash (*Operação Lava Jato*). Operation Car Wash was and is the largest corruption scandal in the history of Latin America, featuring more than 1,184 warrants for search and seizure, temporary prevention and detention orders, and plea bargain coercive measures, with the aim of ascertaining the full extent of money laundering and other schemes. The amounts involved have been estimated at not less than R$40.3 billion.

17.   The Batista Brothers are the main criminals at the centre of Operation Car Wash. Indeed, the attention of Brazil (if not the world) became focussed on the Batista Brothers when, in May 2017, a recording of a dialogue between

the 1st Defendant, Joesley Batista and Michel Temer, the then President of Brazil, was made public. The recording reveals discussions between the 1st Defendant and Michel Temer regarding the making of certain payments to buy the "silence" of a former Brazilian Lower House Speaker, Eduardo Cunha ("**Cunha**"). At that time, there were four ongoing investigations (briefly described below) into the activities of the Batista Brothers and forming part of Operation Car Wash.

(a)     **Operation Sépsis**: In Operation Sépsis, the Brazilian Federal Police investigated the payment of bribes in the amount of R$37.4 million that were made on behalf of Eldorado in exchange for the subscription by a unit of the Brazilian state pension fund, *Fundo de Investimento do Fundo de Garantia do Tempo de Serviço* ("**FI-FGTS**") for debentures in an aggregate principal amount of R$940 million issued by Eldorado (the "**Brazilian Debentures**"). By way of background, FI-FGTS is an investment fund created in 2007, managed by Caixa Econômica Federal ("**Caixa**"), a Brazilian Government-controlled institution, to finance investments in infrastructure in areas of transportation, energy and sanitation. The fund was founded in 1996, financed by employers' mandatory monthly contributions of 8 percent of workers' wages. Accordingly, the money invested by FI-FGTS in Eldorado is sourced from mandatory contributions from rank and file workers in Brazil whose hard-earned money is placed in the custody and control of FI-FGTS. The Brazilian Debentures constitute existing indebtedness of Eldorado that is referred to in the Offering Memoranda. A detailed

explanation as to the relevance of Operation Sépsis is set out in paragraphs 118 to 124 below.

(b) **Operation Cui Bono**: In Operation Cui Bono, the Brazilian Federal Police investigated irregularities in the financing provided by state-owned lender Caixa to various corporations in Brazil, including Batista Brothers' controlled entities such as Eldorado, during the period from 2011 to 2015. In this regard, Eldorado was referred to in a document entitled "*pipe line geddel*" that was discovered by the Brazilian Federal Police during this investigation. During this period, the Batista Brothers conspired to pay bribes through companies controlled by lobbyist Lúcio Funaro ("**Funaro**") in exchange for Caixa advancing R$5.5 billion in loans to companies controlled by the Batista Brothers, including Eldorado.

(c) **Operation Greenfield**: In Operation Greenfield, the Brazilian Federal Police investigated bribes that were paid by the Batista Brothers to the Chief Executive Officers of Petrobras and Caixa in exchange for Petrobras and Caixa purchasing shares in JBS at inflated prices. As part of the Brazilian Federal Police's investigation in Operation Greenfield, an arrest order was made against one Mário Celso Lopes, a partner at pulp company Eucalipto Brasil S.A., based on evidence that proceeds from a R$190 million supply contract entered into by Mário Celso Lopes' company with Eldorado was used to buy the silence of a witness.

(d) **Operation Weak Meat**: In Operation Weak Meat, the Brazilian Federal Police investigated the payment of bribes by the Batista Brothers (through JBS) to officials in the Brazilian Ministry of Agriculture in exchange for the certification of rotten and tainted meat for sale.

18. These investigations eventually led to the Batista Brothers and certain other officers of J&F group companies (including, in particular, the 6th Defendant, Francisco de Assis e Silva ("**Francisco Assis**") who is a director of Eldorado appointed by the Batista Brothers) entering into a plea bargain (each, a "**Plea Bargain**") with the Brazilian Federal Prosecutor Service on 3 May 2017. The purpose of each Plea Bargain was for each of the Batista Brothers (and their accomplices) to obtain immunity from prosecution in exchange for payment of fines in the aggregate amount of R$225 million. In addition, each of the Batista Brothers had fundamental obligations under his Plea Bargain including (a) ceasing all criminal activity and no longer taking part in or contributing to the activities of the organisations under investigation; (b) providing full disclosure in all criminal and civil investigations in which the Batista Brothers were called upon to testify; and (c) continuing to fully cooperate with the Brazilian Federal Prosecution Service, including providing supporting evidence against other persons in the context of those investigations.

19. On 5 June 2017, J&F entered into a leniency agreement (the "**Leniency Agreement**") pursuant to which J&F assumed responsibility for criminal conduct set out in its Plea Bargain. J&F agreed to pay a fine of R$8.0 billion

and to contribute an additional R$2.3 billion for social projects over a 25-year period in exchange for which the Brazilian Federal Prosecution Service agreed not to initiate certain proceedings against the J&F group and its officers who adhered to the Leniency Agreement. The Batista Brothers caused Eldorado, a prominent tool and device in the commission and implementation of extensive fraud and corruption, to adhere to the Leniency Agreement on 21 September 2017. Similarly, the Batista Brothers caused JBS to adhere to the Leniency Agreement on 6 September 2017.

20.   The Plea Bargain proved to be short-lived. Within four months (or so) after the Plea Bargain was entered into by the Batista Brothers, the Brazilian Federal Public Prosecutor's Office (Ministerio Publico Federal) ("**MPF**"), through its Prosecutor General's Office made a request to terminate the Plea Bargain by reason of, among other things, the concealing of information by the Batista Brothers when entering into the Plea Bargains, as explained in paragraph 21 below. The Leniency Agreement entered into by J&F, and adhered to by Eldorado and JBS, continues to be in existence subject to compliance with the conditions referred to therein (including their continuing cooperation with the MPF).

(ii)   *Arrests of the Batista Brothers for concealing information in the Plea Bargain, insider trading and market manipulation*

21.   On 9 September 2017, the 1st Defendant (i.e. Joesley Batista) and a J&F executive named Ricardo Saud were arrested for concealing material

information in connection with the Plea Bargain. In a recording of a dialogue between Joesley Batista and Ricardo Saud that was leaked to the public in Brazil, it transpired that the Batista Brothers availed themselves of the Plea Bargain by paying R$700,000 to Marcelo Miller while he was acting as a federal prosecutor during the negotiations leading up to the Plea Bargain (the "**Marcelo Miller Bribes**"). This was a flagrant breach of the Plea Bargain. Accordingly, the MPF requested that the Plea Bargain of the Batista Brothers be terminated on 14 September 2017 and 16 February 2018 respectively. These requests to terminate the Batista Brothers' Plea Bargain are currently pending before Justice Edson Fachin of the Brazilian Supreme Court, and a final decision is expected in the coming months. While the Brazilian Federal Court ordered that Joesley Batista and Ricardo Saud be released from detention on 9 March 2018 on the basis that the preventive arrests were deemed to be too long, non-custodial measures were imposed including a prohibition from leaving Brazil without prior court authorisation and the obligation to attend all necessary court proceedings. Shortly thereafter, on 25 June 2018, criminal corruption charges were brought against Joesley Batista, and Ricardo Saud in connection with the Marcelo Miller Bribes.

22.    On 13 September 2017, the 2nd Defendant, Wesley Batista, was arrested for insider trading and market manipulation in Operation Achilles Heel (*Tendão de Aquiles*), an operation carried out by the Brazilian Federal Police. In Operation Achilles Heel, the Brazilian Federal Police investigated the use of privileged information and market manipulation by JBS and FB Participações S.A. ("**FBP**"), companies controlled by the Batista Brothers, in

financial market transactions. The 1st Defendant, Joesley Batista, was also accused of these same crimes but had already been arrested for concealing material information in breach of his Plea Bargain (as set out in paragraph 21 above). The Batista Brothers – when they were at the point of finalising their Plea Bargains – brazenly manipulated the Brazilian currency and stock markets by trading on insider information relating to the impending signing of their own Plea Bargain. They perpetrated these crimes by selling their shares in JBS and purchasing USD futures contracts between 2 March 2017 and 17 May 2017 while they negotiated their Plea Bargain. They did this knowing that the public announcements regarding the signing of the Plea Bargain would materially impact both the price of publicly-traded JBS shares and the exchange rate of Brazilian Reais to US Dollars. Astonishingly, Wesley Batista bought US$2.8 billion in US Dollar futures contracts days before his Plea Bargain was announced and also caused FBP to sell 36 million JBS shares at the end of March 2017, decreasing FBP's stake in JBS from 44.35% to 42.80%. After the announcement of the Plea Bargain on 17 May 2017, the US Dollar appreciated 8% against the Brazilian Reais while the price of JBS shares fell 37% within 2 business days. The appreciation of the US Dollar against the Brazilian Reais led the Batista Brothers to wrongfully profit in the amount of approximately US$100 million in a brief period of about 1 month. In April and May 2017, the Batista Brothers-controlled FBP repurchased 23 million JBS shares at a fraction of the price it sold these shares in March 2017, increasing FBP's shareholding in JBS by approximately 1%. In aggregate, the transactions involving the sale and repurchase of JBS shares had the effect of allowing the Batista Brothers to avoid potential losses of approximately R$138 million. Given that a

fundamental term of the Plea Bargain was the non-commission of further crimes by the accused persons, the MPF requested the termination of Wesley Batista's Plea Bargain on 16 February 2018. On 20 February 2018, Wesley Batista was released from detention subject to the imposition of non-custodial measures, including (i) a prohibition from leaving Brazil without prior court authorisation; (ii) a prohibition from having contact with other persons that could interfere in the court process; (iii) prohibitions against undertaking transactions in the capital markets; and (iv) a prohibition from holding positions in companies under investigation. The 2nd Defendant, Wesley Batista, is also under investigation by the Brazilian Securities Exchange Commission ("**CVM**") for possible violations of insider trading laws involving trading in the shares of JBS and in dealing in foreign exchange futures contracts, including derivatives transactions entered into by Eldorado.

(iii)     *Subsequent arrest of Joesley Batista for illegal campaign financing*

23.     Within eight months (or so) from his earlier release from prison, on 9 November 2018, the 1st Defendant, Joesley Batista was detained, again, by the Brazilian Federal Police as part of an ongoing inquiry with respect to bribery and illegal campaigning donations in Operation Capitu. Operation Capitu involved 80 arrest warrants and search and seizures targeted at dismantling a bribery scheme that operated in the Chamber of Deputies and in the Ministry of Agriculture. The aggregate amount of bribes paid to politicians and officials in exchange for legislation and regulations that

directly benefited the Batista Brothers through various J&F companies (including Eldorado) is estimated to be in excess of R$22 million. On 12 November 2018, Joesley Batista was released pursuant to a decision by the Brazilian Supreme Court.

### (iv)    _United States Department of Justice Investigation_

24.    The fraud and corruption activities of the Batista Brothers have transcended borders such that the United States' Department of Justice ("**US DOJ**") is also currently investigating them.

25.    In anticipation of a formal investigation by the US DOJ against the Batista Brothers, in December 2018, the Brazilian Attorney General established an international cooperation procedure between the United States and the relevant Brazilian authorities. In addition, the then Attorney-General of Brazil arranged for the Leniency Agreement to be amended to facilitate the investigation by the US DOJ. Pursuant to the terms of such amendment agreement, no J&F company is permitted to make any payment to any foreign authority without first making a payment of the same amount to the Brazilian government. In addition, the Brazilian authorities are entitled to deny access to information that is contrary to the national interest of Brazil.

26.    The US DOJ interviewed the Batista Brothers in Brasilia from 4 December 2018 to 7 December 2018. The contents of the Batista Brothers' testimonies in these US DOJ interviews have remained confidential.

(v)   *Other continuing investigations against the Batista Brothers and the companies they control*

27.   In January 2016, the MPF commenced a criminal action against the Batista Brothers for violations of financial system laws. According to the prosecutors, Banco Original, a bank controlled by the Batista Brothers, used an illegal indirect structure to advance R$80 million in loans to J&F group companies. In May 2017, a central bank auditor was indefinitely placed in Banco Original to monitor its activities.

28.   In May 2017, the Brazilian Federal Police commenced investigations into irregularities in certain financings provided by *Banco Nacional de Desenvolvimento Econômico e Social* ("**BNDES**") to certain Batista Brothers-controlled companies, including JBS and Eldorado. BNDES is a Brazilian Government-controlled development bank whose mission (among other things) is to provide long-term financing for endeavours that contribute to the development of Brazil. However, by the Batista Brothers' own admission in their plea bargains, billions of dollars from BNDES have been funnelled to companies controlled by the Batista Brothers through massive bribery and corruption schemes orchestrated by the Batista Brothers. It is estimated that these bribery and corruption schemes involved 1,893 politicians in Brazil. Investigations have been undertaken with respect to over R$8 billion in loans and equity injected by BNDES into JBS. In addition, investigations have also been undertaken in relation to the approximately R$2.7 billion financing provided by BNDES to Eldorado for, among others, the construction of the Três Lagoas mill. The Brazilian Public Prosecutor

Service reported that it discovered evidence of damages in excess of R$2 billion caused by J&F group companies to BNDES. Most recently, on 21 February 2019, the Brazilian Chamber of Deputies has established a Parliamentary Commission of Inquiry that has been tasked with the investigation into unlawful activities involving BNDES which occurred during the period from 2003 to 2015 and involving Brazilian corporations of the same type and scale as Eldorado.

29.    In July 2017, the Brazilian prosecutors filed a civil lawsuit for corruption against, among others, the state governor of Mato Grosso do Sul, Reinaldo Azambuja and the Batista Brothers. In the context of his Plea Bargain, the 1st Defendant, Joesley Batista, admitted that he paid R$38 million in bribes to Reinaldo Azambuja in exchange for tax benefits in the State of Mato Grosso do Sul. Joesley Batista further confessed in his Plea Bargain that this bribery began in 2003 under governor José Orcírio Miranda dos Santos (1999 –2006) and continued under governor André Puccinelli (2007 – 2014), to whom JBS paid R$114 million. On 16 October 2017, the Court of Justice of the State of Mato Grosso do Sul froze, amongst other things, approximately 68% of Eldorado's assets and R$730.6 million in assets belonging to the Batista Brothers, J&F, JBS and JBS' subsidiaries.

30.    In September 2017, a Brazilian Supreme Court judge (Gilmar Mendes) ordered an investigation into text-message conversations between J&F executive Francisco Assis (who is also currently a director of Eldorado and the 6th Defendant as set out in paragraph 7 above) and JBS lawyer Renata Gerusa Prado de Araújo on the basis of JBS' alleged payment of bribes to

federal judges in exchange for favourable rulings. This is, again, a flagrant breach of the Plea Bargain that Francisco Assis entered into in May 2017. The judges named in the conversations are Maria do Carmo Cardoso, a federal judge, and three Supreme Court of Justice judges: Napoleão Maia, Mauro Campbell and João Otávio Noronha. Maia is suspected of having received payments to lift a JBS asset freeze of R$73.5 million that had been ordered in 2014 in relation to fiscal benefits improperly obtained by JBS in the State of Mato Grosso do Sul.

31.   In December 2017, the Brazilian Federal Police carried out an investigation of alleged bribery by JBS officials of Brazilian Federal Revenue employees so as to obtain tax credits between 2004 and 2017. The prosecutors estimated that JBS paid R$160 million in bribes and received R$2 billion in tax credits during that period.

32.   In March 2018, the Mato Grosso do Sul State Comptroller General commenced administrative proceedings against JBS relating to the bribery of state officials for tax benefits, as admitted in Joesley Batista's and Silval Barbosa's plea bargains. By way of background, Mato Gross do Sul is a state in Brazil and (importantly) is the location of the primary asset of Eldorado, a state-of-the-art pulp mill with one of the largest single-line pulp processing plants in the world. It was developed as a greenfield project through capital injections and large loans from Brazilian Government entities. If found guilty, JBS could be liable to pay fines of up to 20% of its annual revenue and be banned from signing government contracts for up to five years, according to the Comptroller General's Office. In addition, the

Mato Grosso do Sul Legislative Assembly has formed a Parliamentary Inquiry Commission to investigate reports made by JBS executives to assess irregularities involving improper tax benefits given by the State of Mato Grosso do Sul. The location of Eldorado's material assets (including its pulp mill) in the State of Mato Grosso do Sul is critical given that the treatment of tax credits looms large in certain of the complaints made herein.

33.   On 3 May 2018, the CVM (Brazilian Securities and Exchange Commission) commenced an investigation into alleged breaches by the Batista Brothers of certain provisions of Brazilian corporate law, prohibiting shareholders from voting on certain corporate matters in respect of which they have conflicts of interest. These proceedings have been under review by the rapporteur since 28 December 2018.

### B.   CA Investment's acquisition of Eldorado

34.   As set out in paragraph 18 above, as part of their Plea Bargain, the Batista Brothers (and J&F) agreed to pay massive fines. These fines were of the magnitude of R$10.3 billion (approximately US$3.24 billion based on exchange rates in 2017). In order to fund the payment of such fines, the Batista Brothers embarked upon an asset sale program. One of those assets was J&F's shares in Eldorado, leading to the transaction between CA Investment and J&F, as explained in more detail below.

35.   On or around 2 September 2017, CA Investment entered into a share purchase agreement (the "**Share Purchase Agreement**") with J&F, among

others, to purchase all of J&F's direct and indirect shareholding in Eldorado (representing, at the time, 80.9% of Eldorado's total issued and outstanding capital stock). The minority shareholders at the time were Brazilian Government-owned pension funds, *Fundaçäo Petrobras de sec. social* and *Fund. Dos economiários federais*, who were indirect shareholders of Eldorado, holding 19.1% of Eldorado's share capital. As contemplated in Section 11.1.6 of the original Share Purchase Agreement, on 11 December 2017, Eldorado (among others) became a party to the Share Purchase Agreement as an intervening-consenting party pursuant to a supplemental agreement, unconditionally agreeing to ensure full compliance with the terms of the Share Purchase Agreement (the "**First SPA Supplement**").

36. The Share Purchase Agreement provided that completion of the share acquisition would take place within a one-year period from signing, culminating in a longstop date of 2 September 2018. Under the Share Purchase Agreement, there were three stages for CA Investment's acquisition of Eldorado's entire share capital as follows:

(a) **Initial Acquisition**: Sale by J&F to CA Investment of 13% of the total share capital of Eldorado for approximately R$1,006,000,000 which was completed on 25 September 2017;

(b) **First Purchase**: Sale to CA Investment of 34.45% of the indirect total share capital of Eldorado by FIP Florestal for approximately R$2,700,000,000 and the sale of 1.96% of the indirect total and voting share capital of Eldorado from FIP Florestal for approximately

R$151,000,000, all of which were completed on 12 December 2017, meaning that CA Investment then owned 49.41% of all the shares of Eldorado; and

(c) **Second Purchase**: Sale to CA Investment of the remaining shares in Eldorado owned by J&F. This purchase has not been completed for the reasons set forth in paragraphs 40 to 41 below.

37.   One of the material conditions precedent to the completion of the Second Purchase was the release of certain guarantees and other collateral provided by J&F in favour of certain of Eldorado's creditors (collectively, the "**J&F Guarantees**"). The J&F Guarantees included security over the 50.15% shares in Eldorado owned by J&F (that would need to be transferred to CA Investment under the terms of the Share Purchase Agreement) and shares in JBS owned and/or controlled by the Batista Brothers (through FBP) representing approximately 16.7% of all the issued shares of JBS.

38.   As parties to the Share Purchase Agreement, the 10th Defendant (J&F) and the 11th Defendant (Eldorado) were bound, pursuant to Sections 11.1 and Section 15.3 of the Share Purchase Agreement and Section 2.2 of the First SPA Supplement, to fully cooperate with CA Investment and to act diligently and expeditiously to negotiate with all relevant creditors of Eldorado to obtain the relevant releases of the J&F Guarantees.

39.   During the period from September 2017 to late May / early June 2018, J&F and Eldorado (the 10th and 11th Defendants), cooperated with CA Investment

to negotiate with the relevant creditors with the aim of obtaining the relevant releases of the J&F Guarantees to complete the Second Purchase. For example, Eldorado sent a letter on 8 May 2018 to FI-FGTS, the sole holder of the Brazilian Debentures, to request the early redemption of these debentures for release of the relevant J&F Guarantees.

**C.    Efforts to frustrate the completion of the purchase of Eldorado's shares**

40.    Between September 2017 and June 2018, the relevant pulp price rose significantly from $2,040 per ton to R$2,905 per ton. Around this time, the 1st to 8th Defendants caused J&F and Eldorado (the 10th and 11th Defendants), to act in such a manner to frustrate CA Investment's efforts to release the J&F Guarantees in order to complete the Second Purchase under the Share Purchase Agreement. In other words, due to material increases in relevant pulp prices (along with movements in US Dollar/Brazilian Reais exchange rates), the Batista Brothers conspired with the 3rd to 8th Defendants to intentionally orchestrate a campaign of non-cooperation with respect to the release of the J&F Guarantees, since they were no longer prepared to honour and respect the terms of the Share Purchase Agreement due to these market changes.

41.    Specifically, the Batista Brothers, conspiring with the 3rd to 8th Defendants, took steps or caused J&F and Eldorado to intentionally impede, obstruct and delay CA Investment's efforts to complete the transactions under the Share Purchase Agreement. Examples of such actions are as follows:

(a)   **BNDES**: Following discussions among CA Investment, J&F,
Eldorado and BNDES that were conducted over 10 months, the
parties agreed to the terms of a payoff letter such that CA Investment
could directly repay all of Eldorado's outstanding BNDES debt, for
and on behalf of Eldorado. This would facilitate the release of the
relevant J&F Guarantees. Despite this agreement, in or around July
2018, the Batista Brothers, together with the 3rd to 8th Defendants,
caused Eldorado not to authorise the prepayment of the BNDES
debt. On 27 August 2018, BNDES sent a letter to Eldorado, J&F and
CA Investment, confirming that (i) BNDES was ready to receive
repayments of all amounts outstanding under Eldorado's BNDES
debt and to release the relevant J&F Guarantees, and (ii) that the
last remaining step in achieving such release was Eldorado's
issuance of a simple confirmation (known as a *boleto*).

(b)   **FI-FGTS**: CA Investment, J&F and Eldorado had negotiations with
FI-FGTS with a view to achieving early redemption of the Brazilian
Debentures so as to facilitate the release of the relevant J&F
Guarantees. As at June 2018, the only outstanding condition to such
early redemption was for Eldorado to pay certain fines to FI-FGTS
as a result of Eldorado being in material breach of certain terms of
the Brazilian Debentures (the background to, and details of, such
material breaches are set out in paragraphs 111 to 117 below). To
ascertain the amount of the fines, in May 2018, Eldorado agreed to
submit a "use of proceeds" audit report for the purpose of calculating

these fines. However, despite multiple requests and demands from CA Investment, the 11th Defendant, Eldorado, refused to provide that audit report. Thereafter, J&F and Eldorado took the position that the release of the J&F Guarantees was entirely CA Investment's responsibility, notwithstanding their past cooperation and the clear and explicit duties of cooperation on the part of J&F and Eldorado, as set forth in the Share Purchase Agreement.

(c)     **Export Credit Agencies**: Despite CA Investment, J&F and Eldorado having agreed to the terms of payoff letters with each of the relevant European export credit agencies ("**ECAs**") for payment to be made directly by CA Investment to the ECAs under the following export credit facility agreements: (i) an export credit facility agreement entered into for Eldorado under the guarantee of Exportkreditnamnenden dated 14 December 2012 (as amended from time to time); (ii) two export credit facility agreements entered into for Eldorado under the guarantee of Finnvera PLC dated 14 December 2012 (as amended from time to time); and (iii) an export credit facility agreement entered into for Eldorado under the guarantee of the Republic of Austria represented by Oesterreichische Kontrollbank Aktiengesellschaft dated 14 December 2012 (as amended from time to time) (collectively, the "**Export Credit Facility Agreements**"), in or around July 2018, Eldorado refused to send the final payoff letter to the ECAs authorising such payment.

D.   **CA Investment's injunction relating to the Share Purchase Agreement**

42.   By August 2018, it was abundantly clear to CA Investment that, in light of the 1st to 8th Defendants causing J&F and Eldorado to refuse cooperation and to intentionally frustrate the steps and processes necessary to release the J&F Guarantees, the Second Purchase would not be closed before the longstop date, i.e. 2 September 2018.

43.   Accordingly, on 14 August 2018, CA Investment filed an injunction application with the Brazilian Courts, seeking, *inter alia*, an order to compel J&F and Eldorado to cooperate in order to achieve the release of the J&F Guarantees (as was contemplated in the Share Purchase Agreement) (the "**Share Purchase Injunction**").

44.   Under the guise of settlement talks while the court proceedings were pending, J&F purported to propose a settlement meeting with CA Investment in order to determine whether a settlement could be achieved. Over the weekend of 25 August 2018, representatives of J&F and CA Investment met in Los Angeles, California (the "**LA Meeting**"). At this meeting, it became patently clear that J&F's conduct of non-cooperation in the previous months had been calculated purely to extract more money from CA Investment and that the Batista Brothers and J&F fully intended to (and to cause Eldorado to) abandon and disregard their legal obligations under the Share Purchase Agreement. Astonishingly, during the LA Meeting, J&F brazenly proposed to extend the longstop date of 2 September 2018 by a period of 6 months but

only if CA Investment agreed to pay an additional R$6 billion in addition to the purchase price that had been agreed under the Share Purchase Agreement. J&F also demanded an additional break-fee of US$250 million if the Second Purchase was not consummated by the extended long-stop date. The message was clear. J&F decided to hold CA Investment "hostage" and demanded an additional R$6 billion payment and a potential US$250 million break fee as "ransom". It goes without saying that the LA Meeting ended abruptly, and the discussions blew up in flames.

45.     Accordingly, the litigation in Brazil continued and at first instance, the Lower Court Judge, Eduardo Palma Pellegrinelli, granted CA Investment certain relief in order to preserve the status quo and to provide specific protections to CA Investment (this relief is hereinafter referred to as the "**Lower Court Injunction**"). The Judge held that the dispute should be resolved by means of arbitration administrated by the International Court of Arbitration of the Chamber of Commerce (the "**ICC Arbitration**") (as specified in the Share Purchase Agreement) but, pending the constitution of the arbitral tribunal, J&F was (a) prohibited from disposing of its shares in Eldorado and (b) required to manage Eldorado by observing the legal obligations and restrictions contained in Clause 7 of the Share Purchase Agreement. These restrictions are fundamentally important so as to protect the interests of Eldorado since they ensure that Eldorado is only able to undertake transactions that are in its "Ordinary Course of Business" (as defined in the Share Purchase Agreement) unless both shareholders agree otherwise.

46.   On 4 September 2018, J&F issued a notice to CA Investment purporting to terminate the Share Purchase Agreement on the basis that the longstop date had lapsed without the Second Purchase having been consummated.

47.   On 30 August 2018 and 14 September 2018, J&F and CA Investment respectively filed interlocutory appeals against the Lower Court Injunction. J&F sought the dismissal of the Lower Court Injunction in its entirety, while CA Investment again sought the relief initially sought by it in the Lower Court proceedings (the "**Interlocutory Appeals**").

48.   On 28 November 2018, the Sao Paolo Court of Appeals rendered its decision with respect to the Interlocutory Appeals. The Sao Paolo Court of Appeals suspended J&F's notice of exercise of its right of termination of the Share Purchase Agreement (i.e. the Sao Paulo Court of Appeals ruled that the Share Purchase Agreement was fully in existence) and extended the effectiveness of the Lower Court Injunction (prohibiting J&F from selling its shares in Eldorado and preserving Clause 7 of the Share Purchase Agreement) pending a re-evaluation of matters by the ICC arbitral tribunal. In summary, the life of the Lower Court Injunction was extended until these issues were considered and evaluated by the ICC arbitral tribunal and not simply until the constitution of the ICC arbitral tribunal.

49.   On 5 September 2018, CA Investment submitted a request for arbitration to the ICC, Secretariat of the International Court of Arbitration of Brazil. Both J&F and Eldorado responded on 15 October 2018.

50.     As of the date of filing this Statement of Claim, all 3 arbitrators have been
        appointed. Each of CA Investment, J&F and Eldorado are awaiting
        confirmation that no conflicts of interests exist with respect to the proposed
        Chairman of the arbitral tribunal, following which, the ICC Secretariat will
        confirm the formal constitution of the tribunal. This is expected to occur
        shortly.

**E.**      **The Proposed Bonds**

51.     On 19 January 2019 (Saturday) at 5:05 p.m. (Sao Paulo time), José Batista
        Sobrinho, the 3rd Defendant and the father of the Batista Brothers, on behalf
        of Eldorado, issued a notice (the "**Board Meeting Notice**") to call a BOD
        meeting that was to take place on Monday 21 January 2019 (the "**21
        January Board Meeting**") at 1:00 p.m. (Sao Paulo time). It is no coincidence
        that the Board Meeting Notice was issued on a Saturday, giving the sole
        BOD representative of the minority shareholder, Mr. Freire, very short notice
        to react. The Board Meeting Notice stated that the purpose of the meeting
        was, *inter alia*, to examine, discuss and vote for the "*issuance of debt
        securities of USD 500 million in the foreign market by Eldorado Intl. Finance
        GmbH, [an indirect wholly owned subsidiary of Eldorado], existing under the
        laws of Austria.*" No other details or explanations with respect to the
        Proposed Bonds were included in the Board Meeting Notice.

52.     Prior to Mr. Freire's receipt of the Board Meeting Notes, the only persons
        who appeared to have any awareness of any proposal to issue bonds or

other debt instruments were J&F and Eldorado, acting under the direction of the 1st to 8th Defendants, aided and abetted by BDO, the 9th Defendant.

53.     In addition, the only information received by Mr. Freire prior to the 21 January Board Meeting was a one-page summary of the purported terms and conditions of the Proposed Bonds with little or no substantive details. Indeed, the one-page summary implied that the issuance of the Proposed Bonds was a fairly nascent idea and had to be substantially developed before it could merit any real consideration. However, the true reality was that, at the time of the 21 January Board Meeting, Eldorado was very advanced in the implementation of its plan to issue the Proposed Bonds, having mandated underwriters, and appointed legal counsel in Brazil and New York who had made substantial progress in the drafting of a detailed (near 400-page) offering memorandum.

54.     By way of an email sent on 20 January 2019 to José Batista Sobrinho, the 3rd Defendant, as Chairman of Eldorado's BOD, Mr. Freire requested the postponement of the 21 January Board Meeting given the lack of information and deficiency of the notice of the BOD meeting, and also sought detailed information regarding the agenda for that meeting. This request was refused by Eldorado on the same day.

55.     Under the instructions of the Batista Brothers, the 3rd to 8th Defendants, comprising the majority of the BOD, approved the Proposed Bonds Issuance. Mr. Freire abstained from voting at the 21 January Board Meeting since he had little or no information with respect to the Proposed Bonds.

56.     On 31 January 2019, CA Investment (through its own initiative and without any notice from Eldorado or J&F) discovered that a shareholders' meeting was to be held on 6 February 2019 (the "**6 February Shareholders' Meeting**") at 9:00 a.m. (Sao Paulo time). A notice with respect to the 6 February Shareholders' Meeting had been uploaded to the CVM (Brazilian Securities and Exchange Commission) website, but the 1st to 8th Defendants together with J&F, the 10th Defendant, had caused Eldorado to deliberately fail to notify CA Investment of the 6 February Shareholders' Meeting. This is notwithstanding that CA Investment holds 49.41% of the shares in Eldorado and is **<u>one of two</u>** shareholders of Eldorado.

57.     The Shareholders' Meeting Notice only disclosed a one-page power point presentation, which did not contain any detailed information with respect to the Proposed Bonds Issuance. No further information with respect to the Proposed Bonds was made available by Eldorado, despite its request for its shareholders to approve its incurrence of material financial indebtedness. The behaviour of the 1st to 8th Defendants in this regard is scandalous and clearly demonstrates their intention to abuse Eldorado for the interests of the Batista Brothers and J&F, the 10th Defendant.

58.     On 31 January 2019, there were media releases confirming that Fitch Ratings had rated the Proposed Bonds BB-. This had to mean that the details of the Proposed Bonds were extremely well-developed and not simply a "nascent idea". One day later, on 1 February 2019, CA Investment received further news that Eldorado was planning roadshows in London and

New York to market the Proposed Bonds during the week commencing 4 February 2019. CA Investment also received a copy of the (almost 400 page) 30 January Offering Memorandum with respect to the Proposed Bonds. It was palpably obvious that the preparation for the Proposed Bonds Issuance must have commenced many months prior to the calling of the 21 January Board Meeting.

59.   Notwithstanding CA Investment's attendance at, and its vote against the Proposed Bonds Issuance, the issuance was approved by J&F, the 10th Defendant, at the 6 February Shareholders' Meeting.

60.   The 6 February Shareholders' Meeting was not called or held in good faith but rather was a sham meeting designed to facilitate the raising of funds for the benefit of the Batista Brothers, to the detriment of Eldorado's interests.

### F.   The Offering Memoranda

61.   On 1 February 2019, CA Investment received, from a third party and not any of the Defendants, a copy of the near 400-page 30 January Offering Memorandum in respect of the Proposed Bonds.

62.   The contents of the Offering Memoranda, the preparation of which was controlled and directed by the 3rd to 8th Defendants, being Eldorado's BOD and Chief Executive Officer, under the instructions of the Batista Brothers, were false and/or inaccurate and/or misleading in many material respects, including (without limitation) with respect to the matters referred to below.

As a result, the 1st to 8th Defendants have caused material loss and damage to Eldorado.

### III.    PARTICULARS OF DEFICIENCIES IN THE OFFERING MEMORANDA

### A.    Gross Overstatement of EBITDA

63.    The Offering Memoranda state that Eldorado recorded earnings before interest, tax, depreciation and amortization ("**EBITDA**") at margins of 66% (or more) over the last 2 years. However, Eldorado's EBITDA is based on wholly inaccurate and misleading calculations. These calculations were reviewed and confirmed by the 9th Defendant, BDO, who should not even be the auditor of Eldorado (as to which, see paragraphs 136 to 138 below).

64.    In fact, according to a review undertaken by Ernst & Young ("**EY**"), Eldorado's EBITDA for the trailing twelve-month period ending on 30 September 2017 ought to have been R$1,193.4 million, as opposed to reported EBITDA of R$1,797.6 million. This amounts to an approximately 33% overstatement of EBITDA for this period.

65.    Eldorado's EBITDA is based on wholly inaccurate and misleading calculations for the reasons set forth below, as supported by reviews and reports by EY.

66.    Eldorado's EBITDA (as presented in the Offering Memoranda and Eldorado's audited financial statements) includes ICMS (VAT) tax credits

amounting to approximately R$239.7 million for the trailing twelve-month period ending on 30 September 2017, which should not and cannot properly or appropriately be reflected as EBITDA. These EBITDA calculations include ICMS (VAT) tax credits relating to tax incentives granted by The State of Mato Grosso do Sul that cannot be properly reflected as part of EBITDA. As at 30 September 2018, Eldorado had accumulated ICMS (VAT) tax credits of approximately R$ 1.1 billion. These matters are more fully explained below.

67.   In addition, the discount rate used by Eldorado to calculate the fair value of biological assets inflated the value of biological assets by approximately R$360.6 million for the trailing twelve-month period ending on 30 September 2017. These matters are also more fully explained below.

(i)   *Inappropriate inclusion of ICMS (VAT) tax credits*

68.   ICMS is the abbreviation for "*Imposto sobre Operações relativas à Circulação de Mercadorias e Prestação de Serviços de Transporte Interestadual e Intermunicipal e de Comunicação*" and is a state tax for goods and services payable at all stages of sale from manufacturer to consumer.

69.   In March 2010, Eldorado entered into an understanding with the State of Mato Grosso do Sul (*Termo de Acordo 502/2010*), under which Eldorado would potentially have the ability to benefit from certain ICMS tax incentives

that, in certain circumstances, would provide significant reductions in Eldorado's ICMS tax burden in certain transactions (the "**ICMS Incentives**").

70.    While these ICMS Incentives were potential assets for Eldorado, there were 2 key impediments that Eldorado had to overcome in order for it to benefit from these ICMS Incentives.

71.    Firstly, a definitive agreement would need to be entered into with the authorities of the State of Mato Grosso do Sul with respect to the precise manner in which such ICMS Incentives could be utilised, and the parameters thereof. As of September 2017, Eldorado's management disclosed to EY that this special regime for the utilisation of these ICMS Incentives was 'still under analysis' and was not yet available to Eldorado.

72.    Secondly, even if an agreement was reached between Eldorado and the Mato Grosso do Sul authorities, these ICMS Incentives could only be used if Eldorado (i) continues its pursuit of the Vanguarda 2.0 Project (and purchases plant, machinery and equipment in the context of that project); or (ii) increases its sale of pulp to the domestic Brazilian market, both of which are unlikely.

### (1)    No agreement with the State of Mato Grosso do Sul

73.    As at the date of the Offering Memoranda, Eldorado has not confirmed that any agreement had been reached with the authorities of the State of Mato Grosso do Sul. In fact, on the contrary, Eldorado expressly sets out as a

qualification (at page 195 of the Offering Memoranda and note 9 of BDO's auditors report accompanying Eldorado's unaudited interim condensed financial statements for the third quarter of 2018 and audited 2017 financial statements), that obtaining authorisation from the government of the State of Mato Grosso do Sul to use ICMS credits to pay suppliers hired in connection with the Vanguarda 2.0 project was one of the actions "*prioritized in order to maximize the realisation of ICMS credits that are conditioned mainly in the expectation of increased sales of pulp to the market and the granting of incentives by the government of the State of Mato Grosso do Sul to pay suppliers to be hired under the project to expand production*".

74.     Clearly, no such agreement has been reached. It follows that the ICMS credits cannot, as a matter of proper accounting practice, be regarded as an asset or included in the calculation of Eldorado's EBITDA.

### (2)     The Vanguarda 2.0 Project

75.     The Vanguarda 2.0 project relates to the construction of a second pulp production line at Eldorado's current Três Lagoas mill. The rationale for the government of Mato Grosso do Sul implementing a framework for the possibility of utilising these ICMS tax credits was that the expansion of production by Eldorado would benefit the economy of the State of Mato Grosso do Sul by providing employment and other stimuli. As such, it would be possible that the government of the State of Mato Grosso do Sul could, assuming a definitive agreement was reached, allow Eldorado to utilise

these tax credits to offset the value added tax payable with respect to supplies relating to the Vanguarda 2.0 project.

76.   On 25 February 2017, Eldorado announced that it had put the Vanguarda 2.0 project on hold but that it would likely commence in 2020. Recently, on 15 January 2019, Eldorado's Chief Executive Officer, Aguinaldo again publicly stated that the Vanguarda 2.0 project "*will not get off the drawing board in 2019*" and suggested a further and more extensive delay of the project, noting that "*the best-case scenario for it would be 2020*".

77.   Accordingly, there is no foreseeable engagement of suppliers and other third parties that would allow Eldorado to utilise these ICMS credits in any way in the foreseeable future. In short, these ICMS credits are wholly theoretical and cannot be properly regarded as assets, much less factored into the calculation of Eldorado's EBITDA. The 1st to 8th Defendants have caused Eldorado to present its EBITDA in this manner, with the active participation of BDO, the 9th Defendant, so as to intentionally and materially mislead investors in the context of the Proposed Bonds Issuance.

### (3)   *Eldorado continues to have overwhelmingly export-oriented pulp sales*

78.   Eldorado continues to operate a largely export-oriented business model, with domestic pulp sales only comprising approximately 13.2 % of all pulp sales for the 9-month period ending 30 September 2018 (see page 57 of the Offering Memoranda).

79.     Accordingly, there is no justifiable basis for Eldorado's wholesale inclusion of these accumulated ICMS tax credits in the calculation of Eldorado's EBITDA. As of 30 September 2018, Eldorado recorded accumulated ICMS tax credits in an amount of R$1,154.5 million, which is approximately 47.5% of Eldorado's EBITDA for such period. The 9th Defendant's endorsement of Eldorado's calculation of EBITDA evidences a conspiracy among the Defendants to mislead and deceive investors into purchasing the Proposed Bonds, to the ultimate detriment of Eldorado, for the benefit of the Batista Brothers and J&F.

80.     Further, Eldorado makes no provision for impairment for the full amount of ICMS credits in the State of Mato Grosso do Sul. If it had been properly accounted for, the full amount of the ICMS tax credits would be subject to an impairment provision with monthly revisions as to the estimates for realization thereof due to the difficulties in realization. Eldorado has, with the active assistance and participation of the 9th Defendant, BDO, recognised these ICMS tax credits as assets and attempted to use with a view to intentionally misleading investors by suggesting that Eldorado would have the ability to repay and/or service the payments due thereunder.

(ii)    ***Inappropriate discount rate of biological assets by Eldorado***

81.     Eldorado has applied an inappropriately low discount rate on the value of its biological assets resulting in an overstatement in the value of Eldorado's

assets in the amount of approximately R$360.6 million, also contributing to the gross overestimation and inflation of EBITDA. Eldorado's use of an inappropriately low discount rate (resulting in a higher asset value) has also been confirmed by EY in its review and reports.

82.     In businesses where substantially all of the revenue generating assets are living animals or plants, values have to be attributed to such "biological assets" to properly determine and assess the value of the enterprise. This is applicable to Eldorado where all of its revenue generating assets are Eucalyptus trees. Present values need to be attributed to the Eucalyptus trees given that they require time to grow before they can be harvested for pulp. The discount rate attributed to the value of a company's biological assets (in this case, Eucalyptus trees) is intended to take into account factors that do not make these assets immediately realisable for cash at the time of the valuation. By way of example, the few key factors which impact the discount rate of a pulp producing company such as Eldorado are (i) the length of time it would take a typical tree to mature; (ii) likely growth and mortality statistics; and (iii) species of the tree. As such, discount rates for such biological assets are usually comparable amongst competitors located in the same geographical region given that the same species of trees would be cultivated, and the weather and other geographical conditions would be largely similar.

83.     It is therefore highly surprising that the discount rate applied by Eldorado to its biological assets is much lower than its competitors in the same region who produce the same bleached Eucalyptus hardwood pulp. By way of

example, for the financial years ending 31 December 2015 and 2016, Eldorado used a 4.5% discount rate for the valuation of its biological assets, which was increased to 6.1% in 2017 and 2018. In contrast, its closest competitors, Fibria and Suzano used discount rates of between 7.33% to 10.54% during the same period.

84.    This artificially low discount rate applied to the valuation of its biological assets has also materially inflated Eldorado's EBITDA in a misleading manner, calculated to mislead investors into purchasing the Proposed Bonds.

**B.    Arbitration proceedings between CA Investment, J&F and Eldorado**

85.    The Plaintiff refers to paragraphs 48 to 50 above regarding the arbitration proceedings between CA Investment, J&F and Eldorado. The Offering Memoranda make various references to these arbitration proceedings (at pages 9, 25,101,116 and 123). However, in doing so, the Offering Memoranda portray the dispute as one primarily between CA Investment and J&F. This is wholly inaccurate and misleading, and the Offering Memoranda omit any mention of the fact that Eldorado is named as a co-defendant in the arbitration proceedings and that CA Investment seeks substantial damages from Eldorado.

**C.    Materially inaccurate description of Share Purchase Agreement injunction**

86.     The Offering Memoranda also contain an entirely misleading and inaccurate description of the dispute between CA Investment, Eldorado and J&F in the Share Purchase Injunction before the Courts of Brazil, including the orders issued by the 1st Chamber Reserved for Business Law of the Sao Paulo Court of Appeals court.

87.     In this regard, the Offering Memoranda state (at pages 9, 25,101 and 123) that "*both lower* and *higher courts dismissed CA Investment's requests and ordered that the dispute be settled in arbitration. Until the arbitration is settled, the courts decided to stay the effects of the termination of the agreement by J&F.*" This is a materially inaccurate portrayal since it fails to provide a full and complete description of the specific orders made by the Courts of Brazil. The Plaintiff repeats paragraphs 42 to 48 above as to the orders given by the Brazilian courts.

D.     **Materially inaccurate and/or inadequate disclosure with respect to related party transactions**

88.     The description in the Offering Memoranda of the internal review procedures administered by Eldorado with respect to transactions with related parties is wholly misleading. Eldorado merely provides, among others, generic statements (at page 125 of the Offering Memoranda) that the BOD will review in advance any proposed related party transactions and that all directors, officers and employees are required to report to the BOD any related party transaction prior to entering into the transaction. CA Investment

has raised material questions of Eldorado in this regard and those questions have gone wholly unanswered. For example, Mr. Freire had, on 9 November 2018, raised questions at a BOD meeting in order to understand the details of these internal review procedures. However, to this day, Mr. Freire has not received a response from the directors and/or management of Eldorado. Such procedures do not appear to exist and in any event, do not appear to be implemented and there are therefore serious concerns regarding the disclosure by Eldorado of all transactions with related parties.

**E.      Materially inaccurate and/or inadequate disclosure with respect to certain investigations conducted in Brazil**

89.      The information provided in the Offering Memoranda with respect to certain investigations conducted by the MPF into the Batista Brothers and J&F and the actual or potential impact thereof upon Eldorado is wholly misleading. The 1st to 8th Defendants have caused Eldorado to blandly assert, without any support, that an independent investigation within Eldorado has been carried out and that "*no new relevant fact*" was found after "*218 days of work*". However, given that Eldorado's involvement in the corruption scandals was corroborated by multiple persons in their plea bargains (for example, see paragraphs 118 to 124 regarding Eldorado's involvement in the corruption scandal with respect to FI-FGTS), it is simply not possible that a truly independent investigation would not find a single relevant fact to be reported to and acted upon by the 3rd to 8th Defendants.

90.     Further, on 9 November 2018, Mr. Freire raised questions at a BOD meeting to ask for information regarding any such investigations conducted by Eldorado in respect of the corruption allegations. However, to this date, Mr. Freire has not received a response from any of the 3rd to 8th Defendants.

91.     CA Investment has, since 21 November 2018, by way of letters and notices, demanded certain financial and other information from Eldorado with respect to its business and financial condition, including but not limited to investigations relating to the Leniency Agreement. These demands have effectively been ignored by Eldorado.

92.     In light of the foregoing, the only conclusion is that no proper and/or independent investigation has been carried out by Eldorado with respect to the effects of these corruption scandals or any other criminal or other investigations. The omissions by the 3rd to 8th Defendants in this regard can only be motivated by their interests in protecting the Batista Brothers and J&F, to the detriment of Eldorado. Accordingly, the information in the Offering Memoranda is materially deficient in this regard because it failed to disclose the true nature of the so-called independent investigations.

F.      **Materially inaccurate and/or inadequate disclosure with respect to material deficiencies in Eldorado's management**

        (i)     ***Eldorado has failed to disclose their active efforts to block CA Investment's appointment of a fiscal council member***

93.     Eldorado, under the direction of J&F and the Batista Brothers (through the 3rd to 8th Defendants), has selectively disclosed disputes involving CA Investment and intentionally omitted to disclose the injunction application filed by CA Investment for the appointment of its nominee to the Eldorado fiscal council (the "**Fiscal Council Injunction**").

94.     By way of background, under Brazilian Corporate Law, a fiscal council is responsible for monitoring the management's activities, scrutinizing financial statements and reporting its findings to shareholders.

95.     Pursuant to Article 161 (paragraph 4) of the Brazilian Corporate law, minority shareholders holding more than 10% of a Brazilian corporation's issued and paid up share capital are entitled to elect one member to the fiscal council of such corporation. As a 49.41% shareholder of Eldorado, CA Investment is fully entitled to appoint a member to Eldorado's fiscal council. However, the 1st to 8th Defendants, together with J&F, have actively caused Eldorado to prevent CA Investment from exercising its right to do so.

96.     On 10 September 2018, CA Investment requested an extraordinary shareholders' meeting for the purposes of, amongst other things, electing a candidate to Eldorado's fiscal council. Eldorado refused to comply with CA Investment's request, citing the explanation that CA Investment could instead exercise its right at Eldorado's annual general meeting, typically scheduled for April in each calendar year.

97.     It is now clear that the motive of J&F, the Batista Brothers and the 3rd to 8th Defendants, in rejecting CA Investment's request, was to preserve and maintain a fiscal council that acts completely at the direction of J&F and the Batista Brothers. The lack of oversight, scrutiny and transparency as to Eldorado's financial statements and business has enabled J&F and the Batista Brothers to cause Eldorado to be embroiled in massive corruption scandals in Brazil and, in the present case, to cause Eldorado to attempt the Proposed Bonds Issuance on the basis of materially false and/or misleading statements in the Offering Memoranda.

98.     On 18 October 2018, CA Investment filed the Fiscal Council Injunction. CA Investment's application was not successful at first instance and on appeal (based on the vote of two out of three of the appeal judges). On 11 March 2019, the third appeal judge, Judge Shimura, voted in favour of granting CA Investment's appeal and on that basis, the second judge, Judge Negrão requested a further adjournment of the case to reconsider his vote. If Judge Negrão recasts his vote in favour of CA Investment's appeal, Eldorado will be required to appoint CA Investment's nominee to the fiscal council.

99.     On 13 December 2018, CA Investment filed another appeal in the Sao Paolo Court of Appeals against the dismissal of the Fiscal Council Injunction. At present, the matter is currently pending before the Brazilian courts and is due to be heard by the appeal panel in end March 2019.

    (ii)    ***Eldorado has improperly described the experience of its management team***

100.     The 8th Defendant, Aguinaldo, who is the CEO of Eldorado, had no
         experience in the pulp industry prior to being appointed by the Batista
         Brothers on 1 December 2017. The Offering Memoranda fail to state that
         Aguinaldo has no experience in the pulp industry. It is clear that the sole
         reason for Aguinaldo's appointment as the CEO of Eldorado was and is due
         to the fact that he is the nephew of the Batista Brothers and will act at the
         direction of the Batista Brothers, as set out in paragraph 8 above. Given the
         role and importance of the CEO's position in Eldorado, the Offering
         Memoranda should have explicitly and clearly specified Aguinaldo's lack of
         industry experience and in addition should have highlighted that his family
         relationship with the Batista Brothers present governance and other risks for
         Eldorado and investors in Eldorado.

101.     Given the important role of the CEO, it is imperative that an independent
         individual, unrelated to the controlling shareholder and without any
         connection to the events which caused the conflicts between the only two
         shareholders of Eldorado, should be appointed to the main position in the
         Eldorado's administration.

102.     The family relationship between Aguinaldo and the Batista Brothers naturally
         and inevitably creates an insurmountable conflict of interest which, in this
         case, contaminates all aspects of management of Eldorado and the integrity
         of all decision-making, controls and processes relating to Eldorado.

103.   J&F, acting through the Batista Brothers, have also appointed the 4th Defendant, Francisco Assis as a director of Eldorado. As noted in paragraphs 18 and 30 above, Francisco Assis has also been implicated in the massive corruption scandals involving the Batista Brothers. In fact, on 11 September 2017, search and seizure warrants were issued against him, in connection with his failure to disclose that Marcelo Miller had been acting unlawfully in favour of the Batista Brothers by negotiating the Plea Bargain and Leniency Agreement while serving as a federal public prosecutor. This was a flagrant breach of the terms of the Plea Bargain. Accordingly, on 26 February 2018, the Attorney-General requested that Francisco Assis's Plea Bargain be rescinded.

104.   The continued appointment of Francisco Assis as a director of Eldorado, notwithstanding his direct involvement in the massive corruption scandals that the Batista Brothers have confessed to ought to have been disclosed but was intentionally omitted from the Offering Memoranda. His involvement in these corruption scandals also means that he is not a fit and proper person to hold the office of director at Eldorado. That no reference was made to these facts in the Offering Memoranda demonstrate the extent of the deficiencies of disclosure in the Offering Memoranda.

(iii)   *Eldorado has refused to appoint a Chief Financial Officer pursuant to its By-laws*

105.   Article 16 of Eldorado's By-laws provides that the Board of Executive Officers of Eldorado shall be composed of at least five and a maximum of

seven members. Article 16 also clearly states that one of the members of the Board of Executive Officers will serve as the Chief Financial Officer ("**CFO**"). This important position is vital for proper and prudent financial management, the integrity of financial controls and the proper and prudent preparation of financial statements and other financial reports of Eldorado. All the more so in light of the massive corruption scandals that the Batista Brothers have brought to bear on Eldorado and the obligations that Eldorado is subject to under the terms of its Leniency Agreement.

106.    However, contrary to its By-laws, since April 2016, Eldorado has not appointed a CFO. Absolutely no mention is made of this fact in the Offering Memoranda.

107.    The absence of a specialized, qualified and experienced CFO to direct all functions relating to financial management is a relevant risk for a company of the size of Eldorado. Indeed, the business of Eldorado and the nature and extent of the indebtedness incurred by Eldorado demand and require strict financial control of its day to day business and activities. These controls require experience and skills that Eldorado is deprived of, and this raises material questions regarding the accuracy and completeness of Eldorado's financial reporting.

108.    By way of letter dated 25 February 2019, CA Investment specifically demanded the appointment of a CFO to ensure the proper management of Eldorado's financial affairs. However, CA Investment's request has gone unanswered by Eldorado.

109.    Notably, the Offering Memoranda fail to disclose any information concerning the requirement that Eldorado must have a CFO and similarly fails to disclose that there is currently no CFO of Eldorado.

110.    In the absence of a CFO, CA Investment understands that Eldorado's mandatory disclosure obligations are being directed and certified by Mr. Rodrigo Libaber, its commercial and investor relations officer. This shows a blatant disregard for financial management, integrity of financial controls and procedures, and provision of reliable accounting, financial and other information with respect to Eldorado.

### (iv)    *Inaccurate disclosures with respect to Eldorado's financial indebtedness*

111.    The information provided in the Offering Memoranda with respect to certain financial indebtedness of Eldorado (and breaches thereunder) is materially deficient and fails to fully disclose all material facts and circumstances with respect to multiple existing and highly material breaches by Eldorado under such financial indebtedness.

112.    In particular, the proceeds from the Brazilian Debentures held by FI-FGTS were required to be used for the construction and maintenance of certain pulp projects. An event of default occurred almost immediately under the Brazilian Debentures because the 1st to 8th Defendants caused Eldorado to fail to use part of the proceeds for the agreed and required purpose.

However, in the Offering Memoranda, reference is blandly and simply made to Eldorado being in breach of "*certain covenants*". In reality, there has been an intentional diversion of funds received under the Brazilian Debentures in circumstances where fraudulent conduct could well be involved. Indeed, the circumstances relating to the issuance of the Brazilian Debentures is plagued by corruption and criminal wrongdoing, none of which was even referred to in the Offering Memoranda. A brief summary is set out below.

113. The Brazilian Debentures were issued in an aggregate principal amount of R$940 million. They bear interest at 7.41% per annum, payable quarterly in each calendar year and are due to mature on 1 December 2027. The Brazilian Debentures were issued to purportedly fund, among other things, the construction of the water treatment and sewer facilities and logistics infrastructure in connection with the Três Lagoas mill owned by Eldorado (as referred to in paragraph 32).

114. The Brazilian Debentures were fully subscribed for and held by a single entity - FI-FGTS. As noted above at paragraph 17, the money invested by FI-FGTS in Eldorado is sourced from mandatory contributions from rank and file workers in Brazil whose hard-earned money is placed in the custody and control of FI-FGTS. FI-FGTS provides workers with individual accounts from which money can be withdrawn only in specific circumstances dictated by law, such as involuntary termination of employment, major illness, etc. In effect, FI-FGTS's investments are funded by workers' wages and these investments are meant to provide financial security and protection for workers in their time of need.

115.    As of 30 September 2018, the outstanding amount due under the Brazilian Debentures was R$1,270.5 million.

116.    Given the source of FI-FGTS' capital, FI-FGTS' handling of its investments was (and is) expected to be managed in a conservative manner and subject to the highest levels of scrutiny. However, the Brazilian Debentures became the subject of a corruption scandal in 2016 (details of which are set out below). This highly material fact was completely omitted from the Offering Memoranda. Further, Eldorado has breached certain financial ratios under the Brazilian Debentures. Again, these material facts i.e. that the proceeds of the Brazilian Debentures were not used for the stated purpose (amounting to a potentially fraudulent act) and that Eldorado has been (and continues to be) in breach of its financial covenants under the Brazilian Debentures were not disclosed in the Offering Memoranda.

117.    The reason for the lack of disclosure of these critical issues in the Offering Memoranda is clear. Notwithstanding the stated intention in the Offering Memoranda to use the proceeds of the Proposed Bonds to refinance debt due to certain export credit agencies and others, the 1st to 8th Defendants' attempt to cause Eldorado to issue the Proposed Bonds was much more likely to be used to fully redeem the Brazilian Debentures in order to cover up corruption scandals associated with the Brazilian Debentures and, in addition, the improper and dishonest use of the proceeds thereof, as well as Eldorado's failure to comply with the financial covenants thereunder. Both critical issues are discussed in further detail below.

*(1)*      ***Corruption Scandal***

118.    As noted above, in July 2016, the Federal Police of Brazil and of the Federal Public Prosecutor's Office initiated Operation Sépsis, prompted by the plea bargain of former Caixa vice-president Fabio Cleto ("**Cleto**") which disclosed details of various corruption schemes involving FI-FGTS' investments. Among other things, Cleto's plea bargain stated that the Brazilian Debentures subscribed for by FI-FGTS were approved by the FI-FGTS' board as a result of bribes given by Joesley Batista to, among other people, Cleto himself. Cleto was a board member of FI-FGTS at the relevant time when the Brazilian Debentures were subscribed for by FI-FGTS.

119.    Following the disclosures and confessions in Cleto's plea bargain, on or about 1 July 2016, under *Operation Sépsis*, Eldorado's headquarters and Joesley Batista's house were searched by public officials pursuant to a warrant of search and seizure issued by the Federal Public Prosecutor's office. The search warrant was issued with the objective of obtaining evidence with respect to the underwriting of the Brazilian Debentures by FI-FGTS.

120.    On or about 21 July 2016, in response to the warrant of search and seizure, the BOD allegedly appointed law firm Veriano Advogados Associados ("**Veriano**"), acting jointly with EY, to conduct an independent investigation with respect to the allegations made against Eldorado with respect to the Brazilian Debentures. To facilitate the investigation, Eldorado's

management claim to have provided Veriano and EY with access to information in the company, including emails, documents and other information.

121.   On or about 16 January 2017, after conducting the investigation, Veriano and EY presented their findings to Eldorado's management, claiming that there was no evidence found to support the allegations of corruption made in the context of the subscription for the Brazilian Debentures by FI-FGTS, refuting the allegations in Cleto's plea bargain.

122.   However, just two months later, on or about March 2017, despite Veriano's and EY's purported independent investigation into Eldorado, the 1st Defendant himself, Joesley Batista, confessed in his Plea Bargain that FI-FGTS approved the subscription for the Brazilian Debentures because the 1st to 8th Defendants caused Eldorado to pay bribes of approximately R$37.4 million in 2012 and 2014 (around 3.5% of the total proceeds of the Brazilian Debentures) through companies controlled by Funaro. Funaro was an intermediary who facilitated this corrupt deal and who subsequently distributed the proceeds of these bribes among himself, Cleto and Cunha who had influence over certain members of the board of FI-FGTS, including Cleto.

123.   In short, Funaro, a broker and businessman, and a good friend of Joesley Batista, had together with Cunha and Cleto (the "**FI-FGTS Manipulators**"), brokered a deal with the Batista Brothers to cause Eldorado to pay bribes to the FI-FGTS Manipulators, in return for exerting influence over the board of

FI-FGTS to subscribe for the Brazilian Debentures. This was later confirmed by both Cleto and Funaro in their plea bargains. Funaro also stated in his plea bargain that the bribes were shared with both the former president Michel Temer and former minister of tourism Henrique Eduardo Alves. This corruption scandal involving the Brazilian Debentures has been corroborated by various persons, including Joesley Batista himself. The Plaintiff avers that the 1st to the 8th Defendants seek to "cover up" this corruption and dishonesty by raising funds through the Proposed Bonds Issuance to redeem the Brazilian Debentures. However, to attempt to do so without any reference to the history relating to the issuance of the Brazilian Debentures is extraordinary.

124.   Despite the huge corruption scandals that Eldorado and FI-FGTS were embroiled in with respect to the Brazilian Debentures, including the use of Eldorado's funds to pay these bribes, the 1st to 8th Defendants caused Eldorado to deliberately omit disclosure of any of these material facts in the Offering Memoranda, again to mislead investors.

### (2)   Improper use of proceeds

125.   As stated above, FI-FGTS generally invests and provides funding only for infrastructure and energy projects. Accordingly, the proceeds of the Brazilian Debentures had to be earmarked for certain specified permitted purposes. Pursuant to Clause 3.2.1. of the Brazilian Debentures, the proceeds from the Brazilian Debentures must be used, among other things, to construct and implement a water and sanitary project in the city of Três Lagoas, in the

State of Mato Grosso do Sul. The relevant portion of Clause 3.2.1. of the
Brazilian Debentures deed states:

> "*3.2.1. The funds raised through the Emission will be used by the
> Issuer <u>for the development of the project for the construction and
> implementation of water and effluent treatment (sanitation) related to
> the project located in the city of Três Lagoas, State of Mato Grosso
> do Sul, as well as investment in the solution of road, rail and
> waterway transport of the Issuer, as detailed in Annex I of this Deed
> ("Project"), limited to 90% (ninety percent) of Capex (as defined
> below) of the Project ("Capex" and "Business Plan", respectively)</u>.
> For the purposes of this Deed: "Capital Expenditure", abridged as
> Capex, means the financial amount to be spent by the Issuer on the
> construction, modernization, renovation, expansion or
> implementation of the Project, as set forth in and in accordance with
> the Business Plan, as shown in the consolidated chart in Annex I,
> integrating this instrument for all legal purposes, and it is expressly
> prohibited to use the funds intended for Capex to fund, reimburse or
> pay for administrative expenses, such as travel expenses,
> accommodation, telephone, office supplies and/or institutional
> advertising.*" (Emphasis added).

126.   Further, under Clause 6.1.1(h) of the Brazilian Debentures, Eldorado has an
       obligation to "*apply the funds received as a result of the Issuance solely for
       the execution of the Project, in accordance with the provisions of item 3.2.
       of this Deed*".

127.   Despite Eldorado's clear obligations with respect to the use of proceeds under the Brazilian Debentures, the 1st to 8th Defendants deliberately caused Eldorado to divert a material proportion of these funds for non-permitted purposes. To date, the precise details of these non-permitted purposes have not been disclosed.

128.   On or about 14 March 2018, Eldorado met with officials of FI-FGTS to negotiate the possible early redemption of the Brazilian Debentures.

129.   At this meeting, FI-FGTS informed Eldorado that it was in breach of certain covenants under the Brazilian Debentures. FI-FGTS reiterated that it could only have provided funding in order to finance infrastructure projects and, according to them, Eldorado had a "use of proceeds" verification gap of approximately R$200 million, i.e. Eldorado had failed to demonstrate to FI-FGTS that it had effectively used R$200 million of the proceeds of the Brazilian Debentures to fund the water and sanitation project in Três Lagoas, in the State of Mato Grosso do Sul. CA Investment is unaware of any explanation from any of Eldorado's directors in this regard, nor have they disclosed what these funds were used for. This is clearly a material and glaring omission in the Offering Memoranda.

130.   As a result of Eldorado's misuse of proceeds, Clause 5.1.2(b) of the Brazilian Debentures permit FI-FGTS to call an event of default and accelerate all amounts due and payable under the Brazilian Debentures at any time. Clause 5.1.2(b) provides that "*use of the resources obtained through this*

*Issuance for purposes other than those set forth in this Deed and in the Business Plan included in Annex I of this Deed...*" constitutes an event of default. This effectively leaves Eldorado's financial fate in the hands of FI-FGTS, who may singlehandedly cause the acceleration of R$1,270.5 million of debt (potentially leading to a further domino effect of additional debt defaults, as explained below at paragraphs 131 to 133).

131.    To make matters worse, the existing defaults under the Brazilian Debentures result in the existence of cross-defaults under Eldorado's other debt instruments being triggered. The potential impact of all affected financial indebtedness of Eldorado being declared due and payable is highly material and would raise serious questions as to the solvency of Eldorado. By way of example, the cross-default provisions under debt financings provided by the ECAs (Clause 24.5(d) in each Export Credit Facility Agreement) are triggered by reason of the fact that FI-FGTS is entitled to declare an event of default under the Brazilian Debentures. If the ECAs exercise their respective rights under these cross-default provisions in the Export Credit Facility Agreements, this could lead to an acceleration of total debt of approximately R$954.3 million. All of this is completely outside of Eldorado's control.

132.    In addition, and under an Intercreditor Agreement (*Instrumento Particular de Compartilhamento de Garantias e Outras Avenças)* dated on or about 26 December 2012 between, *inter alia*, BNDES, Banco Santander (Brasil) S.A. and the ECA Lenders ("**Shared Collateral Creditors**"), the Shared Collateral Creditors have shared rights and obligations with respect to the

material assets and property of Eldorado and shares in Eldorado and JBS pledged by J&F, which forms part of the J&F Guarantees (referred to above at paragraph 37).

133.   The existence of the FI-FGTS default, the cross defaults under the Export Credit Facility Agreements with the ECAs and the fact that the ECAs and BNDES are, among other parties, Shared Collateral Creditors means that there are real and present material risks with respect to the acceleration and immediate repayment of substantial amounts due to critical creditors of Eldorado. This raises the risk of enforcement by creditors with respect to all the key assets of Eldorado and consequently serious questions regarding Eldorado's status as a going concern. Again, it is appalling that the Offering Memoranda merely make bland reference to these risks.

(v)   ***Inaccurate disclosures relating to Eldorado that require CA Investment's consent as a substantial shareholder***

134.   The Offering Memoranda make specific reference to certain material decisions relating to Eldorado that require the consent of CA Investment as a substantial shareholder, including but not limited to the approval of related party transactions that Eldorado may enter from time to time. However, they make no reference to the fact that no such consent has at any time been sought from CA Investment with respect to any matter, including with respect to the Proposed Bonds Issuance as outlined in paragraphs 51 to 60 above. The Plaintiff repeats paragraph 45 above.

G.     **Material inaccuracies and/or deficiencies in relation to BDO's role as Eldorado's auditor**

135.    The Offering Memoranda also fail to disclose very serious deficiencies in the appointment and performance of BDO.

(i)     ***BDO is not legally permitted to act as the independent auditor of Eldorado***

136.    Eldorado's By-laws clearly stipulate that only a big-four international auditing firm is permitted to act as the auditor of Eldorado. In particular, Article 15 of the By-laws of Eldorado states "*…it is incumbent upon the Audit Committee to select and remove independent auditors, which selection shall be made among the four largest auditing firms with international reputation and operation*".

137.    The 1st to 8th Defendants have caused Eldorado to be in flagrant breach of this article, given that BDO is not one of the four largest auditing firms and BDO continues to actively participate in and facilitate this breach. Yet, the Offering Memoranda with respect to the Proposed Bonds is completely silent in this respect.

138.    The By-laws of Eldorado are publicly available on its website. Any professional organization that is acting honestly and in good faith would conduct basic due diligence in this regard and it is clear that BDO accepted

the appointment as auditor of Eldorado in obvious disregard of Eldorado's By-laws.

### (ii) *BDO's affirmation of improper tax accounting practices*

139.   Eldorado's treatment of the ICMS tax incentives fails to take into account several factors that are typically and prudentially taken into account. This includes matters relating to Federal Corporate Income Tax ("**IRPJ**"), Federal Social Contribution on Net Profit ("**CSLL**"), Federal Gross Receipt Tax (on sales and/or importations) ("**PIS**") and Federal Gross Receipt Tax (on sales and importations) ("**COFINS**"). The method of calculation of these tax incentives is likely to be susceptible to challenge from the Brazilian tax authorities, with the deficiency in taxation likely to be levied against Eldorado, together with any penalties. This could potentially represent a significant cash impact on, and tax exposure for, Eldorado.

140.   In 2016, Eldorado recognised certain forms of input tax credits, valued at approximately R$100 million, which was inconsistent with its tax practices in previous accounting periods. While tax legislation in Brazil allows taxpayers to utilise input tax credits in certain scenarios, Eldorado appears to have applied PIS and COFINS input tax credit in situations where they have not been clearly indicated on tax regulations to have been allowed to do so. As a result, the application of these input tax credits in these situations may again be challenged by the tax authorities, and Eldorado may be required to make cash payments for such deficiencies.

141.    These tax issues and the accounting treatment thereof adopted in Eldorado's financial statements have been reviewed, audited and approved by BDO. The Plaintiff avers that the 9th Defendant, BDO, acted in breach of its duties to Eldorado in adopting the above accounting procedures. The Plaintiff adds that BDO, in doing so, was acting at the behest of and in the interests of the 1st to 8th Defendants and J&F, or any one or more of them, and against the interests of Eldorado.

142.    As a purportedly independent auditor, BDO's approval of Eldorado's tax treatment and accounting measures (as set out above) raises serious questions with respect to its independence in its role as an independent auditor of Eldorado.

143.    In addition, BDO failed to act to prevent the manipulation and inflation of Eldorado's EBITDA (as set out in paragraphs 63 to 84 above), and instead provided its consent to Eldorado to attach its independent audit report to the Offering Memoranda, with full knowledge that the report would be used to entice and mislead investors into subscribing for the Proposed Bonds.

144.    Finally, the Offering Memoranda contain review reports purportedly issued by BDO to the shareholders of Eldorado, dated 9 November 2018 and 28 January 2019 respectively. CA Investment, despite being one of two shareholders in Eldorado holding a 49.41% shareholding interest, did not receive either of these reports. The Plaintiff avers that, at the behest of and in the service of the 1st to 8th Defendants and J&F, or any one or more of them, these reports were provided only to the 10th Defendant, J&F, and not

to CA Investment. BDO was prepared to publicly represent that the audit reports were provided to both shareholders of Eldorado to give the false impression to the investing public that both shareholders of Eldorado had been kept equally informed of the Proposed Bonds Issuance and that no objections had been raised. This is a clear and blatant misrepresentation that BDO is clearly prepared to perpetrate in facilitating Eldorado's management's attempt to mislead investors.

145.    BDO's lack of legal standing to be Eldorado's auditor, its confirmation of Eldorado's improper tax accounting practices together with the overestimated and inflated EBITDA as set out in paragraphs 63 to 84 above, and its clear misrepresentation with respect to the recipients of its audit report, show a clear and active participation by BDO in Eldorado's management's intention to mislead and deceive, without regard for the interests of Eldorado.

### (iii)    *Investigation of BDO by CVM*

146.    BDO has also acted at the behest of the Batista Brothers in relation to JBS. BDO's willingness to discard independence when dealing with companies controlled by the Batista Brothers is not confined to Eldorado. BDO had, for a period of 5 years up to February 2018, acted as the independent auditor of JBS. On 23 May 2017, at the request of the Superintendent of Accounting Standards and Audit, CVM (the Securities and Exchange Commission of Brazil) launched an investigation into BDO and BDO's audit procedures performed on the financial statements of JBS during the years 2013 to 2016.

This investigation is currently in progress and has not been completed. Notwithstanding this ongoing investigation, BDO has seen fit to continue to act as the purported independent auditor of Eldorado and allowing its purported "independent" verification to be used as a tool to deceive and manipulate investors, to the detriment of Eldorado.

147. The Plaintiff avers that the 9th Defendant, BDO, is not independent of the 1st to 8th Defendants and/or J&F, and that it acted negligently in relation to the Proposed Bonds Issuance or alternatively acted in concert with the 1st to 8th Defendants with the intention to injure Eldorado and/or the investing public.

148. Based on all the facts and circumstances referred to above, the Plaintiff avers that the Offering Memoranda are materially false and/or inaccurate and/or misleading and the dissemination thereof was in contravention of sections 199, 200 and 330 of the Securities and Futures Act (Cap 289) ("**SFA**"), and Rules 103, 313, 322 and 703 of the Listing Manual of the Singapore Exchange Securities Trading Limited ("**SGX Listing Manual**").

149. On 1 February 2019, CA Investment, through its counsel, issued cease and desist letters to White & Case LLP ("**White & Case"**) as lawyers representing *inter alia* Eldorado and to the lawyers representing the Initial Purchasers ("**Davis Polk**") of the Proposed Bonds to put them on clear and urgent notice that the contents of the Offering Memoranda were false and misleading and that dissemination thereof would result in breach of the applicable securities laws and regulations of the United States and other

relevant jurisdictions. Similar letters were sent to the Singapore Listing Agent, M/s Allen & Gledhill LLP, and the SGX-ST on 3 February 2019.

150. On 5 February 2019, CA Investment's counsel sent further letters to White & Case and Davis Polk, demanding immediate written confirmation that their respective clients would not take any further action in connection with the issuance of the Proposed Bonds.

151. CA Investment did not receive any response to any of these letters.

152. Instead, the Supplemental Offering Memorandum was issued on 4 February 2019. In the Supplemental Offering Memorandum, the 1st to 8th Defendants caused Eldorado not to provide any further disclosures or attempt to remedy any of the materially misleading and inadequate disclosures.

H.    **The Singapore Bond Injunction**

153. On 7 February 2019, CA Investment commenced HC/OS 169/2019 ("**OS 169**") seeking an injunction pursuant to Section 326 and/or Section 25 of the SFA to restrain, *inter alia*, Eldorado from taking any further steps to publish and/or otherwise disseminate the Offering Memoranda, or to apply to list the Proposed Bonds on the SGX-ST.

154. Concurrently, CA Investment also applied for an interim injunction in HC/SUM 612/2019 ("**SUM 612**") to restrain *inter alia* Eldorado from taking any further steps to publish and/or otherwise disseminate the Offering

Memoranda, or to apply to list the Proposed Bonds on the SGX-ST, pending the outcome of OS 169.

155.   On 7 February 2019, the Honourable Judicial Commissioner Dedar Singh Gill heard SUM 612 and granted an order in terms of the application. The interim injunction remains in force.

I.   **The Brazilian Bond Injunction**

156.   On 7 February 2019, CA investment filed an *ex parte* injunction application in the 2nd Business and Arbitration Dispute Court in Sao Paulo to restrain Eldorado from taking any steps to implement the issuance of the Proposed Bonds, arguing that issuance of the Proposed Bonds was a breach of the Share Purchase Agreement since the Proposed Bonds could not be issued in the "Ordinary Course of Business" pursuant to Section 7 of the Share Purchase Agreement. Dr. Eduardo Palma Pellegrinelli granted the injunction in favour of CA Investment. (the "**Brazilian Bond Injunction**")

157.   Subsequently, J&F and Eldorado filed motions on 15 February 2019 to revoke the Brazilian Bond Injunction. On 27 February 2019, Dr. Eduardo Palma Pellegrinelli revoked the injunction on the basis that, among other things, the issuance of the Proposed Bonds was within the "Ordinary Course of Business" pursuant to Section 7 of the Share Purchase Agreement.

158.   Thereafter, CA Investment appealed to the Sao Paolo Court of Appeals, arguing that the issuance of the Proposed Bonds was not a step in the

ordinary course of business. On 1 March 2019, Judge Alexandre Lazzarini restored the Brazilian Bond Injunction in part, holding that until the arbitral tribunal in the ICC Arbitration has reviewed this matter, Eldorado may only carry out procedures to ***prepare for*** the Proposed Bonds Issuance.

159.   On 7 March 2019, J&F and Eldorado appealed against the restoration of the Brazilian Bond Injunction. On 12 March 2019, Judge Alexandre Lazzarini reconsidered his decision and reversed his earlier decision. Steps are under way in Brazil to make further submissions to Judge Lazzarini to again reconsider his decision.

## IV.   THE PROPOSED BONDS ISSUANCE WAS CALCULATED TO HARM ELDORADO

160.   Under the terms of the Proposed Bonds, Eldorado would be liable to repay 101% of the principal amount of the Proposed Bonds (the "**Change of Control Redemption Premium**") in the event of a change of control in Eldorado which results in a ratings decline (the "**Change of Control Event**") within 30 to 90 days of the occurrence of such Change of Control Event. The 1st to 10th Defendants knew that a change of control in Eldorado was specifically contemplated under the Share Purchase Agreement, yet intended to cause harm to Eldorado by causing the issuance of bonds that contained the Change of Control Redemption Premium.

161.   The Offering Memoranda provide (at page 9 of the Memoranda) that if CA Investment were to acquire more than 50.0% of Eldorado's stock, a change

of control event under the terms of the Proposed Bonds would occur. In the event that the change of control results in a ratings decline (the likelihood of which was not addressed or in any way commented upon in the Offering Memoranda), Eldorado would be required to offer to purchase the Proposed Bonds at a price equal to 101% of their respective interest amounts plus accrued interest and additional amounts to the date of repurchase. This could be disastrous as by the time of the Change of Control Event, the 1st to 8th Defendants may have caused Eldorado to spend or otherwise dissipate all the funds raised pursuant to the Proposed Bonds Issuance.

162.   The intentions of the 1st to 8th Defendants with respect to the Change of Control Redemption Premium are clear and consistent with their past conduct. Their aim is to damage Eldorado and to totally disregard the interests of Eldorado, for the benefit of the Batista Brothers and J&F. The 1st to 8th Defendants have failed to discharge their duty of care owed to Eldorado in causing Eldorado to offer to issue the Proposed Bonds on these terms.

## V.   THE BATISTA BROTHERS WERE AND ARE SHADOW DIRECTORS OF ELDORADO

163.   The 3rd to 8th Defendants have at all material times acted, and continue to act, under the direction of J&F and the Batista Brothers. Accordingly, the Plaintiff avers that the 1st and 2nd Defendants were and are shadow directors of Eldorado.

**Particulars**

(a)     The 3rd to 8th Defendants were appointed by J&F (which is controlled by the 1st and 2nd Defendants) as directors and officers of Eldorado. Paragraph 6 above is repeated.

(b)     The 3rd to 7th Defendants consistently and habitually take, or fail to take, actions based on the wishes and directions of the 1st Defendant and 2nd Defendant.

(c)     The 1st Defendant and 2nd Defendant are persons in accordance with whose directions or instructions the 3rd to 7th Defendants or majority of the 3rd to 7th Defendants are accustomed to act.

## VI.     DERIVATIVE ACTION

164.     As stated at paragraph 1 above, CA Investment is a minority shareholder in Eldorado and is unable to pass any resolution or take any other corporate action to cause Eldorado to commence any action or legal proceedings against the 1st to 10th Defendants.

165.     Further, the 1st to 8th Defendants also constitute the overwhelming majority of the named and shadow members of Eldorado's BOD and they act in the interests of and/or at the behest of, the Batista Brothers. In contrast, Mr Freire is CA Investment's sole nominee on Eldorado's BOD.

166.    The Plaintiff further avers that 1st to 8th Defendants have exercised and continue to exercise control over Eldorado and will prevent and stifle any claim or legal action being brought against them.

## **Particulars**

(a)     On 8 March 2019, CA Investment sent a letter to Eldorado's BOD demanding that Eldorado initiate a claim against the 3rd to 8th Defendants for their actions in causing Eldorado to prepare and seek to disseminate the false and/or inaccurate and/or misleading Offering Memoranda (the "**8 March Letter**"); and

(b)     To date, CA Investment has not received any reply to the 8 March Letter.

167.    In light of the aforesaid, the 1st to 8th Defendants, acting in the interests of and/or at the direction of the Batista Brothers, are wrongfully abusing their majority voting powers in Eldorado to preserve, protect and benefit the Batista Brothers by preventing and/or stifling any claim from being brought against the 3rd to 8th Defendants.

168.    Further, by causing Eldorado to publish materially false and/or inaccurate and/or misleading statements in the Offering Memoranda in order to raise funds in Singapore on false premises, the 1st to 8th Defendants have committed fraud on the minority and breached their fiduciary duties to act in

good faith and/or in the best interests of Eldorado. Full particulars of this are pleaded at paragraphs 169 to 179 below.

## VII.    BREACH OF FIDUCIARY DUTY / DUTY OF GOOD FAITH

169.    The Plaintiff avers that at all material times, the 1st to 8th Defendants were directors and/or officers of Eldorado. As directors of Eldorado, the 1st to 8th Defendants owed to Eldorado, *inter alia*, the following duties:

   (a)    A duty to perform their duties with care and diligence;

   (b)    A duty to act for the benefit of Eldorado's interests;

   (c)    A duty of loyalty to Eldorado; and

   (d)    A duty not to act in conflict of interest and to prioritize Eldorado's interest over their personal interests or the interests of a particular shareholder.

170.    Between 30 January 2019 and 7 February 2019, the 1st to 8th Defendants caused Eldorado to prepare and publish false and/or inaccurate and/or misleading statements in the Offering Memoranda for the purposes of seeking to list the Proposed Bonds on the SGX-ST. In doing so, the 1st to 8th Defendants have caused Eldorado to be in breach of the relevant provisions of the SFA and the SGX Listing Manual. Accordingly, the Plaintiff avers that the 1st to 8th Defendants have:

(a)     failed to perform their duties with care and diligence;

(b)     acted in bad faith and against the interests of Eldorado;

(c)     acted in breach of their duty of loyalty to Eldorado;

(d)     preferred the interests of J&F, the 10th Defendant, and failed to act in the best interests of Eldorado.

## **Particulars**

(a)     The Offering Memoranda fail to disclose the fact that the Batista Brothers are shadow directors of Eldorado and their criminal background;

(b)     The Offering Memoranda fail to address the cross defaults under the BNDES Facility and Export Credit Facility Agreements that were the direct result of misapplication of the proceeds from the Brazilian Debentures. The Plaintiff repeats paragraphs 125 to 133 above;

(c)     They grossly overstated and inflated Eldorado's EBITDA as set out in the Offering Memoranda. The Plaintiff repeats paragraphs 63 to 84 above;

(d)     They have an intentionally misleading description of the dispute between CA Investment, J&F and Eldorado. Paragraphs 34 to 50 and 85 above are repeated;

(e)     They provide an intentionally misleading description of the Share Purchase Injunction obtained by CA Investment against J&F and Eldorado. Paragraphs 42 to 48 above are repeated;

(f)     They deliberately conceal the fact that pending determination in the ICC Arbitration, Eldorado requires CA Investment's prior consent for material decisions. Paragraphs 48, 86 to 87 and 134 above are repeated;

(g)     They fail to provide proper disclosure of and/or include misleading and/or inaccurate descriptions of Eldorado's internal review procedures with related parties and related party transactions. Paragraph 88 above is repeated;

(h)     They provide inaccurate and/or misleading disclosure about the lack of proper and/or independent investigations carried out by Eldorado on the effect of MPF investigations into J&F and refuse to conduct a proper assessment and/or analysis in relation thereto. Paragraph 89 to 92 above is repeated;

(i)     They fail to disclose Eldorado and J&F's efforts to block CA Investment's appointment of a fiscal council member and the Fiscal Council Injunction. Paragraphs 93 to 99 above are repeated;

(j)     They provide an improper and misleading description of the experience and background of Eldorado's management team, including the failure to disclose the conflicts of interest of Eldorado's CEO, Aguinaldo, and the fact that Francisco Assis is unfit to hold the office of director at Eldorado. Paragraphs 100 to 104 above are repeated;

(k)     They fail to disclose the absence of a CFO in Eldorado and Eldorado's continued refusal to appoint a CFO despite CA Investment's repeated requests and caused Eldorado to omit disclosure of this fact. Paragraphs 105 to 110 above are repeated;

(l)     They provide deficient and inaccurate disclosure of material facts in relation to Eldorado's payment of bribes to obtain funding through the issuance of the Brazilian Debentures, as well as the improper use of proceeds arising therefrom. Paragraphs 111 to 127 above are repeated;

(m)     They fail to disclose matters relating to Eldorado that require CA Investment's consent as a substantial shareholder and the failure to obtain that consent. Paragraph 134 above is repeated; and

(n)    They contain material inaccuracies and/or deficiencies with respect to BDO's role as Eldorado's independent auditor. Paragraphs 136 to 138 are repeated.

(o)    They fail to give adequate disclosure of the purpose and consequences of the Change of Control provisions in the Proposed Bonds. Paragraphs 160 to 162 are repeated.

171.    By reason of the matters pleaded above, Eldorado has suffered loss and damage. Accordingly, the 1st to 8th Defendants are liable to account to Eldorado for loss and damage suffered as a result of their breach of fiduciary duties and/or duty to act in good faith as set out above.

## VIII.    BREACH OF DUTY OF CARE

172.    The Plaintiff avers that in addition to fiduciary duties, the 1st to 8th Defendants owe to Eldorado a duty to exercise reasonable care and to use reasonable diligence and skill in the discharge of their functions as directors and/or officers of Eldorado.

173.    In particular, the 1st to 8th Defendants were under a duty to exercise reasonable care and skill to ensure that, in the preparation of the Offering Memoranda, Eldorado complied with all relevant provisions under Singapore law and regulations.

174.   In causing Eldorado to publish false and/or inaccurate and/or misleading statements in the Offering Memoranda for the purposes of seeking to list the Proposed Bonds on the SGX-ST, the 1st to 8th Defendants have caused Eldorado to be in breach of the relevant provisions of the SFA and the SGX Listing Manual. Accordingly, the Plaintiff avers that the 1st to 8th Defendants have acted in breach of their duty of care.

175.   The Plaintiff repeats the particulars set out at paragraph 170 above.

176.   As a result of the 1st to 8th Defendants' breach of the duty of care to Eldorado as set out above, Eldorado has suffered loss and damage.

177.   The Plaintiff also avers that BDO, the 9th Defendant, owed Eldorado a duty to exercise reasonable care and to use reasonable diligence and skill in the discharge of its functions as Eldorado's independent auditor.

178.   BDO breached its said duty of care by:

(a)   failing to prevent the misrepresentation of Eldorado's EBITDA in the Offering Memoranda. The Plaintiff refers to paragraphs 139 to 145 above;

(b)   failing to adopt proper accounting practices. The Plaintiff repeats paragraphs 139 to 145 above;

(c)     acting such as to give the investing public the false impression that both shareholders of Eldorado were equally aware of the Proposed Bonds Issuance. The Plaintiff repeats paragraphs 144 to 145 above; and

(d)     acting at the behest of the 1st to 8th Defendants and against the interests of Eldorado. The Plaintiff repeats paragraphs 135 to 147 above.

179.    As a result of the 9th Defendant's breach of its duty to exercise reasonable care and to use reasonable diligence and skill in the discharge of its functions as set out above, Eldorado has suffered loss and damage.

## IX.    DISHONEST ASSISTANCE IN BREACH OF FIDUCIARY DUTIES

180.    The Plaintiff avers that each of the 1st to 8th Defendants knowingly and dishonestly assisted in the breach of the fiduciary duties to Eldorado of each of the others among the 1st to 8th Defendants. Such knowledge arises out of the fact that each of them acted at all times at the behest and/or in the interests of the 1st and 2nd Defendants (the Batista Brothers) to the exclusion of the interests of Eldorado. The 1st to 8th Defendants' conduct was not honest by the ordinary standards of reasonable and honest people and they were of the knowledge that, by those standards, their conduct was dishonest.

181.   The 10th Defendant, J&F, knowingly and dishonestly assisted in the breach by the 1st to 8th Defendants of their fiduciary duties to Eldorado. The 10th Defendant's conduct was not honest by ordinary standards of a reasonable and honest person and the 10th Defendant was of the knowledge that by those standards, its conduct was dishonest. The particulars of which are as follows:

   (a)   The 10th Defendant is entirely under the control of the 1st and 2nd Defendants and acts entirely at the direction of the 1st and 2nd Defendant;

   (b)   the 10th Defendant approved the Proposed Bonds Issuance and the issuance of the Offering Memoranda in the 6 February 2019 Shareholder's Meeting despite being aware of their inaccuracy, incompleteness and/or falsity.

182.   BDO, the 9th Defendant, acted knowingly and dishonestly in assisting in the breach by the 1st to 8th Defendants of their fiduciary duties to Eldorado. The 9th Defendant's conduct was not honest by ordinary standards of a reasonable and honest person and the 9th Defendant was of the knowledge that by those standards, its conduct was dishonest. The particulars of which are as follows:

**Particulars**

(a)   accepting their appointment as independent auditors despite being aware or being required to be aware that this was not permissible under Eldorado's By-laws. Paragraphs 136 to 138 are repeated;

(b)   adopting improper accounting practices. Paragraphs 139 to 145 are repeated;

(c)   failing to prevent the gross misrepresentation of Eldorado's EBITDA, including signing off on Eldorado's financial statements and the Offering Memoranda which had deliberately overstated and inflated Eldorado's EBITDA. Paragraphs 63 to 84 above are repeated;

(d)   acting so as to give the investing public the false impression that both shareholders of Eldorado were equally aware of the Proposed Bonds Issuance. Paragraph 144 is repeated;

(e)   acting at the behest of and in the interests of the 1st to 8th Defendants to the exclusion of Eldorado. The Plaintiff repeats paragraph 178 above; and

(f)   Knowingly aiding and abetting the 1st to 8th Defendants' attempts to mislead investors by preparing and seeking to disseminate the false and/or inaccurate and/or misleading Offering Memoranda. Paragraphs 63 to 147 are repeated.

183. Further or in the alternative, if (which is denied) the 1st to 10th Defendants were not dishonest in their assistance the 1st to 8th Defendants in relation to each of the 1st to 8th Defendants' breaches of fiduciary duties, the 1st to 10th Defendants nevertheless had actual knowledge of, or alternatively wilfully shut their eyes to the obvious fact of, or alternatively wilfully and recklessly failed to make such inquiries as an honest and reasonable man would make of, the dishonest and fraudulent conduct of the 1st to 8th Defendants in acting in breach their of fiduciary duties as set out in paragraphs 169 to 171 above. The particulars of which are as follows:

**Particulars**

(a)     At all material times, the 3rd to 8th Defendants acted at the behest of the Batista Brothers and the 10th Defendant;

(b)     The 10th Defendant approved the Proposed Bonds Issuance and the issuance of the Offering Memoranda in the 6 February 2019 Shareholder's Meeting despite being aware of their inaccuracy, incompleteness and/or falsity.

(c)     The 3rd to 8th Defendants appointed the 9th Defendant as Eldorado's independent auditor notwithstanding that Eldorado's By-laws did not permit this. The 9th Defendant accepted such appointment despite the fact that it knew or should have known that this appointment was not in compliance with Eldorado's By-laws given that Eldorado's By-laws were publicly available;

(d)     The 9th Defendants acted at the behest of the 1st to 8th Defendants and/or J&F and signed off on the financial statements of Eldorado, including the Offering Memoranda which had deliberately overstated and inflated Eldorado's EBITDA; and

(e)     In the premises, the 9th Defendant knowingly aided and abetted the 1st to 8th Defendants' attempts to seek to mislead investors in Singapore by preparing and seeking to disseminate the false and/or inaccurate and/or misleading Offering Memoranda.

184.    Pursuant to and in furtherance of the matters pleaded in paragraphs 186 to 188 below, the 1st to 8th Defendants and J&F knowingly and dishonestly assisted the 1st to 8th Defendants (aside, where applicable, from themselves) in their breach of fiduciary duties to Eldorado, by carrying out (and/or aiding and abetting) the unlawful act of preparing and seeking to disseminate the false and/or inaccurate and/or misleading Offering Memoranda and had therefore contravened sections 199, 200 and 330 of the SFA, and Rules 103, 313, 322 and 703 of the SGX Listing Manual.

185.    As a result of the above, Eldorado has suffered loss and damage.

## X.     CONSPIRACY

186.    The 1st to 10th Defendants wrongfully and with intent to injure Eldorado and/or to cause loss to Eldorado by unlawful means conspired and

combined together to prepare and seek to disseminate the false and/or inaccurate and/or misleading Offering Memoranda which did not comply with the relevant provisions of the SFA and the SGX Listing Manual.

187.   Further or in the alternative, the Plaintiff avers that the 1st to 10th Defendants conspired and combined together wrongfully and with the sole or predominant intention of injuring Eldorado and/or of causing loss to Eldorado.

**Particulars**

(a)   The 3rd to 8th Defendants were appointed as directors and/or officers of Eldorado by the 1st and 2nd Defendants (the Batista Brothers) and have acted in accordance with their instructions. Paragraphs 3, 4, 8, 55 and 62 above are repeated;

(b)   The 3rd to 8th Defendants, as Directors and Chief Executive Officer of Eldorado, attended the 21 January Board Meeting and approved the Proposed Bonds Issuance. Paragraphs 51 to 55 above are repeated;

(c)   The 1st to 8th Defendants controlled and directed Eldorado to take steps to disseminate the Offering Memoranda which contain false and/or inaccurate and/or misleading information as set out in paragraphs 63 to 152 above;

(d)    The 1st to 8th Defendants controlled and directed Eldorado to issue the Offering Memoranda with the view of using proceeds from the Proposed Bonds to fully redeem the Brazilian Debentures in order to cover up corruption scandals and breaches of covenants under the Brazilian Debentures. Paragraphs 111 to 133 above are repeated;

(e)    The 1st to 8th Defendants took active and deliberate steps to prevent the participation of CA Investment in the approval of the Proposed Bonds Issuance in order to ensure that the Offering Memoranda might be disseminated by Eldorado, without the review and/or consent by CA Investment. Paragraphs 51 to 60 above are repeated; and

(f)    The 9th Defendant (BDO), by accepting their appointments in connection with the Proposed Bonds Issuance and acting in accordance with the instructions of the 1st to 8th Defendants, acted with the 1st to 8th Defendants to prepare Offering Memoranda which contain false and/or inaccurate and/or misleading information as set out in paragraphs 63 to 145.

188.   As a result of the above, Eldorado has suffered loss and damages.

## XI.    BREACH OF STATUTORY DUTY

189.   Further or in the alternative, the Plaintiff avers that the 1st to 8th Defendants owe a statutory duty under the SFA and/or the SGX Listing Manual to

Eldorado not to cause Eldorado to be in breach of the relevant provisions of the SFA and/or the SGX Listing Manual.

190.   By reason of the matters pleaded at paragraphs 169 to 179 above, the 1st to 8th Defendants have breached such statutory duty to Eldorado and have caused Eldorado to be in breach of sections 199, 200 and 330 of the SFA, and Rules 103, 313, 322 and 703 of the SGX Listing Manual by preparing and seeking to disseminate the false and/or inaccurate and/or misleading Offering Memoranda.

191.   Eldorado has suffered loss and damages as a result.

## XII.   ELDORADO HAS SUFFERED LOSS AND DAMAGE

192.   For the reasons pleaded herein, CA Investment avers that Eldorado has suffered loss and damage as a result of the 1st to 10th Defendants actions. Such losses include the following:

## Particulars

(a)   Expenses incurred by Eldorado in Singapore in relation to the attempt to list the Proposed Bonds on the SGX-ST, including but not limited to expenses incurred in appointing a Listing Agent in Singapore, and maintaining a paying agent and transfer agent in Singapore;

(b)     Expenses incurred by Eldorado in relation to the preparation of the false and/or inaccurate and/or misleading Offering Memoranda including fees paid by Eldorado to financial and legal advisors;

(c)     Harm to Eldorado's reputation as a consequence of the ensuing litigation as a result of the false and/or inaccurate and/or misleading Offering Memoranda;

(d)     Harm to Eldorado's future ability to raise financing through the issuance of bonds as a consequence of the negative and adverse impression created by Eldorado on the investor community;

AND THE PLAINTIFF CLAIMS:-

Against the 1st to 8th Defendants:

(1)     A declaration that the 1st to 8th Defendants have breached their fiduciary duties and/or duty of care to Eldorado in causing Eldorado to prepare and seek to disseminate the false and/or inaccurate and/or misleading Offering Memoranda;

(2)     A declaration that the 1st to 8th Defendants are liable to account to Eldorado for all losses suffered by Eldorado on the ground of their breach of fiduciary duty and/or dishonest assistance;

(3)     Loss and damages to be assessed;

(4)    Interest under Section 12 of the Civil Law Act (Cap 43);

(5)    Costs; and

(6)    Such further or other relief as this Honourable Court deems fit.

Against the 9th and 10th Defendants:

(1)    A declaration that the 9th and 10th Defendants are liable to account to Eldorado for all losses suffered by Eldorado on the ground of dishonest assistance of the 1st to 8th Defendants' breach of fiduciary duty;

(2)    Loss and damages to be assessed for negligence and/or conspiracy and/or dishonest assistance in breaches of fiduciary duties;

(3)    Interest under Section 12 of the Civil Law Act (Cap 43);

(4)    Costs; and

(5)    Such further or other relief as this Honourable Court deems fit.

Dated this 15th day of March 2019

*Nair & Co.*

_____

Nair & Co LLC
Solicitors for the Plaintiff